## ELIZABETH FOLEY, Appellant, v. J. S. HARRISON.

### Division One, March 31, 1911.

1. **NEW TRIAL: Verdict Against Evidence.** Where the trial court may well have concluded that the verdict is against the weight of the evidence or is not supported by the evidence, it should grant a new trial.

2. **DONATIO MORTIS CAUSA: Essential Elements.** A *donatio causa mortis*, which means a gift in case of death, is a disposition by the owner who, apprehending his death to be near, delivers or causes to be delivered any personal goods or chattels to another, or puts the physical means of dominion over them into such other's power, to keep them for himself or for some one else, in case of the donor's decease. In the event of the donor's recovering, the property reverts to him; if the donor die, the property belongs to the donee without the assent of the executor, though not as against creditors.

3. ————: **Contents of Safety-Deposit Box: Delivery of Keys: Choses in Action.** There may be a valid gift *mortis causa* of choses in action and money locked up in a box of a safety deposit vault, by a delivery of the key to the box to the donee and words giving her all its contents, without any indorsement of the choses in action or written assignment thereof. A bachelor, seventy-five years old, estranged for thirty-five years from his only brother, on his death-bed, a few days prior to his death, called to his bed the donee, a woman in whose family he had long lived and whose youngest child (John) was named for him, and holding two duplicate keys in his hand, in the presence of her eighteen-year-old son, said to her: "Here are the keys to my safety-deposit box; I will give them to you; what is in there belongs to you; you will find Johnnie's money there also." She took the keys and put them in a drawer down stairs, and kept them there until after his death. In the box were money, notes, deeds of trust and other valuables. According to the regulations of the safety-deposit company no person except the renter, or a deputy authorized by a writing and named in its books, or the renter's legal representative in case of his death, insolvency or other disability, could have access to the box. *Held*, that, if all these facts were clearly established by the evidence, the gift was a valid donation *mortis causa*.

4. ————: Actual Delivery of Choses. All species of personal property are proper subjects of gift *mortis causa*, and actual physical delivery of the thing given must be made when practicable; but when the nature of the thing attempted to be given is such that actual physical delivery cannot be made, or where the existing conditions are such that a physical delivery would be unreasonable, a symbolic delivery is sufficient; but in determining the sufficiency of a symbolic delivery, the intention of the donor to part with the control of and dominion over the property is a prime factor to be considered. In this case the authorities are elaborately reviewed, and it is held that the opinion of Lord HARDWICKE in Ward v. Turner, 2 Ves. Sr. 430, holding, in the days before choses in action were assignable, that there must have been an actual physical delivery of the chose in action before the laws would acknowledge a valid gift *mortis causá*, is not in keeping with modern jurisprudence, which is to the effect that all species of personal property are proper subjects of gift, either *inter vivos* or *mortis causa*, and where the intention to give is clear and unmistakable, and is accompanied by a delivery of possession consistent with and becoming to the nature, character and location of the property donated, such gift is valid.

5. ————: Character of Evidence. Evidence to establish a gift *mortis causa* must be of clear and unequivocal probative force and must convince the judicial mind of its truthfulness beyond a reasonable doubt. And the evidence in this case is reviewed, and held not to measure up to the standard.

Appeal from Jackson Circuit Court.—*Hon. John G. Park,* Judge.

AFFIRMED.

*Guthrie, Gamble & Street, Boyle & Howell* and *A. F. Smith* for appellant.

(1) The new trial was not granted because of the weight of the evidence, but on account of the insufficiency of the evidence—a demurrer. If there was any evidence to sustain the verdict, it was final. Dunn v. Bank, 109 Mo. 101. (2) No particular number of witnesses is required to prove a gift. One witness, credible or corroborated, is sufficient. Gifts have been sustained where the donee was the only witness, but the

circumstances corroborated. These cases, however, are rare, because the donee is in most jurisdictions an incompetent witness. Thomas v. Lewis, 89 Va. 1; Walsh v. Striddere, 2 C. & L. 423, 6 Ir. Eq. 161; Mc-Gonnell v. Murray, 1 Ir. 3 Eq. 460; In re Farman, 57 L. J. Ch. 637, 58 L. T. Rep. (N. S.) 12; Devlin v. Farmer, 16 Daly 98; Ward v. Turner, 2 Ves. Sr. 431; Hatch v. Atkinson, 56 Me. 324; Delmotte v. Taylor, 1 Redf. Surr. (N. Y.) 417; Casnahan v. Grice, 7 L. T. (N. S.) 82. (3) No particular form of language is required to make a gift, if the intent be apparent from the words actually used. 14 Am. and Eng. Ency. Law, 1055; Shackelford v. Brown, 89 Mo. 549; Keniston v. Seva, 54 N. H. 24; Devin v. Farmer, 16 Daly 98; Vendor v. Roach, 73 Cal. 14; Deval v. Dye, 123 Ind. 325; Banking Co. v. Miller, 190 Mo. 662; Estate of Soulard, 141 Mo. 655. (4) Even where the language used is ambiguous, the jury may find a gift, by construing the language used in connection with previous declarations of intent, subsequent declarations as to the act done, and the general situation in relation of the parties. Smith v. Maine, 25 Barb. 33; Barnes v. People to use, 25 Ill. App. 136; Doty v. Wilson, 47 N. Y. 580. (5) While delivery is required, it may be either actual or constructive, appropriate under the circumstances, to evidence in a substantial manner the transfer of interest. Ten Brook v. Brown, 17 Ind. 413; Wing v. Merchant, 52 Me. 383; Lydale v. Randall, 154 Mass. 103; Caylor v. Caylor, 22 Ind. App. 673; Davis v. Kruck, 93 Minn. 292; Fletcher v. Fletcher, 55 Vt. 325; Ross v. Draper, 55 Vt. 404; Shackelford v. Brown, 89 Mo. 546; Estate of Soulard, 141 Mo. 642; Hillebrandt v. Brewer, 6 Tex. 45; Vogel v. Gast, 22 Mo. App. 107; Gartside v. Pahlman, 45 Mo. App. 164; Bates v. Vary, 40 Ala. 421; Straughan v. Tucker, 59 Ark. 93; Ebel v. Piahl, 134 Mich. 64; Trowell v. Caraway, 10 Heisk. 104; Grangiack v. Arden, 10 Johns. 293; Brown v. Brown, 4 B. Mon. 535; Waite v. Grubb, 43 Ore. 406. (6) The

delivery of the keys was a sufficient delivery. Thomas
v. Lewis, 89 Va. 1; Cooper v. Burr, 45 Barb. 9; Dubens
v. Emmens, 158 Mass. 592; People v. Benson, 99 Ill.
App. 325; Telford v. Patten, 144 Ill. 620; Reynolds v.
Reynolds, 20 Misc. 254; Goulding v. Harbury, 85 Me.
227; Stevenson v. King, 81 Ky. 425; March v. Fuller,
18 N. H. 360; Sheekog v. Perkins, 4 Baxt. 281. (7)
Even where there is no direct evidence of delivery at
all, the fact of delivery may be gathered from other
evidence tending to establish its probability. Blake v.
Jones, 1 Bailey (S. C. Eq.) 136; Isaacs v. Williams, 3
Gill (N. D.) 278, 287; Caldwell v. Wilson, 2 Spears
(S. C. Law) 63; Moray v. Wyley, 100 Ill. App. 75; San-
derlin v. Sanderlin, 24 Ga. 583. (8) The claimed rule
of the safe deposit company requiring a written au-
thorization to a deputy to secure access to the box,
did not prevent the delivery of the keys from being suf-
ficient. Thomas v. Lewis, 89 Va. 9; Ridden v. Thrall,
125 N. Y. 572; Candee v. Sav. Bk., 81 Conn. 372; Ley-
son v. Davis, 31 L. R. A. 429; Tidewater Co. v. Kitchen-
man, 108 Pa. St. 630; Comm. Co. v. Grumbles, 129 Fed.
291; Connor v. Root, 11 Colo. 183. (9) It was proper
for the jury to consider the ill-will of the deceased
toward his only natural heir as strongly tending to
support the probability of a gift. Conners v. Root, 11
Colo. 183. (10) It was proper for the jury to con-
sider the natural inclination towards bounty to the Fo-
leys as strongly tending to support the probability of
a gift. Schwendt v. Schwendt, 61 Kas. 377. (11)
Where one prevents, by a successful objection, the in-
troduction of competent evidence, he cannot on appeal
deny the right to consider such evidence as if intro-
duced. Randolph v. Railroad, 106 Mo. App. 651; Hind
v. Kansas City, 120 Mo. App. 190. (12) The offer of
proof of the nurse, Arletta Long, was an offer of com-
petent testimony. Rosenwall v. Middlebrook, 188 Mo.
101; Heirmueller v. Scullin, 109 Mo. App. 193; Martin

v. Jones, 59 Mo. 187; Eyermann v. Piron, 157 Mo. 107; 20 Cyc. 1238-1240.

*Jacob L. Lorie* for respondent.

(1) Before there can be a valid gift there must be notice to and acceptance by the bailee. Castle v. Persons, 117 Fed. 835; 2 Kent's Comm. (11 Ed.) 567; Hooper v. Goodwin, 1 Swanst. 485; Picot v. Sanderson, 12 N. C. 309; Sanborn v. Goodhue, 28 N. H. 48; Bond v. Bunting, 78 Pa. St. 210. (2) Where the subject of a gift is in the hands of the bailee, it is essential to the validity of the gift that the bailee be notified, otherwise there can be no constructive delivery. Vogel v. Gast, 20 Mo. App. 104; Gartside v. Pahlman, 45 Mo. App. 160; Holderman v. Tillington, 63 Mo. App. 212; Worley ex rel. v. Watson, 22 Mo. App. 552; Allgear v. Walsh, 24 Mo. App. 134; How v. Taylor, 53 Mo. 592; Irwin v. Arthur, 61 Mo. 287. (3) A deposit of money in the hands of a third person for safe keeping gives the owner a mere right of action therefor, and an assignment or some instrument equivalent thereto is necessary to perfect the delivery. Hawn v. Stoler, 208 Pa. St. 610; Bond v. Bunting, 78 Pa. St. 218; 2 Kent's Comm. 439; Castle v. Persons, 117 Fed. 841; Story's Eq. Jur., par. 607c. (4) Where the subject of the gift is in the hands of the bailee, the owner's order of transfer should be acted upon, in order to complete the gift; for the general rule is to require the utmost delivery of which the thing is actually capable. 2 Schouler's Personal Property, par. 75, p. 81; Delmott v. Taylor, 1 Red. (N. Y. Surr.) 417. (5) No right of action accrues in any case against the bailee unless there has been some wrongful conversion or some loss by gross negligence on his part, until after a demand made upon him, and a refusal by him to redeliver the deposit. Story on Bailments (9 Ed.), par. 107; Boone v. Savings Bank, 84 N. Y. 88. (6) The gift must be com-

pleted and° take full effect during the lifetime of the donor.  Yancey v. Field, 85 Va. 760; Basket v. Hassell, 107 U. S. 602; 2 Kent's Comm. (14 Ed.) 448; 2 Schouler's Personal Property, par. 163, p. 166; Keepers v. Fidelity Company, 56 N. J. L. 302; Hewitt v. Kaye, L. R. 6 Eq. 198; In re Beeks' Estate, L. R. Eq. 489; Bank v. Milliard, 154 U. S. 656; Bank v. Williams, 13 Mich. 382; Bromley v. Brunton, L. R. 6 Eq. 275; 2 Schouler's Personal Property, par. 75, p. 81.  (7) A safe deposit company is a bailee for hire and has all the rights and is subject to all the duties as such.  19 Am. and Eng. Ency. Law, 481; 2 Am. and Eng. Ency. Law, 756; Jones v. Morgan, 90 N. Y. 4; Roberts v. Safe Deposit Company, 123 N. Y. 57; Story on Bailments (9 Ed.), par. 107.  (8)  Where the subject-matter of a gift is deposited, as here, in a safe deposit vault and can be withdrawn by no one but the depositor, except by the compliance with the rules and regulations of the safe deposit company, no person other than the depositor can gain access to the thing deposited, or can obtain any title to such thing except by showing a prior compliance by the original depositor, with such rules and regulations.  Ward v. Turner, 2 Ves. Sr. 431; Beak v. Beak, L. R. 13 Eq. 489; Pennington v. Gittings, 2 Gill. & J. 208; Moore v. Moore, L. R. 18 Eq. 474; Coleman v. Sarel, 3 Bro. Ch. 12, 1 Ves. Jr. 50; Milroy v. Lord, 4 De G. F. & J. 264; Searle v. Law, 15 Sim. 95; Beech v. Keep, 18 Beav. 285; Morawetz, Corp., par. 501; McGonnell v. Murray, 3 Ir. R. Eq. 460; Lewin, Trusts (2 Amer. Ed.) 136; Pringle v. Pringle, 59 Pa. St. 281; Bond v. Bunting, 78 Pa. St. 210; Scott v. Lauman, 104 Pa. St. 593; Fross's Appeal, 105 Pa. St. 258; Baltimore Co. v. Mali, 65 Md. 93; Nutt v. Morse, 142 Mass. 1; Eaves v. Savings Bank, 27 Conn. 229; Heath v. Savings Bank, 46 N. H. 78; Sullivan v. Savings Bank, 56 Me. 507; Wall v. Savings Bank, 3 Ala. 96; Doubleday v. Kress, 60 Barb. 181; Allen v. Savings Bank, 69

N. Y. 314; Smith v. Savings Bank, 101 N. Y. 58; Boone v. Savings Banks, 84 N. Y. 83. (9) It is presumed as a matter of law, that the depositor had actual notice of the terms upon which the depositary received and would deliver the thing deposited. Bank v. Hughes, 17 Wend. 94; Bank v. Page, 9 Mass. 155; Mill v. Bank, 11 Wheat. 431; Smith v. Whiting, 12 Mass. 5; Raborg v. Bank, 1 H. & G. 239; Hays v. Bank, 1 M. & Y. 179. (10) There can only be a constructive delivery of the subject of a gift when such delivery is a delivery of the thing which in itself and alone is the means of using and enjoying a thing given. There is no such thing as a symbolical delivery except in the sense of a constructive delivery. Newman v. Bost, 122 N. C. 528; McGrath v. Reynolds, 116 Mass. 566; Harris v. Clark, 3 N. Y. 113; Val Fleet v. McCarn, 2 N. Y. Supp. 675; 3 Pomeroy's Eq. Jur., par. 1149, p. 2241; Debinson v. Emmons, 158 Mass. 592. (11) The transaction must show a completely executed transfer to the donee with the present right of property and the possession. The donee must become the owner of the property given and the donor must part with all his right in and dominion over the subject of the gift which must take effect immediately and absolutely, leaving nothing essential to be done in the future. Thomas v. Thomas, 107 Mo. 459; Allen-West Com. Co. v. Grumbles, 63 C. C. A. 404; 1 Parson's Cont. (5 Ed.) 234; Spencer v. Vance, 57 Mo. 429; Tomlinson v. Ellison, 104 Mo. 105; School Dist. v. Sheidley, 138 Mo. 683; In re Estate of Soulard, 141 Mo. 657; Harris Banking Co. v. Miller, 190 Mo. 662; Matthews v. Hoagland, 48 N. J. Eq. 455; Walsh's Appeal, 122 Pa. St. 177; 2 Pomeroy's Eq. Jur. 1149; Trenholn v. Morgan, 1 L. R. A. 536; Keepers v. Fidelity Title Co., 56 N. J. L. 302; Dunn v. Bank, 109 Mo. 90; Biebers v. Boeckman, 70 Mo. App. 503; Keyl v. Westerhause, 42 Mo. App. 49; Gartside v. Pahlman, 45 Mo. App. 91; Tygard v. McComb, 64 Mo. App. 91; Drew v. Haggarty, 81 Me. 231; Snowden v. Reid,

67 Md. 130; Schick v. Grote, 42 N. J. Eq. 352; Daniel v. Smith, 75 Cal. 548; Calvin v. Free, 66 Kas. 469; Cochran v. Moore, 25 Kas. 57; Semmary v. Robbins, 128 Ind. 85; In re Breton's Estate, L. R. 17 Ch. 416; McMahon v. Bank, 67 Conn. 78; Giselman v. Starr, 106 Cal. 651; Hamilton v. Clark, 25 Mo. App. 436; 20 Cyc. 1232; Liebe v. Battman, 33 Ore. 241; Miller v. Jeffries, 4 Gratt. 472; Powell v. Hellicar, 26 Beav. 261; Shegog v. Perkins, 4 Baxt. 273; 2 Schouler's Personal Property, 163, 166; Delmott v. Taylor, 1 Red. (N. Y. Surr.) 417; Appeal of Fross, 105 Pa. St. 267; Scott v. Lauman, 104 Pa. St. 595; Taylor v. Henry, 48 Md. 550; Case v. Dennison, 9 R. I. 88. (12) The fact that the property is out of the reach of the would-be donor, so that delivery is impossible, is entirely immaterial; the gift cannot be sustained in the absence of a delivery, whether delivery is possible or not. 3 Lawson's Rights, Remedies and Practice, par. 2421, p. 1325; 3 Wait's Actions and Defenses, p. 508; Delmotte v. Taylor, 1 Red. (N. Y. Surr.) 426. (13) The mere delivery of a key will not be a sufficient delivery to perfect the gift unless thereby the donor completely divests himself of all power over its subject. If the donor still retain in any manner any custody or dominion over it, such delivery is not sufficient. Powell v. Hellicar, 26 Beav. 261; Shegog v. Perkins, 4 Baxt. 273; 3 Pomeroy's Eq. Jur. 2243, note 2; 2 Schouler's Personal Property, par. 163, p. 166; Hatch v. Atkinson, 56 Me. 324; Ward v. Turner, 2 Ves. Sr. 431; McGrath v. Reynolds, 116 Mass. 566; Culting v. Gilman, 41 N. H. 147; Thornton, Gifts and Advancements, 134; Jones v. Weakley, 99 Ala. 441; Gano v. Fisk, 43 Oh. St. 462; Pierce v. Savings Bank, 129 Mass. 425; Keepers v. Fidelity Company, 56 N. J. L. 302. (14) Gifts of this character are not favored in the law, are viewed with suspicion and great strictness, clear proof and full and conclusive evidence is required to sustain them. The utmost strictness is absolutely indispensible, and if

there is any doubt whatsoever, that doubt will be resolved against the donee and against the validity of the gift. 3 Wait's Actions and Defenses, 502 and 509; 8 Am. and Eng. Ency. Law (1 Ed.) 1342, 1343; Parsons, Contracts (6 Ed.) 2237; Gano v. Fisk, 43 Oh. St. 462; 2 Schouler's Personal Property, pp. 192-197; 3 Lawson's Rights, Remedies and Practice, p. 2428, par. 1337; 3 Redfield, Wills, 348, 349; Walter v. Hodge, 2 Swanst. 92; Hebb v. Hebb, 5 Gill. 506; In re Bailey, 98 N. Y. Supp. 725; Goulding v. Harbury, 85 Me. 227; Delmotte v. Taylor, 1 Redf. (N. Y. Surr.) 427; Lewis v. Merritt, 42 Hun 161; Schick v. Grote, 42 N. J. Eq. 352; Oller v. Bonebreak, 65 Pa. St. 344; Thornton on Gifts and Advancements, par. 216; Clapper v. Frederick, 199 Pa. St. 609; Doty v. Wilson, 47 N. Y. 580; In re Rogers, 10 App. Div. 593, 42 N. Y. Supp. 133; In re Schroeder, 113 App. Div. (N. Y.) 204; In re O'Connell, 33 App. Div. 483; Matter of Farians, 31 Abb. (N. C.) 159. (15) The courts of this State have uniformly held, even in cases where a valuable consideration had been received for the promise, that such a promise would not be specifically enforced upon the death of the promisor unless the proof of the contract was so cogent, clear and forceful as to leave no reasonable doubt in the mind of the chancellor as to its terms and character; that an effort to distribute by a contract resting in parol, the estate of a deceased person, to persons other than those designated by the law to take it, is looked upon with jealousy, and the evidence relied upon to establish such a contract should be weighed in the most scrupulous manner. Rosenwald v. Middlebrook, 188 Mo. 58; Grantham v. Gossett, 182 Mo. 651. (16) The testimony based upon the alleged declarations of Medley is looked upon with suspicion and disfavor, is a low grade of evidence, should be received with caution, and it is sometimes doubted whether it ought to be received at all. There is no substantial reliance upon this class of testimony. Ros-

enwald v. Middlebrook, 188 Mo. 94; Johnson v. Quarles, 46 Mo. 427; Curd v. Brown, 148 Mo. 92; Reed v. Morgan, 100 Mo. App. 723; Grantham v. Gossett, 182 Mo. 674; Pitts v. Weakley, 155 Mo. 138. The offer of proof of the nurse, Arletta Long, was not only incompetent because it was hearsay and attempted to prove indirectly what could not be proved directly, but is incompetent by the very authorities cited by appellant. Mrs. Foley was incompetent to testify as to any relative fact or transaction which happened before Medley's death and of course could not get around this incompetency by telling Miss Long about it and having her relate it. Eyermann v. Piron, 151 Mo. 107; Martin v. Jones, 59 Mo. 187.

*C. O. Tichenor* for respondent.

(1) In order to be a gift the evidence must show two things: (a) an intention to give, and (b) "the intention must be executed by a complete and unconditional delivery. Neither will a delivery be sufficient unless made with an intention to give. The transaction must show a completely executed transfer to the donee of the present right of property and the possession." In re Estate of Soulard, 141 Mo. 656. All this must be shown in gifts *donatio mortis causa* as well as in gifts *inter vivos.* McCord's Administrator v. McCord, 77 Mo. 173. (2) The evidence necessary to show intention. (a) "The circumstances of this case forcibly illustrate the wisdom of the rule of evidence so firmly established and so often declared by this court, viz.: that the proof to sustain a claim of this kind in the face of the Statute of Frauds must be overwhelming in its probative force, leaving no room for reasonable doubt." "This proceeding is simply an effort to distribute the estate of a deceased person different from that provided by law, by a contract resting on parol. Such efforts and the evidence relied upon to establish

such contracts have uniformly been 'looked upon with jealousy and should be weighed in the most scrupulous manner.' " Rosenwald v. Middlebrook, 188 Mo. 101; Asbury v. Hicklin, 181 Mo. 675; Kirk v. Middlebrook, 201 Mo. 245; Grantham v. Gossett, 182 Mo. 651; Coberly v. Coberly, 189 Mo. 18. "If such a transaction is to be held a *donatio causa mortis*, the section of the statute in relation to nuncupative wills and that requiring other wills to be in writing signed by the testator, etc., have no force whatever." McCord's Admr. v. McCord, 77 Mo. 174. (b) "Evidence of mere loose declarations of the person holding the legal title will not be sufficient, and testimony of verbal admissions or statements of persons since dead are entitled to small weight in establishing such a trust." Curd v. Brown, 148 Mo. 92; Wells v. Holden, 209 Mo. 596; Kirk v. Middlebrook, 201 Mo. 292; Rosenwald v. Middlebrook, 188 Mo. 95; Asbury v. Hicklin, 181 Mo. 675. See, also, Keepers v. Fidelity Co., 56 N. J. L. 302; Snyder v. Harris, 61 N. J. Eq. 480; Gallagher v. Donaby, 65 Kas. 341; Ward v. Turner, 2 Ves. Sr. 438; Jones v. Falls, 101 Mo. App. 544; Hatch v. Anderson, 56 Me. 326; Riddel v. Dobree, 10 Simons 250; Cosnahan v. Grice, 15 Moore's P. C. Cas. 222. The words "I will give" even with the delivery of possession will not create a gift. Goddard v. Conrad, 125 Mo. App. 172. Conversations in which one said she intended to make a gift to another are not evidence. Jones v. Falls, 101 Mo. App. 549. (3) All authorities agree that there must be an actual delivery of the subject of the gift by the donor. Tomlinson v. Ellison, 104 Mo. 105; Walter v. Ford, 74 Mo. 198; Dunn v. Bank, 109 Mo. 98; In re Soulard, 141 Mo. 656; Thomas v. Tilley, 147 Ala. 193; Walsh's Appeal, 122 Pa. St. 186; McGrath v. Reynolds, 116 Mass. 566; 3 Pomeroy's Eq. Jur., sec. 1149, p. 87; Stokes v. Sprague, 110 Ia. 89. Delivery of key cases: Whalen v. Mulholland, 89 Md. 201; In re Bauernschmidt's Estate, 97 Md. 362; Keepers v. Fidelity Co.,

56 N. J. L. 302; Chambers v. McCreery, 98 Fed. 784; affirmed by U. S. C. A., 106 Fed. 364; Allen-West Com. Co. v. Gumbles, 129 Fed. 287; Trenholman v. Morgan, 28 S. C. 278; Millard v. Millard, 221 Ia. 86; Powell v. Hellican, 26 Beav. 261.

WOODSON, J.—The plaintiff instituted this suit against the defendant, in the circuit court of Jackson county, by filing the following petition therein, to-wit:

"The plaintiff says that she is the owner of and entitled to the immediate possession of certain promissory notes or bonds, secured by mortgages or deeds of trust, and of the value of the amounts thereof as follows:

"Note or bond, $500, dated January 14, 1903, payable three years after date at the office of Harrison & Son, Kansas City, Missouri, bearing seven per cent interest; maker, Fritz Dolde; secured by a mortgage or deed of trust on lot forty-seven Brighton Park, an addition to Kansas City, Jackson county, Missouri."

Then follows fifteen other allegations, describing fifteen other notes and deeds of trust, differing from the foregoing only in the dates, the amounts, rates of interest, when payable, the makers, and the description of the land. Continuing, the petition states:

"The plaintiff says that said promissory notes or bonds and the mortgages or deeds of trust securing the same are in possession of the defendant; that the defendant, although possession thereof has been duly demanded by plaintiff, refuses to deliver the possession thereof to the plaintiff and wrongfully detains the same from the plaintiff; that all of said promissory notes or bonds have interest accruing thereon as appears by the terms thereof.

"Wherefore, plaintiff prays judgment against the defendant that the defendant be ordered to deliver the possession of said promissory notes or bonds, and

the mortgages or deeds of trust securing the same to the plaintiff; or if possession of any thereof cannot be delivered, that the defendant pay to the plaintiff the value thereof and for costs of suit.

"Second Count.

"The plaintiff says that on or about the 25th day of September, 1906, the plaintiff was the owner of four thousand four hundred and ninety-five dollars in current moneys, then in a safety deposit vault of the Kansas City Safety Deposit Company, in Kansas City, Jackson county, Missouri, and on or about said date defendant took possession thereof; that thereafter the plaintiff demanded possession thereof from the defendant and the defendant refused to deliver the same to the plaintiff but wrongfully converted same and has deprived the plaintiff thereof.

"Wherefore, plaintiff prays judgment against the defendant for four thousand, four hundred and ninety-five dollars, with interest at six per cent from the date of the commencement of this action and for costs of suit."

The answer was as follows:

"Defendant, for answer, denies each and every allegation of plaintiff's petition. Wherefore, he demands judgment with his costs.

"Further answering, defendant says that John Medley died on the 20th day of September, 1906; that on the 25th day of September, 1906, he, defendant, was duly appointed administrator of the estate of said John Medley, and on the 26th day of September, 1906, he duly qualified as such administrator; that said John Medley, when he died, was the owner of the notes described in the petition as well as the sum of $4495 in money; that prior to the commencement of this suit, he, as such administrator, took possession of said notes and money; that said notes and money belong to defendant as such administrator, and that he has

inventoried them as such.   Wherefore, he demands judgment with his costs.''

The reply was as follows:

''For reply to the answer of the defendant, the plaintiff says that she denies that said John Medley, when he died, was the owner of the notes described in the petition, as well as the sum of $4495 in money. And plaintiff herein prays judgment as in her petition.''

A trial was had before the court and jury, which resulted in a verdict and judgment for the plaintiff, as prayed.

In due time a motion for a new trial was filed, which was by the court sustained, ''for the reason that the plaintiff is not entitled to recover,'' and plaintiff excepted and appealed the cause to this court, the amount involved being about $14,000 or $15,000.

Plaintiff's claim is predicated upon an alleged *donatio mortis causa*.

The plaintiff's evidence tended to show the following facts:

John Medley, the alleged donor, a Frenchman by birth, a bachelor of about seventy-five years of age, lived for about sixteen years and died in the home of the plaintiff. Her husband was a carpenter, and they resided in Armourdale, Kansas. Medley was a man of some education in his own tongue, but his knowledge of English was imperfect, and was a good business man. By industry and frugality he accumulated sufficient of this world's goods to support him comfortably during his latter years. He paid the plaintiff for his room and breakfast the sum of five dollars a week. He had no relatives except a brother, who resided in the State of Pennsylvania, from whom he had become estranged, and had no communication with him for some thirty-five years. The brother was also a bachelor, and was four or five years younger. There was evidence tending to show that Medley had bitter feel-

ings against his brother and did not like his habits, and frequently stated that his brother should never have any of his property; that his relations with the Foleys had been intimate and affectionate for a number of years, their home being his; they cared for his clothing, mended the same and did his washing; they attended and nursed him during sickness. He advised with and assisted in teaching the children, and did many little things about the house and garden. He was particularly fond of the youngest child, John, who was born subsequent to Medley's becoming a member of the family. He nursed and cared for the child and was with him much of the time, slept with and spoke to him in affectionate terms. A number of times he was heard to say that his property should go to those who were kind to him and to those with whom he had lived if they were kind to him; and upon some of those occasions he mentioned the Foleys by name. It also appears that he was opposed to disposing of property by will, and frequently declared that he intended to dispose of his property during his life. He was a man of few words, had a mind of his own and acted with promptness.

The defendant for a number of years prior to Medley's death had been his agent, looking after his property, lending his money and collecting his interest.

About the year 1903, Medley rented a box in the Safe Deposit Company of Kansas City, in Kansas City, Missouri, in which he usually kept his money, papers and other valuables, and they were there at the time of his death, which occurred September 20, 1906, except $3750 worth of securities, which at the time of his death were in the hands of defendant for collection.

The defendant was duly appointed by the probate court of Jackson county, Missouri, administrator of the estate of Medley, shortly after his death. He qualified as such, and took possession of the property which is

now the subject-matter of this suit.   He claims no
other interest in the property save that as administra-
tor of Medley's estate.

There was but one witness who was present and
testified to the alleged gift of the property in question
by Mr. Medley to the plaintiff, and that was Edwin
Foley, a son of the plaintiff; and since this suit de-
pends largely upon his testimony, we deem it advis-
able to copy liberally therefrom.

He was called as a witness for plaintiff, and testi-
fied as follows:

*Direct Examination by Mr. Guthrie:*

"Q.   Your name is Edwin Foley?   A.   Yes, sir.
Q.   You are the oldest of the two Foley boys?   A.   Yes,
sir.   My mother is Mrs. Elizabeth Foley.   I knew Mr.
John Medley who lived at our house sixteen years.
Q.   Were you present at a transaction between your
mother and Mr. Medley a few days before he died in
which some keys were transferred?   A.   Yes, sir.   Q.
What day in the week, if you remember, did this trans-
action occur?   A.   On the 14th.   Q.   About what time
in the day?   A.   It was about two o'clock.   Q.   How
long long after that was it that Mr. Medley died?   A.
Well, it was the following Thursday.   Q.   Where did
this transaction occur, Edwin?   A.   In his room.   Q.
In your mother's home?   A.   Yes, sir.   Q.   How did
you happen to be in the room at the time the transac-
tion occurred?   A.   He called me in.   Q.   What did he
call you for?   A.   He told me to bring the paper in,
the morning paper.   Q.   Now after you came into this
room did you give him this paper?   A.   Yes, sir.   Q.
How long or how shortly after that did this trans-
action occur between him and your mother?   A.   Right
then.   Q.   What was your mother doing at the time?
A.   She was preparing some medicine for him.   Q.
Did he give her anything?   A.   Yes, sir.   Q.   What

did he give her? A. Gave her two keys. Q. Does this key that I hand you, marked '1130' look like one of them? A. Yes, sir. Q. You say there were two keys? A. Yes, sir. Q. Were they different keys or the same kind? A. The same kind. Q. Seemed to be duplicates? A. Yes, sir. Q. At the time he gave her these keys what did he say to her, as near as you can give it? A. Well, he called her over to the bed and he said: 'Mrs. Foley, here are the keys to my safety deposit box; I will give them to you; what is in there belongs to you; you will find Johnnie's money there also.' Q. What did your mother say to that—or, just a moment, did your mother take the keys? A. Yes, sir. Q. What did she say to Mr. Medley? A. Well, she told him she had saw him sick many a time and never did see him give up like this, and he says, 'I have to.' Q. How long did you remain in there after that? A. Well, about twenty minutes, I guess. Q. Do you know what your mother did with the keys? A. Yes, sir. Q. What did she do with them? A. She put them away in the book case. Q. Where was the book case? A. Downstairs. Q. Do you remember what part of the book case she put them in? A. In the drawer, the little drawer."

*Cross-Examination by Mr. Tichenor:*

"Q. Mr. Foley, how old are you? A. Eighteen years old. Q. At the time Mr. Medley died what were you doing? A. I was working. Q. You were a clerk in a confectinery store? A. Yes, sir. Q. How many, at that time, were in your father's family. You have a father, have you? A. Yes, sir. Q. And you have a sister? A. Yes, sir. Q. Is she older than you? A. Yes, sir. Q. She was home there at that time, wasn't she? A. No, sir. Q. She was living, I mean, at home? A. Yes, sir. Q. Where was she working? A. John Taylor's. Q. Then you have a brother still

younger than you? A. Yes, sir. Q. Now, I suppose, during the last five months, since the old man died, this matter has been talked about in the family, this claim of your mother's. You are all there together since then? A. Yes, sir. Q. This has been a matter of common talk, this claim of your mother's, in the family? A. Yes, sir. Q. A matter of considerable interest to all of you? A. Yes, sir. Q. And you talked about it? A. Yes, sir. Q. Now, when was the first time that you talked with your mother as to what was said by Medley at the time he handed those keys, as you claim here, when was the first talk you had with your mother after the old man died? A. It was at the evening supper table. Q. I say when? You spoke about in the evening at the supper table? A. I think the same day. On that same day. Q. The same day the old man died? A. Yes, sir. Q. She asked you if you recollected what was said there at that time? A. Yes, sir. Q. So then the very first day, during that day that you say these keys were handed to your mother by Medley she talked with you as to what was said there. A. Yes, sir. Q. Well, now, where were you when that talk occurred? A. I was downstairs in the kitchen. Q. And you told her, did you, what you recollected as to what was said there at that time? A. Yes, sir. Q. Well, now, when was the next time that you and your mother talked about this? A. I don't remember when it was. Q. You remember when the old man died? A. Couple days after. Q. Well, then, you went over this matter again then, did you, as to what was said there? A. Yes, sir. Q. Now, that is twice. Now, did you have another talk with your mother about what was said there before you had a talk with these gentlemen (indicating counsel for plaintiff)? A. Sir? Q. Did you have any more talks with your mother as to what was said there before you had a talk with these gentlemen here, her counsel? A. Yes, sir. Q. You had other talks,

did you? A. Yes, sir. Q. With your mother? A. Yes, sir. Q. Now, how many more talks did you have with your mother before you talked with these gentlemen? A. Oh, about twice. Q. Then we have got four talks between you and your mother about this conversation before you had a talk with these gentlemen. Now, which one of these gentlemen did you have a talk with? A. Mr. Boyle. Q. Where was that? A. Up in his office. Q. Well, now, how long was that after Mr. Medley died? A. About two months afterwards. Q. You came over to Kansas City, did you? A. Yes, sir. Q. Came over alone, did you? A. Yes, sir. Q. And you told Mr. Boyle this conversation? A. Yes, sir. Q. Well, that was here in his office in Kansas City? A. Yes, sir. Q. That was before the suit was brought, was it? A. Yes, sir. Q. Well, then, when did you next have a talk with either of these gentlemen as to what was said there that day by Mr. Medley when your mother got those keys, when did you next have a talk with either of these gentlemen? A. About a week after. Q. Where were you then? A. In his office. Q. How did you happen to be over there the second time? A. Just happened to go up. Q. They didn't send for you? A. No, sir. Q. And you told them again the second time as to what Medley said at the time he handed those keys to your mother? A. Yes, sir. Q. That was here in Kansas City, was it, at their offices? A. Yes, sir. Q. Well, when did you tell this again to them? A. Well, a couple weeks after, I guess. Q. Where were they when you told it over again? A. Over in their office. Q. How did you happen to come up there that time? A. I was just up there. Q. And you repeated that conversation? A. Yes, sir. Q. So then, we have two talks—four talks with your mother, in which you repeated this conversation, and two talks in which you repeated it to Mr. Boyle. That was before your deposition was taken, wasn't it? A. Yes, sir. Q. That is your signature,

isn't it (showing deposition to witness)? A. Yes, sir. Q. You remember the taking of that deposition, don't you? A. Yes, sir. Q. You .remember the notary reading it over to you, don't you, when you signed that? A. Yes, sir. Q. Well, now, after you heard they were going to take this deposition, did you have any talk then about this conversation? A. Yes, sir. Q. Where and when was that? I mean with either of these gentlemen that represent your mother? A. Mr. Boyle's office. Q. Well, whom did you go with then up there? A. Myself. Q. You just went alone? A. Yes, sir. Q. What did you go there for? A. Well, just to talk it over with them. Q. You had heard then your deposition was going to be taken? A. Yes, sir. Q. So you talked it over again. That was the third time, wasn't it? A. Yes, sir. Q. About what was said there by Medley? A. Yes, sir. Q. Well, now, did you go up there any other time before this deposition was taken? You went up there first after you heard it was to be taken; did you go up there the second time? A. No, sir. Q. Well, now, let's see about that. Now, just please listen to me, 'Yes, as near as you can recollect. I don't expect you to remember it to the day.' He is asking you now about what you said. 'Question. About how long was it, about how many weeks? Answer. Five weeks, I guess.' That is, before the taking of this deposition that you had had a talk with Mr. Boyle. Do you remember having a talk five weeks before? A. Yes, I might have talked with him before then. Q. Now, when was it, do you remember the day of the week that this deposition was taken? A. I think it was the 22d, Saturday. Q. Well, now what day before that Saturday were you up there to the office? A. Friday. Q. You were up there on Friday. So, then, this is correct, as you have stated there: 'Did you go to his office last Friday? A. Yes, sir.' So that makes three times that you talked with Mr. Boyle and four times that you talked

with your mother about this conversation, doesn't it? A. Yes, sir. Q. Well, now, did you talk with him out in the hall? A. Yes, sir. Q. Just before they took your deposition? A. Yes, sir. Q. How long was that before you went on the witness stand that you repeated this conversation? A. About ten minutes. Q. What did you talk about there in the hall? A. Didn't go all over it. Q. Didn't go all over it, I know, but you went over a part of it? A. Yes. Q. Oh, just—A. (interrupting) Well, about how he gave the keys. Q. About he gave the keys and what he said? A. Yes. Q. So, then, up to the time of taking this deposition you have been over this conversation some eight times, four times with your mother and four times with Mr. Boyle? A. Yes, sir. Q. Well, now, since the taking of that deposition it has been talked of, hasn't it, there in the family? Can't you remember the date when the deposition was taken? This was taken on the 22d day of last December. Now, you have talked this matter over since about this conversation there in your family, since that deposition was taken, haven't you? A. Yes, sir. Q. Have you talked it over with either of these attorneys since this deposition was taken? A. Yes, sir. Q. How often? A. Well, about three times. Q. Haven't you had a copy of this deposition, too? A. Yes, sir. Q. When did you get that copy? A. Last Thursday, I believe. Q. Last Thursday? A. Yes, sir. Q. Well, now, how often have you read this deposition over since you got it? A. Once. Q. Only once? A. Yes, sir. Q. Haven't you read it to-day? A. No, sir. Q. Just read it once, and how many talks with Mr. Boyle? A. About three or four talks, I guess. Q. Three or four talks. So, then you have talked this over with your mother four times before the deposition was taken, and Mr. Boyle four times before the deposition was taken, that is eight, and three or four times with Mr. Boyle since the deposition was taken. So you have had at least

twelve talks, haven't you? A. Yes, sir. Q. Well, now, was there ever a time when you got it exactly the same twice? A. No, sir. Q. You never got it the same twice? A. No, sir. Q. You never could repeat it the same in any one of those twelve times, you couldn't repeat it over the second time the same? A. Yes, sir. Q. Do you mean to say you repeated it here to-day the same as you did in the taking of this deposition. A. No, sir. Q. Well, did you repeat it here on the witness stand the same as you did when your deposition was taken? A. No, sir. Q. That the testimony in that deposition as to what Mr. Medley said at the time your mother got those keys—that you didn't tell it the same then as you did to-day. Now, is that true? Am I right in that supposition or am I wrong? A. I don't remember the same words, except but what I am saying to-day is the substance of it. Q. Yes, you can't tell whether what you say to-day is the same language that you used when your deposition was taken? A. I don't know whether it is the same words or not; it is the substance of it. Q. Do you have any distinct recollection of what words were used? Do you pretend to say to this jury what words were actually used by Mr. Medley at the time you say that your mother got those keys? A. Yes, sir. Q. You pretend to give the exact language, do you? A. Yes, sir, I am trying to give you the exact language. Q. I know you are trying to, but have you done it? A. I don't know whether they are the same words or not. Q. Can you remember the exact language that Mr. Medley used? A. No, sir. Q. You can't remember it? A. No, sir. Q. Then if you can't remember it, of course, you can't tell it, can you? (Witness makes no response.) Q. When you gave this language to these people, Mr. Boyle here four times—or eight times, and your mother four times, at least, did you give the same language at any two of those times? A.

Yes, sir. Q. What two? (Witness makes no response.) Q. Now, you say you remember giving the same language two of those times. Now, what two times did you give the language the same? A. I don't remember what two times they were. Q. Well, now, if you can't remember what two times, can you say then that you did give this language the same twice, if you can't remember what two times? A. I don't know as I gave it the same. Q. Well, now, how do you give it, how do you recollect it now as to what Mr. Medley said when your mother got those keys? A. What did he say? Q. Can you give the language now that Mr. Medley used at the time your mother got those keys? A. I don't know as I can give the same language. Q. Well, give it just the best you can. What did he say? A. Well, he said, 'Mrs. Foley'—called her over and said, 'Mrs. Foley, here are the keys to my safety deposit box; I give them to you; what is in there belongs to you; you will find Johnnie's money there also.' Q. Now, in your deposition which you have signed here, which I have shown you, which was taken there on the 22d day of December, here is what you say: 'Mrs. Foley, here are the keys to my safety deposit boxes.' What did you use that in the plural, 'safety boxes?' A. I don't remember saying boxes. Q. Do you say you didn't? A. I don't say I didn't though. Q. Now, didn't you get the idea that there were two boxes from the fact that there were two keys? A. No, sir. Q. Well, why did you say that: 'Here are the keys to my safety deposit boxes?' A. I don't believe I said 'boxes.' Q. Will you swear that you didn't say it? A. I wouldn't swear. Q. 'They are yours; what is in them I will give it to you.' Now you say 'what is in there belongs to you.' That is the way you say it to-day. 'They are yours; what is in them I will give it to you.' 'You will find Johnnie's money there also.' Now, which is correct, that you said then, or that you say to-day? A. What I say now is cor-

rect, I know. Q. Well, then, you say then that if you said that there, that is not correct? A. No, sir, I don't say it ain't correct. Q. How do you account for making two different statements, if you did make them? (Witness makes no response.)

"The Court: Do you understand the question, Edwin? (Question read by reporter.) Witness makes no response.

"Q. Well, let's drop that. We will pass on. Now, you say you had this deposition in your hands for several days. Since when, did you say Thursday? A. Yes, sir. Q. Well, now, don't you remember anything that it contains? What did you get it for? What was it given to you for? A. Well, I read it over is all. Q. You read it over to see what you said on that occasion, didn't you? A. Yes, sir. Q. Now, do you recollect that you stated that conversation that you say took place between your mother and Mr. Medley at the time she got those keys—do you recollect that you stated it twice differently in this deposition? A. That in there I stated it twice different? Q. Yes? A. No, sir. Q. You remember stating it twice, this conversation, in this deposition, don't you? A. Yes, sir. Q. Do you think it is just the same? A. I don't know as it is just the same. Q. Now, here is what you say the second time here. Here is the deposition, Mr. Foley, the one I showed you and the one you signed. Just read that. You can read, can't you? A. Yes, sir. Q. Yes, I want you to read the answer to that question. A. 'Mrs. Foley, here is the keys to the safety deposit box; I give them to you and all the money there is in there I give to you, and Johnnie's money is there, too.' Q. Well, now, was that the conversation that you heard there? A. I don't know whether it is exactly or not. Q. Oh, I know, but in the first question you answered there, the first time you detailed this conversation you say that everything that was in that box was hers, now in this one you say the

money that was in there was hers; that the old man said so, don't you? A. I don't remember of ever saying anything about money; I know Johnnie's money was mentioned. Q. Do you tell the jury that you didn't swear on the taking of this deposition this: 'Mrs. Foley, here is the keys to the safety deposit box; I give them to you and all the money there is there I give to you, and Johnnie's money is in there, too.' Now, did you use. that language? A. I don't recall ever saying that. Q. Do you swear that you didn't do it? A. No, I don't swear. Q. Why did you state here, 'Mrs. Foley, here is the keys to the safety deposit box; I give them to you and all the money there is in there?' Why did you make that statement? Was that what the old man said. A. I know he spoke in connection with Johnnie's money. Q. Well, this is not in connection with Johnnie's money. A. I don't remember saying anything about the money in there. Q. Would your memory be better now to-day. here than it was in December? A. No, sir. Q. It ought to have been better then, oughtn't it, than now? It was nearer to the time. It ought to have been just as good? A. Yes, sir. Q. Then if you said that, why did you say, if it wasn't true? (Witness hesitates.) Q. Can you answer? (Witness makes no response.) Q. If you decline to say so, just say so, and that ends the business. Do you want to answer it or not? A. Well, I know it was in connection with Johnnie's money. Q. Oh, of course, it was in connection with Johnnie's money, because he mentions Johnnie's money right there next? A. Yes, sir. Q. But the answer is this: 'I give them to you (that is, the keys) and all the money there is in there I give to you, and Johnnie's is in there, too.' Of course, he speaks about Johnnie's money. You are right on that. I am not undertaking to say that that is wrong or the other is wrong, but I am just saying—asking you now why you stated that the old man said that .all the money

that was in there belonged to your mother and he gave it to her, if it wasn't true? Why did you make that statement? (Witness hesitates.) Q. Can you answer it? (Witness makes no response.) Q. Oh, if you can't answer it, just say so, and we will go on.

"The Court: Do you understand the question, Edwin? A. Yes, sir.

"The Court: Well, can you answer it? (Question read by the reporter)—

"Q. Well, he can say he can't answer it.

"The Court: Answer the question, Edwin.

"(Question again read by the reporter.)

"The Court: Do you know what statement he is talking about? A. Yes, sir.

"The Court: Well, then, answer the question; why did you make that statement? A. I don't know.

"The Court: He says he don't know."

### Re-Direct Examination by Mr. Guthrie:

"Q. You say that you were over to see Gen. Boyle and talked to him two or three times? A. Yes, sir. Q. Did he, in talking with you, go back through the long period of years and try to find out all you knew about Mr. Medley? A. No, sir. Q. That is, did he talk to you about other things than this money proposition? Did he go into what Mr. Medley had promised you or promised to do for you and your mother and things like that? A. Yes, sir."

Mr. Guthrie: "We make no question about the rules produced being on the back of the receipt issued, but we object to them as being incompetent, irrelevant and immaterial and as not controlling a donor in making a gift of the contents of the box; that is, that a rule of the kind offered would not prevent his making the transfer in the manner claimed, and therefore it does not tend to defeat the transfer."

Foley v. Harrison.

Objection overruled by the court. To which action and ruling of the court the plaintiff at the time duly excepted.

Mr. Tichenor: "We offer this blank receipt and the rules on the back thereof in evidence."

Said blank receipt is as follows:

$........                                         No. ........

SAFE DEPOSIT COMPANY OF KANSAS CITY.

American Bank Building.

Kansas City, Mo., ................190....

Received of...............................................

........................................................ Dollars,

for rent of Safe No. ....:... in the Vaults of Company, for the term of ........ months, expiring the......... day of .........190.....

Accepted, subject to the Rules and Regulations prescribed by the Company, which are printed on the back of this receipt.

..................................

Manager.

Office Hours: From 9 a. m. to 4:30 p. m.
Sundays and Public Holidays excepted.
Close on Saturdays 2 p. m.

On the back of said receipt is the following:

RULES AND REGULATIONS.

By which Renter will be Governed.

1. Satisfactory reference must be given upon application for safe.

2. No person other than the Renter or approved deputy named in the the books of the Company, or legal representative, (in case of the death, insolvency, or other disability of the Renter) shall have access to the safe, except as hereinafter expressly stipulated.

3. On surrender of any safe the keys or combination must be returned to the Company.

4. The cost of replacing a lost key or combination shall be paid AT ONCE by the Renter.

5. The Company reserves the right to terminate, at any time, the renting and possession of the safe, upon notice to the address of, or otherwise delivered to the Renter; or, if absent, to the deputy designated upon the books, or to any other legal representative, and upon the surrender of the keys to the safe and the removal of its contents, a pro rata proportion of the rent received will be refunded.

6. All rents are payable in advance.

7. In case the lease of a safe is not renewed within six months after expiration of any renewal thereof, the Company reserves the right, and is hereby further authorized, to open the safe at the expense of the Renter."

*Re-Cross-Examination by Mr. Tichenor:*

"Q. Mr. Foley, who were present at the time you say this conversation took place there when your mother got those keys. A. Who was present? Q. Yes? A. My mother and I. Q. Anybody else? A. Well, Mr. Medley. Q. Just you three? A. Yes, sir."

In order to clear up some of the seeming contradictory statements of the witness, Edwin Foley, plaintiff, called S. H. Whisner as a witness, who testified that he was the notary and stenographer who took Edwin Foley's deposition in this case; that he took the deposition in shorthand; that his notes showed Edwin testified that Mr. Medley said: "Mrs. Foley, here are the keys to my safety deposit box," and that by mistake he transcribed the word "box" as "boxes." That counsel for appellant requested him to examine his notes, and by doing so he discovered the mistake.

MAMIE FOLEY, a daughter of plaintiff, was called as a witness, and testified substantially as follows, regarding the alleged gift:

"Q. Now, that was Friday? (The day on which the alleged gift was made.) A. Yes, sir. Q. Did you see Mr. Medley that evening? A. I did, yes, sir. Q. Did you see him on Saturday? A. Yes, sir. Q. What time Saturday did you see see him? A. I saw him Saturday morning. Q. Where? A. In his room. Q. Did you see him Saturday evening again? A. Yes, sir. Q. Did you have any conversation with him? A. Yes, sir. Q. When was it on Saturday evening? A. Well, after I returned from work. Q. Tell what you did? A. Well, when I came home from work, why, I came in and asked Mama how Mall was and she said she thought he was very sick.

"The Court: That was Saturday evening? A. This was Saturday evening, yes, sir.

"So I said, 'I will go up and see how he is before I eat.' Mama says, 'Take him up a cup of tea.' I took

up a cup of tea and I says, 'Good evening, Mall (Medley was sometimes called Mall) how do you feel?' He says, 'Mamie, I feel very bad.' I says, 'I have brought you up a cup of tea.' So he sat up on the side of the bed and I says, 'Well, Mall, you are looking better.' He says, 'Oh, I don't know, Mamie,' and I was pouring out the tea, you know, and cooling it for him, and he says—let's see, how was it—I asked him what the doctor had said about his condition and he says, 'Oh, the doctors don't always know,' he says. He says, 'Whatever does happen,' he says, 'I have fixed things so you folks will be well provided for. I gave your mother the keys to our safety deposit box;' whatever was in there she could have; that there was sufficient in there that would provide for all. I says, 'Why, Mall,' I says, 'don't feel so despondent,' and I says, 'you ought to keep up your courage,' and he says, 'why, I feel pretty bad,' and so then he laid down in bed again and I went downstairs.''

Mr. Medley was a great friend of Johnny, and they were always together. The latter was named for the former. He said he was going to set up Edwin and Johnny in business, the confectionery business, stating that he thought there was a great deal of profit in that business. With that idea in view he had selected a lot for that purpose in Armourdale, but never purchased it. Upon being urged by Mrs. Foley to purchase the lot, he said: ''Well, if I don't buy the lot now, I will leave plenty to buy it with.'' That was during February before he died. The Sunday before Mr. Medley's death, she telephoned for the defendant to come over, and told him Mr. Medley was quite sick. He came about nine o'clock p. m. Mr. Harrison was not in the habit of coming over to see Mr. Medley, but came occasionally to see him on business. Medley was never out of the house after that Sunday. That prior to Medley's death she saw the keys to the safety box in the book case, her attention was called to them.

Never heard from the brother after Mr. Medley's death, nor has he ever been at our home to talk with us about his death. That she had heard Medley speak of his safety box, and he told her that he had Johnny's money there also. That he was sick continuously during his last spell, and kept his room.

On cross-examination she testified: That her mother acted as nurse for Mr. Medley whenever he was sick. He was a very delicate man and she nursed him right along whenever he was feeling badly. She gave him his medicines. He was in our home and had no friends to visit or advise him. "We were all just one." That he taught her Latin and was a man of good education, and was also a good business man. He spoke of the Tilden will, and thought it was foolish to make wills. That he was sick several times during the last four years of his life. He was very delicate, and was confined to his bed several times during that period, but could not state the exact number of times, but probably a half dozen times, or more. During all those times the plaintiff nursed him. It was about September 1st when he was attacked with his last sickness. He died on September 20th. She nursed him all that time. He gave her mother the keys to the safety box on Friday previous to his death. He was perfectly rational at the time he told witness that he had given the keys to her mother. He talked freely with Mr. Harrison when he visited him on Sunday evening—he answered his questions. His mental condition was perfect when Mr. Harrison was there, he was not in a stupor, that was about nine o'clock. He was too weak to go into conversation, but his mind was perfectly clear, and would answer whatever questions were propounded to him. His mind was also clear on Monday.

"Q. And it was so on Tuesday? A. Well, he was quite weak—from Monday on he was quite weak. The same on Wednesday, and would only say 'Yes,' or

'Uhuh, uhuh,' that is the way he would answer.'' She could not say his mind was clear on Wednesday—he was too weak to talk. That he died Thursday about 5:30 p. m.

ARLETTA LONG, a witness for plaintiff, on cross-examination, testified that she was a professional nurse and waited on John Medley during his last illness from 2:30 o'clock p. m. Sunday until his death; and that during that time he was perfectly rational.

MAURICE ALDEN, a witness for plaintiff, testified that he was appointed administrator of the estate of John Medley by the probate court of Wyandotte county, Kansas, and proceeded to administer the estate. "Q. At the time Mrs. Foley delivered these two keys to you, did she make any claim of any kind as to the right to retain the keys? A. Yes, sir. Q. What was that? A. She claimed to be the owner of the keys and the owner of the property in the box. Q. Did she say how she had become the owner? A. She said that Mr. Medley had given them to her. Q. How long after his death was it that you had this talk with her? A. The talk was had with her, I think, September 22, 1906; that is the date of my letters of administration. My recollection is that I went down that same day. Mr. Medley, I believe, had died that same week.''

*Cross-Examination by Mr. Tichenor:*

"Q. You are a practicing lawyer, Mr. Alden? A. Yes, sir. Q. Now, when you went there to get those keys from her, what did she say that Medley said to her when she got those keys? A. We sat down in the parlor; I had ascertained that there was a safety deposit box somewhere, and I ascertained from her that she had the keys, and I asked her to give them to me, and she refused to do so, claiming that they belonged to her, and that the stuff in the box belonged to her, and I said, 'What did Mr. Medley say when he gave them to you?' and she replied that he called her to him

and said, 'Here are my keys to my safety deposit box; Johnny's money is in that box; I want you to have these keys because I don't know what may happen to me.' Q. Now, when you examined the box you say there was an envelope with Johnny's name marked on it? A. I believe there was. Q. Did you open that? A. I didn't. The appraisers handled the stuff. Q. You didn't see what was opened—you were not present, I mean, when it was opened? A. Yes, I was there, but I sat on the opposite side of the table and didn't handle the stuff as it was taken from the box. Q. So, you can't tell really what was in the envelope? A. I believe the money was taken out and there was twenty dollars in it. Q. Now, when you went in there to open up that box, how was the—just describe how you got into it and the number of locks on it. A. Mr. Harrison had one key and the custodian of the safety deposit vault had another key; we all went in together and the custodian put his key in a keyhole and Mr. Harrison put his key in the keyhole and I believe they both turned at the same time, or one right after the other, and the box was opened. Q. So then, according to the way you saw it, it took two keys to get in? A. Yes, sir. Q. The one that was had by the safe deposit company and the other by Mr. Harrison? A. Yes, sir."

### Re-Direct Examination by Mr. Guthrie:

"Q. Now, do you know how that safe deposit company regularly transacted its business with its customers—that is, whether the renter or lessee of the box would have to get the custodian of the key, of the general key, to come and use that, in order to enable him, the box owner, to get in? A. Well, you ask me if I know; I was there on one other occasion in another matter, and the same procedure was gone through with; there were two keys; those are the only two times I was ever in that safety deposit place."

ORLANDO M. MITCHELL, a witness called on behalf of the plaintiff, testified as follows:

### Direct-Examination by Mr. Guthrie:

"Q. What relation do you sustain to the Kansas City Safe Deposit Company? A. Assistant manager. That is, the Safe Deposit Company of Kansas City. Q. Did Mr. John Medley have a box rented in your vaults at the time of his death? A. He did. Q. Will you kindly now, in your own way, describe to the jury how that business is managed and how the boxes are controlled. A. Well, just what part of it? Q. Well, in the first place, these boxes are lock boxes arranged in tiers, intended for the preservation and care of valuable papers and valuable articles? A. Yes, sir. Q. And you rent them—your company rents them to people who want such places of security? A. Yes, sir. Q. Those boxes are kept inside of a locked vault, are they not? A. They are. Q. And an attendant admits the person applying, apparently entitled to apply, from the outside through the vault door into the vault where the boxes are? A. Yes, sir. Q. Then each of these boxes has a set of co-operating keys; the box owner, or lessee, has his keys, which, however, in case of loss could not be used to open the box, but in order to get in—

"Mr. Tichenor (interrupting): Hadn't you better sift a little of this testimony from the witness? I would rather have him explain it than you.

"Q. Very well, when a man comes there, now, a box owner, to get into his box for any purpose, what course of procedure is gone through? A. Well, he first comes, of course, into a room; then we have a steel grill work that we don't admit him to, unless we know him; he comes in to the door; he is admitted there possibly by the porter, or by the person in charge, and then, unless we know him to be a customer, he is not allowed to go into the vault; whenever he goes to

the vault, an attendant is always with him, and on the box in question there is a lock which has two key holes; the customer has the key to part of this lock, and the attendant has the key to the other. It is necessary for the customer of the vault and the attendant to be there at the same time with the proper keys in order to get into that box. Q. The attendant can't open the box with the key which he has. A. No, sir. Q. Without the use of the key held by the customer? A. No, sir. Q. And the customer can't open the box without the use of the key held by the attendant? A. No, sir. Q. That is the way the safety deposit business is conducted everywhere, isn't it? A. That is the way I understand it. Q. You give to your customers duplicate keys, do you not—two keys, so that if one is lost, they still have another. A. Yes, sir. Q. Is this key produced by the defendant Harrison one of the duplicate keys which you issued to John Medley? A. It appears to be. Q. You can positively identify it, can't you, by the number? A. Yes, that is the proper number. Q. It is the key isn't it? A. That is the key."

### Cross-Examination by Mr. Tichenor:

"Q. Is there anything on that key—anything to indicate that it belongs to your company, so that if anyone would pick it up, they would know? A. No, sir. Q. Nothing to identify it as being a key to any box in your company? A. No, sir. Q. In your safety deposit vault? A. Yes, sir. Q. Now, is there anything else that is necessary to get into the vault—to get into the box? Is there any such thing as a password? A. Yes, sir. Q. Can you turn to the book here in this case? (Witness indicates upon book.) Q. Now, just tell the jury, if you please, about this pass-word, what is the object and purpose of it? A. It is to thoroughly identify the party. When a party—do you wish me to explain? Q. Yes. A. When a party comes in to rent a box, we show them the boxes, show

them the rooms they can occupy if they are a renter and after we come to terms as to the box, in order to identify them, we have what we call a pass-word, and the pass-word is always suggested by the customer so that he will be sure to remember it, and then we, of course, keep that pass-word recorded and we have it right at our hand, and at any time a man comes in and there is any doubt about him, we simply ask him for the pass-word; if he gives that rightly, we may or may not let him in; and then may be we ask him for his signature, which we keep in another place. Q. Did John Medley give any pass-word to you? A. Yes, sir. Q. What was that pass-word? A. "Power." Q. That was his pass-word? A. Yes, sir. Q. Now, if Mrs. Foley, for instance, the plaintiff in this case, had come there to your place of business with simply the key, that key that you have been shown, or both of those keys, could she have gotten into that box? A. No, sir. Q. Now, I see something on this, where the word "power" is written, "I hereby appoint as my deputy or substitute to have access to my safe No. .......... Name .......... Name .......... signature." What does that mean? A. Well, it means simply this: When the party rents the box there are times when he wants another party to have access to it; this blank is for him to fill out at that or any subsequent time that he chooses; it is explained fully to him at that time, that should he want another person to have access to or occupy that box that he must come there and give us notice in writing. Q. Did Medley do that? A. You mean give us notice? Q. Yes. A. No, sir. Q. He never appointed anybody? A. No, sir.

"Mr. Tichenor: I would like to introduce that in evidence.

"Q. No. 9221. What does that number mean? A. It is the check number. It corresponds with the number of the receipt which was given to the customer. Q.

Can you turn to the receipt? A. The receipt was issued to Mr. Medley. Q. What is that record you have there? A. That is Mr. Medley's signature. Q. Oh, yes, that is his signature? A. Yes, sir. Q. What do you say is the purpose of that signature? A. Identification. Q. Now, when was that signature given in reference to his renting that box? A. The first day that he was there to rent the box. Q. Do you remember when he rented that box? A. No, I don't. Q. Could you tell anything about it by looking at that? A. Yes, he rented that box on June 26, 1903. 'No. 9221. Date 6-26-03. Name, John Medley. Safe 1130. Amount $10.00. Time, 12 M. Expires 6-26-04. Password, Power. I hereby appoint as my deputy or substitute to have access to my safe No. .......... Name .........., Name .........., Signature .........., Address, 820 Coy Avenue, Kansas City, Kansas.' Q. Do you know Mrs. Foley, here, the plaintiff in this case? A. No, sir; I do not. Q. Did she ever come to your place to give you notice in any way of any claim? A. Not that I remember of."

### Re-Direct Examination by Mr. Guthrie:

"Q. Mr. Mitchell, a number of your customers have agents who transact their business for them regularly, do they not? A. How is that? (Question read by the Reporter.) A. Yes, I should say so. Q. Take in this case, assuming, by way of illustration, that Mr. Medley was a man of some means who loaned his money and took many securities and had an agent like Mr. Harrison who made those loans for him and collected the moneys as they came due, and collected the interest coupons, and all that sort of thing, in many of those cases the box owner who really owns what is in the box executes this power of attorney to his agent and gives him one of the keys so he can have access whenever it is necessary in the transaction of his

principal's business. A. There are such cases, yes, sir. Q. That was about the idea that was in mind in providing for the deputy acting for the principal, wasn't it? A. Well, that was before I went there. I should say so—I should judge so. Q. Now, in the case of this particular box you permitted Mr. Harrison, the administrator, to open it, did you not? A. Yes, sir, when he came in with letters of administration. Q. He didn't know the pass-word, but he brought the keys? A. Yes, sir. Q. And he said he had succeeded to Mr. Medley's rights in the matter, and therefore you let him open the box? A. Yes, sir. Q. Now, if Mrs. Foley had come there and satisfied you in any way that she had succeeded to Mr. Medley's rights to the contents of that box, bringing such proof as would satisfy you that that was the fact, she would have been permitted to open it, would she not? A. In what case? In his death, or in his life? Q. In case of either, in case she satisfied you fully that she had succeeded to his rights? A. No, sir. We have just one case, when the man is dead, which is invariable. Q. But in his lifetime, suppose she had come there and satisfied you that Mr. Medley was sick, or that he couldn't come and that she was a responsible party, and that by right acquired from Mr. Medley she was entitled to go into that box, and you were thoroughly satisfied about it, so there would be no mistake, would she be let in? A. Only upon his written order, and her thorough identification. Q. Now, is there any rule or law, or is that just your judgment in the matter? A. That is our custom there; I don't know the law. Q. Is that custom in writing, or anything of that kind? Do you issue any book of rules to your customers? A. I think you will find that on the receipt which was given him for that box, on the back of it. Q. This pass-word that you have, that is intended as a means of identification, is it not? A. It is. Q. Like the signature? A. Yes, sir. Q. And you have a great many

customers, haven't you? A. Yes, sir. Q. You don't feel that the particular attendant there at any particular time can be certain that the man who comes in is the man entitled to go into the box? A. Not always. Q. And these are the means of assuring yourself further than your recollection of the appearance? A. Certainly."

*Re-cross examination by Mr. Tichenor*:

"Q. Mr. Harrison couldn't have gone in there unless he had brought the letters of administration, could he? A. Certainly not. Q. Even though you had known he had been his agent in making loans. A. Yes, sir. Q. Now, these receipts that you give, there seems to be something torn off here. What is originally attached to that? A. The receipt gives the date the box was rented— Q. (Interrupting) I know, but the receipt that is given to the renter, that is attached to this stub, isn't it? A. Yes, sir. Q. This receipt that Mr. Medley got was originally attached right to that stub? A. Yes, sir. Q. That I have read here in evidence? A. Yes, sir; you will find the instructions to the renter on the back of that receipt. Q. The instructions are just the same now as they were back in 1903, are they? A. Just the same; never been changed."

Here the plaintiff rested her case, and thereupon counsel for defendant asked an instruction in the nature of a demurrer, telling the jury that their verdict must be for the defendant. This instruction was refused, and defendant duly excepted.

### Defendant's Evidence.

J. S. Harrison, the defendant, called as a witness in his own behalf, testified as follows:

*Direct examination by Mr. Tichenor:*

"Q. Mr. Harrison, you are the defendant in this case? A. Yes, sir. Q. What interest have you in this property here sued for? A. Nothing, except as administrator. Q. How did it come in your hands? A. It came into my hands by my appointment as administrator. Q. After you had been appointed and qualified? A. Yes, sir. Q. Now, is there any of these notes that are sued for here—were any of them in your possession and not in the possession of the safe deposit company at the time Medley died? A. Yes, sir; four of them. Q. What were they? A. They were a note for $1000 given by St. John, a note given by Barnard for $1000, note for $1000 given by Alice Geary, and then one note of $750 given by the Phelpses. They were in my safe for some time before Mr. Medley's death. Q. How came you in possession of those notes—to be in possession at the time of Medley's death? A. They were left with me some time before his death; it was his custom to bring the notes in there some time before the payment of interest was due and leave them with me for the payment of interest. Q. How long was it before he died—was he over often to see you in Kansas City? A. Yes, he came most every week when he was at all well; very few weeks elapsed? A. How long had you been his agent? A. Since 1871. Q. Since 1871? A. Yes, sir, 35 years. Q. How long was it before he died that you saw him over here? A. I can't recall the time that he was over here; it may have been something over two weeks. Q. Something over two weeks? A. Yes, sir. Q. Well, now, did you go over to see him during his last illness, if so, when did you first go there? A. I was called over there by one of the Foley family the evening of Saturday, the 15th of September. Q. What time did you go over there? A. Why, it was some time between eight and nine

o'clock; I don't remember just the exact time; sometime between eight and nine o'clock, I should say, in the evening. Q. Now, you say you went over there to see him during his last sickness? A. Yes, sir. I was there Sunday evening, September 15th, between eight and nine o'clock. He was a very sick man. I spoke to him but obtained no answer, yet I think he recognized. I asked him if there was anything I could do for him, but he made no reply. The only expression of recognition I got was from his eye. I spoke to him several times. I was there about an hour and a half. I went over there because I was telephoned for by some one of Foley.'s family. I was there next the following morning—Sunday—about ten o'clock. His condition was at this time apparently the same as it was the previous evening. He did not speak. I was there again Monday evening. I tried this time to talk to him, but got no answer. I never got an intelligent answer from him during his sickness on Saturday the first day I was there or afterwards. I was there again Tuesday and Wednesday, and each day thereafter until his death. I was there the day after his death also. Some one 'phoned me he was dead. I attended his funeral.

"The plaintiff took my deposition. I began doing business for Mr. Medley in 1871, and continued to do so until his death. I kept all of his papers in my safe from 1871 to 1903, when he rented the safety vault box. I went over to see him during his last sickness because he was an old customer of mine, the oldest I had, and I knew him intimately for years, and we were mutual friends. I heard him speak of his brother once or twice during the years I knew him. Said they had been in business together in the oil fields of Pennsylvania, in an early day. The cooperage business. He was a quiet, reticent man and talked but little about his business. Never heard him talk of Foleys except as to one member. I heard him speak very frequently

of the little boy Johnny. I can't remember that I every heard him speak of the rest of them. He brought the little boy to my office twice.

"The first I ever heard of plaintiff's claim to the property was on the day I went over there after Mr. Medley's death, Friday. I did not ask Mrs. Foley for the keys that day, not until after I had been appointed administrator. That was Monday following his death.

"Q. Well, now, did she know what those keys belonged to? A. I don't think she had a conception of what a safety deposit box was, for I explained to her, and she said Mr. Medley had the keys. She did not know where the box was, or to what the keys belonged until I told her they were the keys to the safety deposit box, and that it was located in the same building with my office. I invited her to come over and be present when the box was opened. She came over. She wanted to be there because both of us suggested that there might be a will, and she said she would like to be there when it was opened. I notified her of the time and she came."

On cross-examination:

"I asked plaintiff for the keys after I had been appointed administrator. She declined to give them to me, and said she had 'been advised to hold to the keys,' was her expression. I had a talk with Mr. Alden, the Kansas administrator, about the keys. He got them from her and I got them from him.

"Joseph Medley, the brother, learned of John's death through letters written by Mr. Lorie, at my suggestion. I knew he was in the oil regions, so had letters written to several towns in that district, and received a reply from him from Titusville, Pennsylvania. I did not learn from Mr. Medley the address of his brother.

"Medley had but few social acquaintances. He was measurably firm in his opinions, but frequently I would bring him around to my way of thinking as to

values of property. I made all of his loans for him, except one. In a jocular manner once I advised him to make a will. He never made one that I know of. He consulted a lawyer a few times about business. I did not know whether there was a will or not. I supposed if there was one, it would be in the safety deposit box.

"I went to Dr. Milner's office, the attending physician, and with his and the Foleys' consent, I had a trained nurse sent to wait upon Mr. Medley.

"Don't think he had any debts."

JOSEPH MEDLEY on behalf of defendant, testified as follows: "Am a brother of John Medley, deceased. I had not seen him for thirty-six years. I live in Titusville, Pennsylvania, and have lived there ever since 1861. I last saw John in July, 1870, when he left Pennsylvania to come back to Missouri. Both of us had been in Missouri in 1869—came out here to buy land and go into the stock business. We went to Pettis county, and had some trouble in getting the title straightened out. We paid five dollars an acre for a thirty days' option on the land. The lawyer thought it would take two months to do that, so we went back to Pennsylvania. In about a month we heard from the lawyer and he said the title could never be fixed up, so brother came back here for the purpose of looking after other land; and after being here about a month he wrote me this letter.

"'Sedalia, August 11, 1870.

"'Dear Brother: I received your letter the 1 of Aug. Both no news. it must be werey scaires. I and D. titus and Loucks are a going out to Saline County this week to louk at this land. Titus Payed five Dollars for the Refusal of this land for thirty days. He wants 80 acres of it. Loucks wants forty or Eithey acres of it and there it only 320 acres of it all in one peice and all viled land. The North east fence and the South east fence is Build or up so it would not tack

very much to fence it. Oure Refusal Run out on the 11th of August and I Don't think he can Pay his payment when the time comes. He can't get a letter from Hydetores. he Dont know wath to Due. I think he Cant get the money and loucks he is a going to see a Bout it. I Do know whether he thaks aney or not D' titus licks it very mush out there he wanste the land it this a spledit piece of land: You can make up your mond thill I Wrote a gain and then I let you know all the peticlars a bout it. I ath you Doo. use your owen judgment the land there is verey high. There is Wile land that Cant be Bouth least than thirty dollars in that Wicinity and the going to have a railroad which will mack this land higher thats the Best of Missouri a long ther on the River. a man is joure of a Crope Every year the Crope is not verey this no vere Bout it is good ther they claim a good full grape everey year it is only tow miles from a town and one mile from a saw mill and tow more sawmills with in three miles and hlafe mile from steamboth landing the weather is still warm here nity five and a hundred Decrees heat if it don't rain before long we vont have no Coren here in the South West. Everything is Drying up for the vant of Rain I would lick to know how you and Pesnicker getting a long Bout that land I must close know when I get to Saline I let you know what to Doo I hint Bought this land yet Waiting for you for a anser it touck to long we got to go now over ther Mine Best Respects to you all.

" 'yours truly, JOHN MEDLEY.'

"Q. At the time your brother came back here to Missouri with the Titus family in 1870 had there been any difficulty of any kind between you? A. No, sir, there never was. Q. Did you owe him any money? A. No, sir. Q. Had there been any words or any feeling at all between you at that time? A. No, sir, there never was any hard feelings between us. Q. Did you try to locate your brother after he came out

here? A. I did. Here is a letter I wrote to these parties after I didn't hear from him after about two or three months, to Mr. Loucks, the first party that he came here with, roomed and boarded with them when he was here; I asked Mr. Loucks, 'What has become of my brother; I don't hear from him any more.' Mr. Loucks wrote this letter back and said that he came and told him good-bye and that he went to St. Louis to work at his trade. Then I employed a fellow that went from here down to St. Louis to go to the chief of police and have the chief of police get his force and hunt my brother in St. Louis. When he came back he said they couldn't find him. From that time on I didn't know anything more about him. Q. Never heard from him since. A. No, sir. Q. Until the time of his death? A. Until the time of his death. Q. What is your nationality, Mr. Medley? A. Came from France.''

*Cross-examination by Mr. Boyle:*

''Q. Mr. Medley, was your brother older than you or younger. A. No, he was four years older than I was. Q. Your brother was a man who told the truth, was he not? He was a very truthful man? A. He was. Q. And a very just man, was he not? A. Yes, he was a just man. Q. A good man? A. He was a good man. Q. Do you know why your brother would tell others that you owed him money and that you hadn't treated him right, if that was not true? Do you know why he would do that, Mr. Medley? A. No, I wouldn't know why, but I don't believe he ever did. Q. You know Mr. Harrison here? Do you know his administrator? A. Yes, I know him since. Q. Do you know why your brother would tell him you owed him some money and wouldn't pay him? A. I can explain that to you probably. Q. I wish you would. A. We had bargained for two acres of land

and when I bought the farm, there was two hundred dollars that he had paid was to go back to him if he didn't keep it. He left that deed in my possession when he came out here, and said, 'You see to it,' and I bought the land, the whole farm, and then we got into a controversy about the title, and it has never been settled to this day, and there is where this two hundred dollars remains. Q. What two hundred dollars. A. That you were speaking about me owing him. Q. I wasn't speaking about two hundred dollars you owed him. Was this his two hundred dollars? A. This was his two hundred dollars. Q. That is how many years ago? A. That is since 1868. Q. And that isn't settled yet? A. That is not settled yet; it is in the courts now. Q. Who has got it in court? A. Well, it was me and a fellow by the name of Pasnecker. Q. What is the name of the law suit? A. Why, it is about the real estate—about the title. Q. What court is it in? A. In Bernango county. Q. Is that suit in your name? A. No, I sued the party for the title. Q. Well, whose two hundred dollars was this? A. This was Pasnecker that I sued for the title; this two hundred dollars that my brother paid on these two acres went to this Pasnecker, not to me. Q. Was you suing for that? A. No, sir, I was suing for the title, to get it. Q. That was one of the things he felt a little miffed about? A. No, he didn't feel hurt to me, because I never had in fact received—never went through the court, never was settled; I couldn't do anything more when I didn't hear from him. Q. Do you think that this was what he referred to when he spoke to Mr. Harrison? A. That is the only thing I would know. Q. Was he a man that had a good memory? Did he have a pretty good memory? A. Why, so far as his memory was concerned, I don't know as there was anything wrong with his memory. Q. Mr. Medley, he wasn't a man that roamed around the world very much, was he? A.

No, he didn't. Q. He was a very quiet, steady-going man, was he not? A. Well, he was the same as any ordinary man about going around the world; we were always together mostly. Q. You haven't moved from the place where you were? A. Yes, we were in Pleasantville; now I live up in Titusville. Q. How far is that? A. About six miles. Q. How long have you lived in that locality? A. Where I am now? Off and on we lived in Pleasantville from 1863 to 1870. Q. About how many years—thirty-five or forty years? A. Well, let's see; it was in 1860—I went there in 1861, to this Hightown; I was just six years at the time in Pleasanton. Q. As soon as you heard of the death you came right on here? A. No, sir, I didn't. Q. Oh, you didn't come right on? A. No, sir. Q. You have been over to see the Foleys haven't you? A. No, sir. Q. Since you came here to this trial? A. No, sir, I haven't. Q. Didn't you go over and talk to them about how John died, about how he had lived here all these years, and what he did? A. No, sir, I don't know the Foley family; I haven't seen them as I know of. Q. Well, you made arrangements for a tombstone? A. No, sir. Q. Sir? A. No, sir, I haven't."

## Re-Direct Examination by Mr. Lorie:

"You wrote to me to attend to the tombstone? A. I wrote to you, and I didn't come out here until about a week or ten days ago, ain't it? Q. Yes, sir. A. That is the first time I have been here in this city."

## Re-Cross Examination by Mr. Boyle:

"You have been here now how long? A. Maybe a week or ten days; we came on Monday, I guess. Q. What have you been doing during that time? A. I have been boarding out here. Q. You haven't stayed there all the time? A. No, sir. Q. Where have you

gone? A. I came to Mr. Harrison's and Mr. Lorie. Q. Is that all the places you have gone? A. That is about all, only going around the town. Q. You went out to the graveyard? A. No, sir. I haven't been out there yet. Q. Didn't you go out to see where your brother was buried? A. No, sir, I haven't. Q. Were you very fond of your brother? A. I am; I would give everything I have now if he was here.

### Re-Direct Examination by Mr. Lorie:

"Q. You told Mr. Harrison here you wanted him to take you over there and show you where your brother's grave was, didn't you? A. Yes, sir. Q. You also wrote to me that when you came out here you wanted to see about having your brother's body moved to Pennsylvania, didn't you. A. I wrote out here if I could get his body, the first letter we wrote to you, if I could have his body if I came out, whether he died of any contagious disease or not, and you said I could have his body; I told you I would come as soon as my health would permit me; I wasn't able to come."

### Re-Cross Examination by Mr. Boyle:

"Q. Why didn't your brother write to you? A. Well, that is one reason I can't give you. Q. Why didn't you write to him? A. Because I didn't know where he was. Q. Your brother knew where you were, didn't he? A. Well, I believe he did; certainly he did; because he left, and he knowed where he left me."

GEORGE TUCKER, in rebuttal, testified that he saw Medley during his last sickness and discussed some business matter, and that he seemed to be perfectly rational.

DR. MILNER, the attending physician, also testified, in rebuttal, that he thought Medley was rational during his last sickness.

Such additional evidence and facts as may be necessary for a proper determination of the case will be noticed in the opinion.

## OPINION.

I.  Counsel for appellant have made no assignment of errors, save those mentioned in connection with the points and authorities made and cited in their briefs.

It is first insisted that the new trial was not granted because the verdict was against the weight of the evidence, but on account of the insufficiency of the evidence. We are unable to ascertain from this record upon what that insistence is predicated. The order sustaining the motion for a new trial contains no such recital, but upon the contrary it affirmatively appears therefrom that the new trial was granted "for the reason that the plaintiff is not entitled to recover."

The trial court might very well have concluded from the entire record that the verdict was against the weight of the evidence, as well as that the evidence was insufficient to support the verdict. If from the former, then this court should not disturb that ruling, for the reason that the question of granting a new trial on account of the verdict being against the weight of the evidence should be exclusively exercised by the court trying the cause; and where the trial court is of the opinion that the verdict is not supported by the evidence or is against the weight of the evidence, it should never hesitate in exercising its power and grant the aggrieved party a new trial.   [Reid v. Life Ins. Co., 58 Mo. 421; Loevenhart v. Railroad, 190 Mo. 342.]

The conclusion thus reached, if standing alone, would result in an affirmance of the order and judgment of the circuit court granting the respondent a new trial; but to stop here would leave undetermined

all the questions presented by this record regarding the merits of the case, and thereby leave those questions as much in the dark as they were before this appeal was taken. Under those conditions another trial in all probability would be had and another appeal would be taken, and after years of litigation and delay the same questions would again be presented to this court for adjudication. So, under the circumstances we think it but wise at this time to give expression to our views of the law governing the case upon the merits.

II. This brings us to the consideration of the real question raised by this controversy, and to be decided by this court, namely: what constitutes a valid *donatio mortis causa;* and whether the evidence introduced by appellant comes up to the legal requirements necessary to establish such a gift by John Medley, the alleged donor, to Elizabeth Foley, the alleged donee?

I am unable to ascertain the exact period when this species of conveyance of personal property was first recognized by law. Its origin, however, is of great antiquity. Justinian embodied it in his Institutes, and it seems to have been in existence among the Greeks at a much earlier date. However, whatever may have been its origin, or the date thereof, it is quite clear that we borrowed it from the English Common Law, and the English borrowed it from the Roman Civil Law. In order, therefore, to acquire a clear and full perspicuity of this gift and of the law governing the same, it is quite essential that we briefly, at least, review the civil and common law applicable to the subject, also the limitations that were placed upon it when we adopted the Common Law of England in this country. Without such a review it would be absolutely impossible to reconcile or understand the apparent conflict of authority existing upon the subject.

The primary definition of a gift *mortis causa*, as we understand that term, is founded in the Civil Law, as shown by the Institutes of Justinian, and that definition is the primary source of the meaning thereof as adopted by the courts of England and by many if not by all of those of this country.

Beginning on page 218 of Hammond's Edition of Justinian's Institutes, in a note, it is said:

"1. A donation *mortis causa* is that which is made to meet the case of death, as when anything is given upon condition that, if any fatal accident befalls the donor, the person to whom it is given shall have it as his own; but if the donor should survive, or if he should repent of having made the gift, or if the person to whom it has been given should die before the donor, then the donor shall receive back the thing given. These donations *mortis causa* are now placed exactly on the footing of legacies. It was much doubted by the jurists whether they ought to be considered as a gift or as a legacy, partaking as they did in some respects of the nature of both; and some were of opinion that they belonged to the one head, and others that they belonged to the other. We have decided by a constitution that they shall be in almost every respect reckoned amongst legacies, and shall be made in accordance with the forms our constitution provides. In short, it is a donation *mortis causa,* when the donor wishes that the thing given should belong to himself rather than to the person to whom he gives it, and to that person rather than to his own heir. It is thus that, in Homer, Telemachus gives to Piraeus:

" 'Piraeus, for we know not how these things shall be, whether the proud suitors shall secretly slay me in the palace, and shall divide the goods of my father, I would that thou thyself shouldst have and enjoy these things rather than that any of those men should; but

if I shall plant slaughter and death amongst those men, then indeed bear these things to my home, and joying give them to me in joy.' ''

Continuing on page 219, the author says:

''There are two essential conditions of a *donatio mortis causa*: it must be made with the view of meeting the case of death; and it must be made to take effect only if death occurs, and so as to be revocable at any time previous, and to fail if the recipient died before the giver. The donor might, however, at his pleasure, alter the character of the gift, making it irrevocable, but it was always dependent on the recipient outliving the donor.

''It might be made conditional upon death in two ways. The donor might say, I hand you over my horse, but the gift is only to be complete if I die in this enterprise; or he might say, I give you my horse, if I survive this enterprise you are to give it me back. In the latter method, the delivery of the thing is made at once, subject to a conditional redelivery; in the former the delivery is made conditional. The donation might also be sometimes made conditional upon the death of a third person, as if a father promised to give to his daughter-in-law in case of the death of his son. All who could make a testament could make a valid *donatio mortis causa*; and all who could receive under a testament could accept one. Every kind of thing could be given in this way. Justinian, in the constitution referred to in the text, required that a *donatio mortis causa* should be made in the presence of five witnesses.

''If the gift was made in the first of the two ways above mentioned, although there was delivery, yet the thing was only acquired on the death of the donor, and the donor not having ceased to be *dominus* could therefore, if he revoked the gift, bring a real action to reclaim the thing handed over. If the gift was made in the second way, the whole property passed at

once by the tradition to the recipient; and as, in the older and stricter law, the *dominium* passed absolutely· when it passed at all, the property in the thing could not revert to the donor merely by the condition having been accomplished. He would only have a personal action against the recipient to compel him to give the value of the thing if he did not choose to give back the thing itself. The later jurists seem, however, to consider that the *dominium* reverted *ipso jure,* and that the donor could bring a real action for the thing itself.

"If the donor was insolvent at the time of his death, this was considered as an implied revocation of the gift."

Even at that early date a distinction was drawn between this class of gifts and legacies. In the consideration of this distinction, it is stated in Moyle's Comments on Justinian's Definitions, page 222, note 1, that such gifts occupied a position "midway between legacies and gifts *inter vivos.* In that it consists in a present act of bounty, it differs from a legacy, which confers no right whatever on the legatee until the testator is dead, and his heir has accepted the inheritance. Here if the donee outlives the donor, the thing given never goes to the heirs at all. It differs from the latter in being absolutely perfected only ·by the donor's decease. The gift may be made so conditional in that event that the property in the gift does not pass to the donee until its occurrence. In the meanwhile he has only its use and enjoyment. Or the property may pass at once, subject to the understanding that it is to revert to the donor in case of his proving the better life."

The foregoing quotations briefly outline the civil law as it existed under the Roman Empire prior to its adoption by the English government.

The early English courts in adopting the civil law were not uniform in their rulings upon this subject.

They differed as to certain elements which were essential to a valid *donatio mortis causa*. The English reports are full of cases showing these disagreements, and the great conflict of authority upon that subject in this country is largely traceable to that diversity of opinion among the English courts. Some of the courts of this country follow one line of the English cases, while the remainder follow the other.

The clearest and most concise review of the conflict between the English cases which I have been able to find is found in the case of Leyson v. Davis, 17 Mont. 220, 31 L. R. A. 429. On page 443, HUNT, J., in speaking for the Supreme Court of Montana, said:

"Inasmuch as the appellant founds his discussion of the description and nature of *donationes causa mortis* upon Swinburne, who wrote in the latter part of the sixteenth century upon the civil law, we give that commentator's definition: 'One, when the giver is not terrified with fear of any present peril, but moved with a general consideration of man's mortality, giveth anything. Another, when the giver, being moved with imminent danger, doth so give that straightways it is made his to whom it is given. The third is when any being in peril of death doth give something, but not so that it shall presently be his that received it, but in case the giver do die.' [Swinburne, Wills (Powell's Ed., 1803), p. 54.] The earliest decisions, next after Swinburne's text, to which we have accessible reference, begin with Drury v. Smith, 1 P. Wms. 405, where Lord COOPER, in 1817, held that, where a testator, in his last sickness, made a gift, and the possession was transmuted to his nephew, it must be upheld, because 'he might in his lifetime, after the making of his will, give away any part of his estate absolutely, and by the same reason might, notwithstanding the will, give away any part thereof conditionally, and this gift being so fully proved,' was held to be a *donatio mortis causa*. That a delivery

has always been held necessary in England is also sustained by Lawson v. Lawson, Id. 441, where a gift was made by a husband, in his last sickness, to his wife of a purse with money in it. In Miller v. Miller, 3 P. Wms. 356, just before death the testator called to his servant to reach him his pocket-book, took thereout two bank notes for £300 each, and another note for £100, not being a cash note, or payable to bearer, all of which notes he ordered his servant to deliver to his wife, who was present. Afterwards the testator, by word of mouth, gave her his coach and horses. The gift of the bank notes for £600 was sustained upon the ground that the party was in his last sickness, and that they were delivered. The next case, and what may be termed a leading one in England, was Lord HARDWICKE's opinion, in 1752, in Ward v. Turner, 2 Ves. Sr. 431. It cited the last two cases just above referred to, sustaining the doctrine that there must be an actual delivery. The deductions from the discussion in that case are well summed up by an English writer (Shearwood) in an Elementary Outline of the Principles of Equity. He says that Lord HARDWICKE decided that a gift of this description, in order to be valid, must be made: (1) In such a state of illness or expectation of death as would warrant a supposition that the gift was made in contemplation of that event. (2) On condition that it is to become absolute only upon the event of the donor's death. It follows from this that it is a gift revocable during the donor's lifetime. (3) There must be actual delivery.

"Advancing, next, to the time of Blackstone, that commentator treats this species of gift as 'another death-bed disposition of property,' and thus defines it: 'And that is, when a person in his last sickness, apprehending his dissolution near, delivers or causes to be delivered to another the possession of any personal goods (under which have been included bonds,

233 Sup.—33

and bills drawn by the deceased upon his banker) to keep in case of his decease. This gift, if the donor dies, needs not the assent of his executor; yet it shall not prevail against creditors, and is accompanied with this implied trust, that, if the donor lives, the property thereof shall revert to himself, being only given in contemplation of death, or *mortis causa*. This method of donation might have subsisted in a state of nature, being always accompanied with delivery of actual possession, and so far differs from a testamentary disposition; but seems to have been handed to us from the civil lawyers, who themselves borrowed it from the Greeks.' [2 Bl. Com., p. 514.] In Tate v. Hilbert, 2 Ves. Jr. 111, Lord LOUGHBOROUGH, in 1793, discusses the delivery essential to sustain a *donatio mortis causa,* and disapproves of the definitions of Swinburne heretofore referred to. He treats them as only references to different texts of the civil law, and says that Swinburne, in his definitions, 'is coupling the description of a legacy with a very short text of the civil law, and there is a perplexity in it.' He further says that the first two definitions of Swinburne, the second of which the appellant in this case relies upon, are clearly mere donations. He then discusses the books of Justinian, and says that Swinburne ought to have looked a little further, and he would have found a history by Justinian of the contests upon the subject of gifts. The exact text from Justinian, from which Professor Hammond has worked his translation, as given above, is quoted in full by Lord LOUGHBOROUGH, who thus approves: 'There it is clearly and correctly defined, that it had in effect the nature of a legacy, was liable to debts, and that it was only a gift upon survivorship; and the danger of suffering these gifts to be taken loosely occasioned, at the same time with the passage I have read, an ordinance by the Emperor, that it should be in writing, with five witnesses.' He then refers to Ward v. Turner, and concurs with

the reasoning that there must be some delivery of the property. We cite this case, having had access to the same and studied it with much care, to demonstrate that that portion of Swinburne's definition upon which the appellant relies has not met with approval by the most learned judges in England since Swinburne wrote. Powell in his comments and annotations to Swinburne's text also says: 'The two first sentences . . . . are simple gifts, the latter only applies to the *donatio mortis causa* and is better described or defined in *lege* 27, and in Justin. Inst., title 7, *De donationibus.*' [See note to Powell's Swinburne, Wills, p. 56.] Roper on Legacies approves of the criticisms of Swinburne by LOUGHBOROUGH in Tate v. Hilbert, and unequivocally states in his text that 'it appears, upon consideration of the before-mentioned definitions [Swinburne's], that the third alone is the proper *donatio mortis causa;* the other two being nothing more than pure irrevocable gifts *inter vivos.*' [1 Roper, Legacies, p. 2.] Other English writers have followed Justinian's definition with the qualification, recognized by Lord HARDWICKE in Ward v. Turner, that a delivery was essential. Spence on Equitable Jurisdiction, in 1846, called a *donatio causa mortis* a disposition of property 'when a person in his sickness, apprehending his dissolution near, delivers or causes to be delivered any personal goods or chattels to another, or puts the physical means of dominion over them into his power, to keep them for himself or for some one else; in case of the donor's decease. . . In the event of the donor recovering, the property reverts to him. If the donor die, the property belongs to the donee without the assent of the executor, though not as against creditors.' [1 Spence, Eq. Jur., p. 196.] Williams on Executors (pt. 2, bk. 2, sec. 4) briefly summarizes the attributes of a *donatio mortis causa* as follows: 'First, the gift must be with a view to the donor's death; second, it must be conditioned to take effect only on the death of

the donor by his existing disorder; third, there must
be a delivery of the subject of the donation.' ''

The great weight of authority in this country is
against the definition given by Swinburne in his treat-
ise upon the civil law, and is in harmony with that
announced by Blackstone, as will appear from the fol-
lowing quotations taken from the text-writers and ad-
judications.

Judge Story defines such a conveyance to be ''a
gift of personal property by a party who is in peril of
death, upon condition that it shall presently belong to
the donee in case the donor shall die, but not otherwise.
To give it effect there must be a delivery of it by the
donor, and it is subject to be defeated by his subse-
quent personal revocation, or by his recovery or es-
cape from the impending peril of death. If no event
happens which revokes it, the title of the donee is
deemed to be directly derived from the donor in his
lifetime, and therefore in no sense is it a testamentary
act.'' [Story, Eq. Jur., sec. 606.]

Judge Kent in treating of this gift says: ''Gifts
*causa mortis* have been a subject of very frequent and
extensive discussion in the English courts of equity.
Such gifts are conditional, like legacies; and it is es-
sential to them that the donor make them in his last
illness, or in contemplation and expectation of death;
and with reference to their effect after his death, they
are good, notwithstanding a previous will; and if he
recovers, the gift becomes void. The apprehension of
death may arise from infirmity or old age, or from ex-
ternal and anticipated danger. The English law on
the subject of this species of gift is derived wholly
from the civil law. Justinian was justly apprehen-
sive of fraud in these gifts, and jealous of the abuse
of them, and he required them to be executed in the
presence of five witnesses. We have not adopted such
precautions; though it has been truly declared that

such donations amount to a revocation *pro tanto* of written wills; and, not being subject to the forms prescribed for nuncupative wills, they were of a dangerous nature. By the civil law, they were reduced to the similitude of legacies, and made liable to debts, and to pass for nothing, and to be returned if the donor recovered or revoked the gift, or if the donee died first. It was a disputed point with the Roman civilians, whether donations *causa mortis* resembled a proper gift or a legacy. The final and correct opinion was established, that a gift *inter vivos* was irrevocable, but that a gift *causa mortis* was conditional and revocable, and of a testamentary character, and made in apprehension of death.'' [2 Kent, Com., *444.]

At an early date the Supreme Court of Connecticut in defining such gifts in the case of Raymond v. Sellick, 10 Conn. 484, said: ''That species of donation is derived wholly from the civil law, and is where a person, in his last sickness, apprehending his dissolution near, delivers to another personal property, under which have been included bonds payable to the donor, and bank bills, to keep in case of the donor's death. Three requisites are necessary to constitute a gift of this sort. (1) It must be made by the donor in contemplation of the conceived approach of death. (2) It must be given to take effect only in case the donor dies. (3) And there must be a delivery of the subject of the donation. It is essential that the condition of its not passing while the donor lives be included, otherwise it will be a donation of another kind, namely, a *donatio inter vivos*. It differs from the latter in several respects, in which it resembles a legacy. It is ambulatory, incomplete and revocable during the donor's life. The revocation may be effected either by the recovery of the donor from his disorder, or by taking back the possession of the property. It can be made to the wife of the donor. On the other hand, it differs from a legacy in several particulars. The

claim need not be proved in a court of probate. The title of the donee becomes, by relation, complete and absolute from the time of the delivery. No consent or other act, on the part of the executor or administrator, is necessary to perfect the title of the donee. It is a claim against the executor; a legacy is a claim from the executor.''

Mr. Pomeroy in his excellent work on Equity Jurisprudence, after a careful and most exhaustive review of the authorities, defines these gifts as follows: ''A gift absolute in form made by the donor in anticipation of his speedy death, and intended to take effect and operate as a transfer of the title upon, and only upon, the happening of the donor's death. Between the time when the gift is made and the article donated is delivered, and the time when donor dies, the donation is wholly inchoate and conditional; the property remains in the donor, awaiting the time of his death, and passes to the donee when the death, in anticipation of which the gift was made, happens, unless the donation has in the meantime been revoked by the donor; the donee thus becomes a trustee for the donor, with respect to the article delivered into his possession, until the gift is made perfect by the donor's death. The gift must be absolute, with the exception of the condition, inherent in its nature, depending upon the donor's death, as above described, and a delivery of the article donated is a necessary element; but it is subject to revocation by the act of the donor prior to death, and is completely revoked by the donor's recovery from the sickness or escape from the danger in view of which it was made.'' [3 Pom. Eq. Jur. (2 Ed.), sec. 1146.] See, also, 2 Beach, Mod. Eq. Jur. sec. 1061; Grymes v. Hone, 49 N. Y. 21; Michener v. Dale, 23 Pa. St. 63; Story, Eq. Jur. pp. 599, 604; 2 Schouler, Pers. Prop. secs. 135, 138; Thornton, Gifts, sec. 21; Croswell, Exrs. and Admrs. sec. 620.

Under the light of the foregoing observations as to the law of *donatio mortis causa,* we will consider, first, the important question of the effect of the delivery of the keys to the safety deposit box by Medley to the appellant; and, second, is the evidence as preserved in this record sufficient to support the verdict of the jury? We will consider these questions in the order stated.

Under this evidence there can be no doubt but what the appellant had the possession of the keys to Medley's safety deposit box just after, if not before, his death; and since there is evidence tending to show that Medley had given them to appellant during his lifetime, and that she accepted the same as symbolic delivery of all his money and effects contained therein, we will for the purposes of this question concede that evidence to be true, but will reserve for future determination the second proposition, whether or not there was in fact a gift of the property made by Medley to the appellant.

Under that concession we are confronted with a delivery, and an acceptance of the keys by appellant at the time of their delivery, with the intention on the part of Medley to make a complete gift of the money and securities. Does that, in law, amount to a delivery of the money and securities contained in the box to appellant? The subject of the gift was money and promissory notes, secured by deeds of trust on various pieces of real estate situate in Kansas City, Missouri. There is no pretense that there was a physical delivery of any of this property to appellant or that any of the notes or deeds of trust were indorsed or assigned in writing, or that the safety deposit company, in whose vault the money and notes were deposited, was notified of the gift, or that it assented thereto. Upon that state of the record, the question materially presents itself, can the possession of money and promissory notes be so transferred and thus become the

subject of a valid gift *mortis causa*. Counsel for appellant affirms, while those for respondent deny that proposition. Each have filed briefs and written arguments, and have displayed great learning and research. They have not only cited us to the law of the case, but have pointed out the conflict of authority upon this subject, and have thereby greatly lessened our labors in this case.

Before passing to the consideration of the authorities of this country specially applicable to the case at bar, it will not be out of place to suggest that the common law of England bearing upon this question was never in force in all of its provisions in any of the States of this country. In the consideration of this subject Mr. Justice McLean, in Wheaton v. Peters, 33 U. S. 659, said: "No one will contend that the common law as it existed in England has ever been in force in all its provisions in any State of this Union. It was adopted so for only as its principles were suited to the conditions of the Colonies; and from this circumstance we see that what is common law in one State is not so considered in another. The judicial decisions, the usages and customs of the respective States, must determine how far the common law has been introduced and sanctioned in each."

In Commonwealth v. York, 9 Met. 93, Chief Justice Shaw said: "As this is an unwritten law, we must seek for the evidence of it in judicial records, precedents and decisions, and those digests, treatises and commentaries of learned and experienced men, which have acquired respect and confidence by long usage and general consent. If we consult English decisions made since the Revolution, it is not because they have any binding force as rules, but because they are expositions of the rules and principles of the common law, by men of great experience and judgment in the knowledge and application of the same laws which we are seeking to expound. And if we read the digests

and treatises of reputable authors, published since we
ceased to be English subjects, it is because they con-
tain the authentic records of the precedents and judi-
cial proceedings, which furnish the evidence of the
common law. In like manner, the decisions of courts
of other States, having the same common origin, and
deriving their laws from the same common source,
are valuable and useful in enabling us the more clearly
to understand, and the more fitly to apply, the rules
and principles of our own authoritative code of laws.''

On acount of the nature of the questions presented
by this record, it will be more convenient, if not more
orderly, to consider first the contentions of counsel for
respondent; and after that we will consider the propo-
sitions presented by counsel for appellant.

As previously stated, counsel for respondent con-
tend that the delivery of the keys to the safety deposit
box by Medley to appellant, accompanied with the dec-
laration that whatever there was in the box belonged
to her, did not constitute a legal delivery to her of
the contents thereof; and for that reason the alleged
gift of the money and notes to appellant was illegal
and void, and, consequently, the trial court properly
granted him a new trial. Or, to state respondent's
position practically in the words of his counsel, it is
as follows:

''That in order to make a gift of a bailment valid
there must be notice of the gift given to the bailee,
and an assent thereto by him, and without such notice
there can be no constructive delivery; that a deposit
of money or other valuables in the hands of a third
person for safe-keeping gives the owner a mere right
of action therefor, and that an assignment thereof in
writing or some instrument equivalent thereto is neces-
sary to perfect a delivery thereof, which assignment
must be accepted by the third party; that no right
of action accrues against a bailee until after demand
made upon him unless he has converted, or negligently

lost, or damaged the deposit; that in case of a gift *inter vivos* or *donatio mortis causa* it must be completed and take full effect during the life of the donor; that a safe deposit company for hire is a bailee within the meaning of the law, and has all the rights and is subject to all the duties of such; that where the subject-matter of a gift is deposited in a safe-deposit vault, as is true in the case at bar, it can be withdrawn by no one but the depositor, except by the compliance with the rules and regulations of the company; that there can only be a constructive delivery of a subject of a gift when such delivery is a delivery of the thing which in itself and alone is the means of using and enjoying a thing given; and that the transaction must show a complete executed transfer to the donee with the present right of property and the possession. The donee must become the owner of the property given and the donor must part with all his right in and dominion over the subject-matter of the gift which must take effect immediately and absolutely, leaving nothing essential to be done in the future.'' In support of that contention we are cited to many cases, which will be briefly considered.

The case of Ward v. Turner, 2 Ves. Sr. 430, is the most important case relied upon by counsel for respondent. As before indicated, this is the case upon which is practically bottomed all the cases relied upon by counsel for respondent, and is the index to their true meaning; and for that reason we feel justified in quoting liberally therefrom. The name of the donor in that case was Fly and the donee was one Mosely. The case made by the plaintiff was this: ''He was executor of Mosely, who was related to Fly by affinity, having married his aunt; that Fly had great obligations to Mosely, who took care of him in his infancy; and at his house Fly used to come from school, when it broke up; and afterward Mosely, who in the latter part of his life appeared to be in very mean circum-

stances, lived with Fly as his servant until Fly's death; had his victuals there; performed services to him; and had now and then a shilling given him; from thence Fly made profession of a strong intent to do for him at his death, and had great kindness for him; in pursuance of which, as Fly drew near his end, being in a very bad state of health, during that time he made Mosely several donations *mortis causa* in prospect of death. , Four times were fixed on by the witnesses, of which several were examined in the cause, speaking of actual gifts and declarations supporting them. First, 18th January, 1746, which was spoken to be by the porter of Furnival's Inn. The second, 6th February, 1746, which was the principal proof relied on by the plaintiff to support the gifts of these annuities, and was proved by Fly's barber, who being sent for by Fly found Mosely with him and no other; and swore to the particular words used, and declarations made, that Fly said to him, viz.: 'I intended to give him (speaking of Mosely) Longford estate for his life; but I have considered of it; and that which is worth £40 a year to another, is not worth so much to him; for if the tenants wanted an abatement for repairs, he would allow it, and therefore I will do better for him.' That thereupon Fly went to his escritoire, and taking three papers said, 'I give you Mosley these papers, which are receipts for South Sea annuities, and will serve you after I am dead.' The third, 23d February, which was proved by one, who swore that in his presence Fly said, 'Mosely, I give you all the goods and plate in this house.' Fourthly, 3d March, by the said barber, who swore, that Fly declared to him and to another person, who alone were present, that he gave to Mosely all his household goods, money, arrears of rent, and everything that should be found in his house, except his sword, gun and books; and that this together with those three receipts would make £2000; that he wished a gentle-

man of his acquaintance had his sword and gun, but all the rest he gave to Mosely. He died in April following.'' In passing upon this case, Lord Chancellor HARDWICKE, in speaking for the High Court of Chancery of England, said:

"There are two general questions. What is the weight and strength of the evidence in point of fact? Next, the result of that evidence in point of law, or the law arising on this fact?

"As to the first, and as to the conviction arising therefrom, there is, to be sure, very strong evidence on the part of the plaintiff of Fly's general intention of bounty, which is not to be disputed; but as to evidence of the-particular gifts, I cannot help taking notice, that the declarations relied on by the plaintiff to prove them are all made to persons of extreme low degree, his porter, barber, etc. It is observable, also, that Fly was bred an attorney; had some property; some real estate; was a man of business; and must be presumed, from his profession and education, to know something of what the law required to make a will; and certainly it would be more easy for him to have made a will in writing, than to have taken all these several steps to give away these parts of his estate. It is, likewise, observable, that the behavior of Mosely, and his declarations after the death of Fly, are some impeachment and weakening of the plaintiff's evidence; for it is extraordinary, that, if he thought himself entitled, he should not insist upon these goods being his own instead of suffering them to be taken away and assisting therein. At the same time, if I was to ground my opinion upon any objection to the evidence in point of fact, I should not determine it, but send it to be tried; for this is as proper a case to be tried as any other. It is not insisted upon by the plaintiff as a testamentary cause; for if he was to insist on that, it would overturn his demand, as he has no probate; but is insisted on as a donation *mortis*

*causa.* Trover might be brought for it; for it would
transfer the property; but though I have searched for
it, I do not find a case of that kind in the books, of such
an action at law, but it might be tried at law, was there
a foundation for it; and if I was to ground my opin-
ion upon the evidence in point of fact, I would direct
a trial. But, according to my opinion, there is no
reason to give the parties that trouble; for next, sup-
posing the fact well proved, the consideration is the
result in point of law.

"The relief sought is founded upon these gifts
being good donations *mortis causa.*

"First, as to any specific parts (if they may be
so called) except the annuities. They are clearly not
good (as I declared at the hearing), there being no
pretense of any delivery in any shape whatever. They
are so general, as, in my opinion, if they prove any-
thing, prove an intent to make a nuncupative will of
all his personal estate (this is, exclusive of annuities),
saying Mosely, I give you all the plate and goods in
this house, or, if I die, all are yours; but nothing was
delivered. It is said, he had possession by living in
the house, and did not want delivery; but he lived as
a servant who had no possession; so that if a servant
had them in custody, it would be a possession for his
master. The other declarations are not only of the
goods, but of all money and arrears of rent, and to
extend almost to everything; consequently there is no
ground to carry it so far; and it is impossible to sup-
port any of these gifts in prospect of death, as I have
declared already.

"Next, as to the gift of this annuity. If the wit-
nesses deserve credit, it is strong evidence of a general
intent of bounty; but it rather turns against the plain-
tiff, for it shows a general intent to give the whole
to Mosely, by making a nuncupative will or wills, at
different times. If that was to be admitted to sup-
port these several gifts as so many donations *mortis*

*causa,* it would overturn not only the letter but the
whole spirit and intent of the Statute of Frauds. But,
notwithstanding, suppose this gift of the annuities
was just as if it was a distinct and independent dona-
tion from the other matters insisted on as gifts, the
question is, whether it is such a gift as the law of
England allows as a donation *mortis causa?* First,
the fact of the gift is proved only by one witness;
whereas the civil law, from which this doctrine is
taken, requires five witnesses thereto; for Justinian,
when he allowed these gifts, was apprehensive of
fraud arising from them; and takes notice in that
very chapter relied on for the plaintiff, that he had
made a constitution to regulate it, that it should be in
the presence of five, limited in point of value, etc.,
which shows how jealous he was of it. Beside the wit-
ness swears to this in very formal words; and though
it is pretty hard to object to a witness as loose and
uncertain on one hand, and the contrary on the other,
yet this argues either a very strong memory or a
pretty strong assurance in swearing. But the ex-
press gift, as he swears, is only of the three receipts.
That is the form of the gift. Taking it, therefore, ac-
cording to the substance of the gift, that this amounted
to a declaration, that Fly by giving these receipts
intended to give the annuities, upon this the principal
point arises; whether delivery of the thing by way of
donation *mortis causa* is necessary; and, if necessary,
whether this delivery of the receipts is sufficient de-
livery of the thing given by way of donation *mortis
causa?* I am of opinion that delivery is necessary to
make good such a gift; and that the delivery of these
receipts for the consideration-money of the purchase
of them was not sufficient delivery to validate this act.
To clear this, it is proper to consider the notion of a
donation *mortis causa,* according to the civil and Ro-
man law and the law of England. According to the
civil and Roman law, there is great variety, and sev-

eral passages therein are pretty difficult to reconcile.
Digest, lib. 39, tit. 6, law 38, requires, that both donor
and donee should be present at the time of the gift,
*quo praesens praesenti dat*; which looks as if delivery
was intended at the time.   It is *quo* there and in several
editions; but in the Lyons edition of Gothofredus's
Corpus it is *quod*; which makes it sense.   Next, in
the Digest, same title, paragraph 1, it speaks of it
throughout as a restoring of the same thing, if donor
should recover; as if a restitution was to be.   It is
proper to take notice that in the Roman law there
were three kinds of donations *mortis causa*.   And in
2 Voet on the Pandect, lib. 39, tit. 6, par. 3, p. 710,
the division is agreeable to that made of these dona-
tions by Swinburne.   The first is a donation by one in
no present danger, but in consideration of mortality
if he died; and this is strictly compared to a legacy;
for the property was to pass at the death, not at the
time.   The second kind is, where the property passed
at the time defeasible, in case of an escape from that
danger in view, or of recovery from that illness.   The
third was, where, though he was moved with the dan-
ger, yet not thinking it so immediate as to vest the
property immediately in the person, but put it in pos-
session of the person as an inchoate gift to take effect
in case he should die.   Vinius's Commentary on this
place of Justinian is more particular; puts the remedy
by action donor might have in case he repented or re-
voked.   That is, on the last kind of donation *mortis
causa;* where he did not part with the property im-
mediately, he should have a real action; but where he
actually parted with the property, but the gift was to
be defeated by his revocation, or recovery, or escape
from that danger he was in, *conditionem habeat* (which
is a personal action), to make the irritancy, or to re-
cover damages for the thing; so that it differed not but
in the nature of the action.   And in Calvin's Lexicon,
that is the distinction.   Swinburne on the text I have

quoted, implies there should be a delivery; saying that legacies differ from such donations; for that legacies are not delivered by the testator; but to be paid or delivered by the administrator; putting the distinction upon the one being delivered in life, the other after death.

"But notwithstanding this, several books in the civil law import the contrary; particularly Vinius in his Comment. lib. 2, tit. 7, sec. 1, numero 2; 1 Cobaruvius, rub. 3; and Voet on the Pandect, same chapter, num. 3 and num. 6, which passages show the different expression and opinions, some importing a delivery, others not. I have mentioned them to come at that which seems the distinction reconciling them all, according to what is laid down by Voet (num. 7), that they did not require an absolute delivery of possession to the first or third kind of gift I have mentioned; but in the other case, where the property was to pass immediately, it was required; which is the meaning of the expression in Voet, *in mortis causa donatione dominium non transit sine traditione,* and of that other expression in Voet. With this distinction these passages in the civil law are properly reconciled. Though I know these donations *mortis causa* could never come directly in question in the ecclesiastical court, they might collaterally; and on these two heads I inquired whether there have been any cases there upon this: viz., in suits against an administrator on account of assets by the next of kin, where the administrator had insisted he could not administer such a part; because it was given *mortis causa*; or if there is a will, in which there are specific legacies, and one of those legacies he had given in his life by way of donation *mortis causa,* there it might come in question in the ecclesiastical court; but I cannot find it has. The nearest case to it is Ousley v. Carroll, June, 1722, in the Prerogative Court before Dr. Bettesworth. There was left a writing in presence of three witnesses, not

in the form of a will, but a deed, viz., 'I have given and granted, and give and grant, to my five sisters and children of the sixth, their heirs, executors, and administrators, in case they survive me, all my goods and chattels, and real and personal estate, and all which I may claim in right of my own, whether alive or dead.' The dispute was by a person claiming as his wife, and who had been so, but divorced; who insisted this was no will, but deed of gift *mortis causa* (and a gift *mortis causa* may be made in writing as well as otherwise, and so it might by the Roman and civil law), but the ecclesiastical judge was of an opinion this was testamentary; proved it as such as a testamentary act, and probate was granted; from which there was no appeal; but a case was there cited of Shargold v. Shargold, upon deed of gift by Dr. Pope not to take place until his death, and sixpence delivered by way of symbol to put grantee in possession; that was pronounced for as a will, not as a donation *mortis causa;* which I mention to show how far the ecclesiastical court has considered these things as testamentary. Having considered these donations, the different species, and how far delivery is necessary by the Roman and civil law, I will consider it according to the law of England. They are undoubtedly taken from the civil law; but not to be allowed of here farther than the civil law on that head has been received and allowed. Taking the law of England to consist (as Hob. says) of rules of law and equity, it might have come in question in cases of action of trover and detinue; but I have never found any action on that head. Consider it, therefore, as in this court; the civil law not binding here but as far as received and allowed, which must be from adjudged cases and authorities, proving that the civil law has been received in England in respect of such donations only so far as attended with delivery, or what the civil law calls *traditio;* for which Swinburne, who

being an English writer on the civil law, what he lays down is some evidence of what has been received here. [Part 1, sec. 7.] But in other places (Sec. 6, in tit. Definition of Legacy) he is still more express. In both places, in one directly, in the other collaterally, he lays down that delivery is necessary. Next, consider it on the resolutions of this court; the same thing results from them. There are not many cases on this head; and they are somewhat loose. The first is Drury v. Smith, 1 P. Wms. 404, where Lord Cowper founded himself on this, and the possession transmitted and changed; next Lawson v. Lawson, 1 P. Wms. 441. All that I can collect from thence is, that the purse was held good, because delivered to the wife herself. As to the other legacy of £100 bill, I cannot say on what it depended. It is a kind of compound gift; so many collateral circumstances are taken into it, that nothing can be inferred from it; but, being a draft on his gold-smith, that draft was delivered; so that it does not contradict what I lay down; and there was delivery, so far as it was capable. In Jones v. Selby, Chan. Pre. 300, the result is, that the opinion of the Master of the Rolls was founded plainly on this of the delivery of possession; holding that the gift of the tally, as contained in the hair trunk was a good donation *mortis causa;* and that Lord Cowper avoided determining that on the foundation of the subsequent point of a satisfaction or ademption, on which he grounded his determination. In all the instances it is absolutely necessary to be the person's after the party's death; though in some cases it vests the property, in others not. But to explain more fully Lord Cowper's opinion there, I will refer you back to Drury v. Smith, and to Hedges v. Hedges, Chan. Pre. 269, which turned on another point; but there Lord Cowper laid down a necessity of delivery very strongly, where he says testator gives with his own hands.

"In Snellgrove v. Baily, determined by me 11th March, 1744, was urged: where a bond was given in prospect of death; the manner of gift was admitted; the bond was delivered; and I held it a good donation *mortis causa.* It was argued that there was no want of actual delivery there or possession, the bond being but a chose in action, and therefore there was no delivery but of the paper. If I went too far in that case, it is not a reason I should go farther; and I choose to stop there. But I am of opinion that decree was right, and differs from this case; for though it is true that a bond, which is specialty, is a chose in action, and its principal value consists in the thing in action, yet some property is conveyed by the delivery; for the property is vested; and to this degree that the law-books say, the person to whom this specialty is given, may cancel, burn and destroy it; the consequence of which is, that it puts it in his power to destroy the obligee's power of bringing an action, because no one can bring an action on a bond without a *profert in cur.* Another thing made it amount to a delivery, that the law allows it a locality; and therefore a bond is *bona notabilia* so as to require a prerogative administration, where a bond is in one diocese, and goods in another. Not that this is conclusive; this reasoning I have gone. upon is agreeable to Jenk. Cent. 109, case 9, relating to delivery to effectuate gifts. How Jenkins applied that rule of law he mentions there, I know not; but rather apprehend he applied it to a donation *mortis causa;* for if to a donation *inter vivos,* I doubt he went too far.

"Another case is Miller v. Miller, 3 P. Will. 356; which is a very strong case, so far as that opinion goes, to require delivery; which case, I believe, was hinted at as inconsistent with my decree; but there is a great difference between delivery of a bond (which is a specialty, is itself the foundation of the action, and destruction of which destroys the demand) and the

delivery of a note payable to bearer, which is only evidence of the contract. Therefore, from the authority of Swinb. and all these cases the consequence is, that by the civil law, as received and allowed in England, and consequently by the law of England, tradition or delivery is necessary to make a good donation *mortis causa*; which brings it to the question, whether delivery of the three receipts was a sufficient delivery of the thing given to effectuate the gift. I am of opinion it was not. It is argued, that though some delivery is necessary, yet delivery of the thing is not necessary, but delivery of anything by way of symbol is sufficient; but I cannot agree to that; nor do I find any authority for that in the civil law, which required delivery to some gifts, or in the law of England, which required delivery throughout. Where the civil law requires it, they require actual tradition, delivery over of the thing. So in all the cases in this court, delivery of the thing given is relied on, and not in the name of the thing; as in the delivery of sixpence in Shargold v. Shargold; if it was allowed any effect, that would have been a gift *mortis causa,* not as a will, but that was allowed as testamentary, proved as a will, and stood. The only case wherein such a symbol seems to be held good is Jones v. Selby; but I am of opinion that amounted to the same thing as delivery of possession of the tally, provided it was in the trunk at the time. Therefore, it was rightly compared to the cases upon 31 J. 1, Ryal v. Rowles and others. It never was imagined on that statute, that delivery of a mere symbol in name of the thing, would be sufficient to take it out of that statute; yet, notwithstanding, delivery of the key of bulky goods, where wines, etc., are, has been allowed as delivery of the possession, because it is the way of coming at the possession, or to make use of the thing; and, therefore, the key is not a symbol, which would not do. If so, then delivery of these receipts amounts to so much waste paper; for if one

purchases stock or annuities, what avail are they after acceptance of the stock? It is true, they are of some avail as to the identity of the person coming to receive; but after that is over, they are nothing but waste paper, and are seldom taken care of afterwards. Suppose Fly, instead of delivering over these receipts to Mosely, had delivered over the broker's note, whom he had employed, that had not been a good delivery of the possession. There is no color for it; there is no evidence of the thing, or part of the title to it; for suppose it had been a mortgage in question, and a separate receipt had been taken for the mortgage-money, not on the back of the deed (which was a very common way formerly, and is frequently seen in the evidence of ancient titles) and mortgagee had delivered over this separate receipt for the consideration-money, that would not have been a good delivery of the possession, nor given the mortgage *mortis causa* by force of that act. Nor does it appear to me by proof, that possession of these three receipts continued with Mosely from the time they were given, in February, to the time of Fly's death; for there is a witness who speaks, that in some short time before his death, Fly showed him these receipts and said he intended them for his uncle Mosely. Therefore, I am of opinion it would be most dangerous to allow this donation *mortis causa* from parol proof of delivery of such receipts, which are not regarded or taken care of after acceptance; and if these annuities are called choses in action, there is less reason to allow of it in this case than in any other chose in action; because stocks and annuities are capable of a transfer of the legal property by act of parliament, which might be done easily; and if the intestate had such an aversion to make a will as supposed, he might have transferred to Mosely; consequently, this is merely legatory, and amounts to a nuncupative will, and contrary to the Statute of Frauds, and would introduce a greater breach on that law than ever was

yet made; for if you take away the necessity of delivery of the thing given, it remains nearly nuncupative. To this purpose, consider the clauses in the Statute of Frauds relating to this; which seem to me to be applied directly to prevent a mischief of this sort. The clauses are in sections 19, 20, 21, 22, which have very anxious provisions against dispositions of this kind, requiring three witnesses, solemn declaration of testator, fixing the place of making, and to be reduced into writing six days after making. These are in cases where no will was made. Next comes another requisite, where a will has been made. If what the plaintiff insists on is right in point of law, that this gift of the annuities by delivery of the receipts was good, yet, though Fly had made a will before, it had been equally good notwithstanding that will, because this relates to revocation of a will in writing by anything amounting to a testamentary act. It would be good against the will, as appears from the cases. Would not that be quite contrary to the plain provision of this clause, taking away delivery of the thing? Here is then a revocation of a will by words only, viz.: 'This is yours when I die.' All these clauses, therefore, will be overturned, if such evidence is admitted. But it is said, if this is not allowed, it will be impossible to make a donation *mortis causa* of stock or annuities, because in their nature they are not capable of actual delivery. I am of opinion it cannot without a transfer, or something amounting to that; and there is no harm in it, considering how much of the personal estate of this kingdom, vastly the greatest proportion of it, subsists now in stock and funds; and all the anxious provisions of the Statute of Frauds will signify nothing, if donation of stocks, attended only by delivery of the paper, is allowed. It might be supported to the extent of any given value, and would leave these things under the greatest degree of uncertainty; and amount to a repeal of that useful law as

to all this part of the property of the subjects of this kingdom. Therefore, notwithstanding the strong evidence of the intent, this gift of annuities is not sufficiently made within the rules of the authorities; and I am of opinion not to carry it further. If any doubt remains in any one's mind, I will add (what I very seldom do, though it has been done by my predecessors) that I should be very glad to have this point settled by the supreme authority; for it highly ought to be settled, if there is a doubt, considering so large a property of this kind.

"The bill ought to be dismissed therefore without costs, as to the demand of these annuities, or any other part of the intestate's estate by way of donation *mortis causa.*"

By here presenting the leading case relied upon by counsel for the other side, and upon which all the authorities cited by them are buttressed, the leading idea running through the authorities cited by both parties will be readily seen and better understood as they are considered. That case is the case of Duffield v. Elwes, 1 Sim. & Stu. 243. That was an action where the defendant was possessed of a certain bond, covenanting to pay a certain sum of money, which was secured by a mortgage upon real estate to secure the money mentioned in the bond. He also had another mortgage calling for a larger sum. The second was dated November 3, 1820. It recited that $30,000 had been advanced upon the mortgage by Sir Sandys to the prior mortgagees, and further secured by a bond, and a judgment recovered, and that the mortgagees had called in the money. It was witnessed, in consideration of the $30,000 advanced by Elwes to Sandys to pay off the mortgage, that the money and judgment were assigned, and certain realty was also conveyed by mortgage from Sandys to Elwes to secure the $30,000. The latter, when on his death-bed and unable to write, stated that he gave the bond and mortgage,

and the money secured thereby, to his daughter, Mrs. Duffield. At the suggestion of Elwes they were delivered into the hands of the daughter.

Upon that state of the record, the Vice-Chancellor held that the gift was not complete as a gift *inter vivos*. But upon appeal, in the House of Lords, Lord ELDON, after citing the authorities, observed: "Lord HARDWICKE is clearly of opinion that the delivery of a bond as a specialty would do; and if, then, the debt is well given by the delivery of the bond, the next question is, what are we to do with the other securities which are, or not, delivered over? In the present case the bond, the assignment, the covenant and all the deeds are delivered over in such manner that the representatives of the donor could not get at them; and the question is, whether, considering the difference between an absolute estate in land and a mortgage, the same principle does not apply in the case of a mortgage as in the case of a bond. Upon the whole, I am of opinion that the delivery of these securities is a good *donatio mortis causa,* as raising a trust by operation of law; and that, as so raising a trust by operation of law, they are not within the provisions of the Statute of Frauds." [1 Dow. & C. 14.]

Practically all of the commentators, text-writers and leading courts of this country and of England recognize that case as the turning point in the English law governing the transfer of property susceptible of delivery; and Lord HARDWICKE's differentiation between the delivery of property and the delivery of the evidence thereof has practically lost its potency.

Under the light of those two leading cases (the former expounding the Lord HARDWICKE rule, and the latter the rule announced by Lord ELDON; we should be enabled to read as we run and understand the authorities cited by counsel for the respective parties.

As previously suggested, we will briefly consider

respondent's authorities bearing upon the question of delivery.

In the case of Thomas v. Thomas, 107 Mo. 459, the husband sold land and had the note for the purchase money made payable to and delivered to his wife, and at the same time the purchaser took back from the husband a contract by which he reserved the right to reconvey the land to the husband and have his note returned. After the death of the husband, the purchaser exercised his right under the contract and conveyed the land to the wife in consideration of the surrender of the note. The mother, brothers and sisters of the deceased brought a bill in equity against the wife to cancel the deed conveying the land to her, for the alleged reason that the deed was without consideration, and was made at a time when the husband was in extreme health, not expected to recover, and with the express agreement with the purchaser that if he recovered the land was to be reconveyed to him; and, if not, then he was to convey it to the plaintiff's heirs-at-law. In passing upon that case, this court said:

"I.  In order to constitute a valid gift of personal property, it is essential that it be delivered by the donor to the donee, or some one for him, with the intention on the part of the donor to part with his right in and dominion over the subject of the gift, and that it be accepted by the donee, whose ownership must take effect immediately and absolutely, leaving nothing essential to be done in the future.  [8 Ency. Law, 1313, and authorities cited; Spencer v. Vance, 57 Mo. 429.]

"II.  It is the settled law in this State that gifts from husband to wife, where all the necessary conditions to their validity have been performed, will be upheld and enforced in equity.  [Welch v. Welch, 63 Mo. 57; Botts v. Gooch, 97 Mo. 90.]

"An examination of the evidence in this case convinces us that every condition that was required to make the gift from Thomas to his wife complete was performed. Indeed, the note itself made, as it was, payable to his wife, by direction of her husband, and being in the possession of the wife, was prima facie evidence of every essential condition to the validity of the gift. [Richardson v. Lowry, 67 Mo. 414.]

"The fact that the purchaser of the land from her husband took back from him a written agreement, by which he retained the right to convey the property and have his note returned to him, we do not think made the gift depend upon any future contingency by which it could have been defeated. It would have been more satisfactory, certainly, if the agreement had been before the court, or its contents more definitely given, but as Dr. Winkler made the deed to defendant, we must assume that the writing so directed, and that the husband retained no rights in either the note or contract, which could, thereafter, have been asserted by him."

That case was clearly decided correctly, for the reason that the note was not only payable to the defendant, but there was an actual delivery of it to her also during the life of the husband, the donor.

In Allen-West Commission Co. v. Grumbles, 53 C. C. A. 401, the defendant owned one hundred and ten shares of stock in a corporation, and in May, 1899, he delivered a written assignment of his interest in the business to his wife, at which time he was out of debt. The defendant retained the possession of the certificates of stock, and voted them and received the dividends upon them until February, 1903, when he became heavily involved. He then transferred the stock to his wife by indorsing and delivering the certificates to her. In a suit by a creditor, challenging the validity of the transfer of the stock to defendant's wife, it was held by the United States Circuit Court of

Appeals, of this circuit, Judge SANBORN delivering the opinion of the court, that the gift and transfer of the stock by the defendant to his wife was void, for the reason that there was neither an actual nor a constructive delivery of the certificates of stock to her.

That case was also correctly decided, for the reason that the gift was invalid under both the Lord HARDWICKE and Lord ELDON rules; there being neither actual nor constructive delivery of the certificates of stocks, until after the defendant became insolvent.

In the case of Spencer v. Vance, 57 Mo. 427, this court held that to constitute a valid parol gift of personal property, there must be a giving and an actual transfer by words, and not mere words that would only signify an intent to transfer in the future.

In Tomlinson v. Ellison, 104 Mo. 105, it was held a delivery of a gift *causa mortis* might be made to one person for the benefit of another. But a delivery by the donor to his agent of a document as evidence of title to certain promissory notes and money given by the donor to his brother to be placed among the donor's other papers in the agent's possession, without direction to deliver them to the donee, the instrument remaining in the agent's hands, until after donor's death, would not constitute a delivery of the notes and money to the donee, the brother. In that case, it should be observed, there was neither an actual delivery of the notes and money nor was there a delivery of the document which was designed as evidence of title to said notes and money. So that gift could not be maintained under either the Lord HARDWICKE or Lord ELDON rule.

In School District v. Sheidley, 138 Mo. 672, it was held, that the execution of a promissory note, whereby the maker promised at a future date to pay the district a certain sum of money, without consideration, with which to purchase a library, was not a valid gift, for the reason that it was essential to a voluntary

donation that it go into effect at once completely; that the money or thing given be delivered and not merely promised. In other words, that such a note is *nudum pactum*.

The case of In re Estate of Soulard, 141 Mo. 642, involved the validity of a gift evidenced by the following writing:

"St. Louis, October 4, 1887.

"I, Harriet M. Soulard, by the power vested in me by a general power of attorney dated January 23, 1885, and given to me by my husband, Henry G. Soulard, on the above date, now by the power vested in me I hereby give to my two grandnieces, Edith M. and Harriet M. Frost, the following described notes, or any reinvestment of the principal of the same that may be hereafter made: One note made and payable by Asby A. Chouteau for the use of thirteen thousand dollars; one note made and payable by James A. Conlon for three thousand and five hundred dollars, and the sum of three thousand five hundred dollars out of two certain notes made and payable by Louise Ottenad, making in all the sum of twenty thousand dollars, share and share alike; that is to say, ten thousand dollars to the use of Edith M. Frost, and ten thousand to the use of Harriett M. Frost, reserving, however, for my own use during my life the income or interest from said notes, and restraining them from making any disposition of the principal of said notes during my life, and also reserving the right to reinvest any money from the payments of these notes as to me may seem fit.            "HENRY G. SOULARD,

"By HARRIET M. SOULARD, Attorney in Fact."

The court held first, that the instrument did not create a valid gift, because the transaction was not an executed, absolute unconditional transfer of the property, the donees taking no present unconditional title.

To the same effect is the case of Harris Banking Co. v. Miller, 190 Mo. 1. c. 662.

In the case of Trenholm v. Morgan, 28 S. C. 268, a memorandum disposing of certain personal property to different individuals, made by a testatrix after making her will, was called for by her on her death bed, and delivered to her sister with the request that it be carried out as her will. Most of the donees, as well as the articles mentioned in the memorandum, were not present at the time. In passing upon that question, the Supreme Court of South Carolina said:

"That brings us to the main question in the case. All the other exceptions charge error of fact and of law on the part of the judge in denying the claim of the appellant to the Hazzard bond as a *donatio causa mortis* from the testatrix, Mrs. Trenholm. The law allows the owner of property to declare, in his life-time, to whom his property shall go after his death; but, in order to avoid contention, this great privilege is carefully guarded. With inconsiderable exception, all such dispositions are required to be in writing, and signed by the donor in the presence of three subscribing witnesses; and if these formalities are not observed, such attempted dispositions are void. The law also gives to the owner of property another right, and that is to give it away—donate it; and if it is personal property, he may do so verbally, always provided the gift is completed by delivery of the article at the time of the gift, and, if so, the donation is irrevocable. But the law recognizes still another mode of giving title to personal property, which, from the circumstances that the right is only accorded to one who is in anticipation of speedy death, is called a *donatio causa mortis*. Being half way between a testamentary gift, and one by a person in health, it partakes somewhat of the nature of both—of a testamentary provision, in going into complete operation only after death; and that of an ordinary gift *inter vivos,* in that the delivery of the

article at the time of the death is absolutely necessary. The right is exceptional, and, although we cannot say that the courts lean against gifts *causa mortis,* yet the evidence to establish them should be clear and unequivocal, and will be closely scrutinized. The burden of proof is on the donee. From the nature of the *donatio* it is apparent that the infallible test, which must distinguish it from a testamentary gift, is delivery—change of dominion *in praesenti;* without this there is really nothing to distinguish it from an ordinary testamentary bequest.' 'It is essential to the validity of a donation that the thing given be delivered to the donee, or to his use. Without a delivery the transaction would only amount to a promise to give, which, being without consideration, would be a nullity. The intention to give must be accompanied by a delivery, and the delivery must be made with an intention to give. The practical question, therefore, is, what is a sufficient delivery? The delivery must be made directly to the donee, or to an agent or trustee on his behalf, but not to an agent for the donor. It may be actual—a manual possession of the article itself by the donee or his agent—or constructive. If constructive, it must be more than any mere words, and more than any mere symbolic act. A constructive delivery must be something which completely terminates the donor's custody and control of the article donated, and which places it wholly under the donee's power, and enables him without further act on the donor's part to reduce it to his own manual possession,' etc. [3 Pom. Eq. Jur., sec. 1149; Gilmore v. Whitesides, Dud. Eq., 14.] There is in the case no conflict of testimony. There was but one witness, Mrs. Hazzard, whose touching statement of the facts was clear, and manifestly frank and truthful. Mrs. Trenholm contemplated making a codicil to her will, and bequeathing certain articles to particular members of her family. This appears from her having the imperfect mem-

orandum of what she wished incorporated into a will, also from the character of the paper, indicating the articles intended for different persons, as well as from her own declarations. 'That is my will—that is what I want done.' The preparation of her will, begun but incomplete, was on her mind, and when death was near at hand, seeing that there would not be time to carry out her purpose regularly, she attempted to do so verbally by declaring her wishes to her daughter, Mrs. Hazzard, somewhat in the nature of a nuncupative will by one *in extremis*. Most of the persons, as well as the articles intended for them respectively, were not present; and as to these articles there could have been no actual delivery, nor could the unsigned memorandum operate as a symbolical delivery so as to transfer dominion to the parties. If so, we do not see why any one *in extremis* might not, in direct violation of the law as to wills, dispose of his whole personal property by simply handing to some one at his bedside a memorandum, stating that he wished it divided among different persons, not present, as therein stated. It seems to us that it was an ineffectual effort to supplement her will. Mrs. Hazzard says: 'She produced the impression on me that she had given me the paper which she called her "will" and the other papers, and that I could see it done, and she seemed satisfied with that.' 'If a person intends to make a testamentary gift, which for any reason is ineffectual, it cannot be supported as a *donatio causa mortis*.' [3 Pom. Eq. Jur., sec. 1147; Gilmore v. Whitesides, Dud. Eq. 23.] But it is urged that there is not the same difficulty as to the contents of 'the box,' which Mrs. Trenholm had with her in Asheville, and, being about to die, placed in charge of Mrs. Hazzard. It must be kept in mind that, up to that time, Mrs. Hazzard had no knowledge of what was in the box. Mrs. Trenholm made no allusion to the subject, but produced the memorandum, and said: 'That is my will—that is what I want done.'

Then she pointed to another drawer, and said: 'There are the papers; I want you to take charge of them.' She said nothing about the Hazzard bond. On the night after her mother's death, Mrs. Hazzard opened the box, and found in it the Hazzard bond, and also that of Bacot and several other papers. Only the Hazzard bond is claimed as a *donatio*. We do not see that it was in any way distinguished from that of Bacot, or indeed from the money paid on the latter. It is clear there was no gift, unless in the terms of the memorandum, which contained the only reference to either: 'I wish the bond that Miles Hazzard holds (owns) to go to E. St. P. Morgan, also Huger Bacot's, and the $1950 paid on the bond—the interest to be held for her to do as she pleases, but not the principal; that is to be held intact,' etc. We suppose the inhibition against the capital being paid to the appellant referred to both bonds; and, if so, that itself would seem to indicate the idea of creating a settlement rather than an absolute delivery. It seems to us that when Mrs. Trenholm said to Mrs. Hazzard, 'There are the papers; I wish you to take charge of them,' she did not mean thereby to deliver them *in praesenti* to or for the appellant; but, being conscious of her approaching end, she meant to intrust them to her daughter as her agent and friend. We concur with the master and circuit judge that the claim of a *donatio causa mortis* was not sustained.''

The conclusion reached in that case was correct, because Mrs. Trenholm never intended to dispose of her property by way of gift, but expressly stated that she wanted the memorandum to be carried out as her will.

In Dunn v. German-American Bank, 109 Mo. 90, a short time prior to the death of Thomas A. Dunn he handed a certificate of deposit, executed by defendant, to his brother for safe-keeping, and requested him to see that the former's children got the money in case

he died. It was there held, and correctly so, that the transaction did not constitute a valid gift *causa mortis.* There was no delivery of the certificate of deposit as evidence of a gift, but it was delivered to the brother of the deceased for safe-keeping, with a request that he see that his children got the money in case he died.

To the same effect are the following cases: Snowden v. Reid, 67 Md. 130; Schick v. Grote, 42 N. J. Eq. 352; Daniel v. Smith, 75 Cal. 548; Calvin v. Free, 66 Kas. 1. c. 469, 470; Gammon Seminary v. Robbins, 128 Ind. 85; McMahon v. Bank, 67 Conn. 78; Giselman v. Starr, 106 Cal. 651.

Coming nearer to the point. In Hawn v. Stoler, 208 Pa. St. 610, Mrs. Little placed $595 in the hands of Mrs. Slentz for safe-keeping, and the latter turned it over to her husband, who deposited it in a bank in his own name. Mrs. Little was very sick, and died a few days later. Shortly before her death she said to Mr. Slentz, in answer to a question as to what she should do with the money: "You gave $300 to my sister, Mrs. Hawn." Upon that state of facts 'the Supreme Court of Pennsylvania held that the transaction did not constitute a valid *donatio causa mortis,* for the reason that she could not make a valid gift by word of mouth without an assignment or some instrument equivalent thereto.

In Castle v. Persons, 117 Fed. 835, the United States Circuit Court of Appeals for this circuit held that a verbal assignment of a chose in action as a gift *causa mortis,* not evidenced by any note or other writing, assented to by the debtor, who promised to pay the debt to the assignee, constituted a complete gift and effectually substituted the assignee as creditor.

In the case of Beak v. Beak, L. R. 13 Eq. 489, the delivery by the donor, in his last illness, of a check on his bankers, accompanied by a delivery of

233 Sup.—35

his banker's pass-book, the check not having been presented until after the donor's death, was held not a good *donatio mortis causa.*

In Pennington v. Gittings, 2 Gill & Johns. 208, it was held that certificates of stock could not by parol merely constitute the subject of a *donatio inter vivos* or a *donatio mortis causa.*

In Moore v. Moore, L. R. 18 Eq. 474, a husband two years before his death, gave to his wife a railway debenture subsequently converted into railway stock, which remained in his name, and on which the dividends were received by him, but paid to his wife. He gave the certificates to his wife, and they remained in her possession until he required them in order to replace a lost dividend warrant. While on his death-bed he handed the certificates to his wife, and said: "These are yours," and also gave her a deposit note: *Held,* that the gift of the stock failed as incomplete and could not be supported as a declaration of trust, the intention to make an immediate gift being inconsistent with a declaration of trust. *Held,* also, that railway stock could not be the subject of *donatio mortis causa. Held,* also, that the gift of the deposit note was a good donation *mortis causa.*

In Searle v. Law, 15 Simmons, 95, A made a voluntary assignment of turnpike bonds and shares in companies to B, in trust for himself for life; and after his death, for his nephew. He delivered the bonds and shares to B, but did not observe the formalities required by the Turnpike Road Act, and the deeds by which the companies were formed, to make the assignments effectual. *Held,* that on the death of A no interest in either the bonds or the shares passed by the assignment, and that B ought to deliver them to A's executors.

The case of Beech v. Keep, 18 Beav. 285, is one of the leading cases of England upon this subject, and is

cited by the courts of this country as frequently as any case that can be found in the books. The facts of that case were as follows:

"By an indenture of settlement, made on the marriage of Thomas Beech and Sarah Griffin, and dated 22d of January, 1824, a sum of £1000 consols (the lady's fortune), which had been invested in the names of trustees, was to be held by them upon trust, for the separate use of the wife, and after the decease of either, in trust for the survivor for life, and after the decease of the survivor, in trust for the children of the marriage, failing whom, and in the absence of any appointment of the wife (which happened), in trust for her next of kin. And the indenture contained a power, for the husband and wife, or the survivor, to appoint new trustees.

"The marriage took effect, and Mrs. Beech died in 1826; and, thereupon, subject to the life interest of the plaintiff, Mr. Beech, the ultimate limitation took effect, in favor of the defendant, Elizabeth Keep, the only sister and sole next of kin of Mrs. Beech.

"The two original trustees of the settlement having died, Mr. Beech, the plaintiff, appointed Samuel Griffin and William Keep trustees, and the fund was transferred into, and now stood in their names. Keep survived Griffin, and died in January, 1846. The defendant, his wife, was his sole legal personal representative. No transfer was made of the fund, but the defendant, as sole executrix of W. Keep, received the dividends and paid them to the plaintiff, Mr. Beech.

"By an indenture dated 4th of May, 1848, and made between the plaintiff, of the one part, and the defendant, of the other part, the defendant voluntarily assigned all her reversionary interest in the £1000 stock to the plaintiff, 'to the end and intent that he might be and become present and absolute owner thereof.' The plaintiff executed a release of even date to the defendant of all claims.

"Disputes having arisen between the plaintiff and the defendant, the latter refused to execute a power of attorney to transfer the fund to the plaintiff, Mr. Beech, in pursuance of the assignment; and he instituted the present suit to compel her to do so. The bill prayed, that, if necessary, it might be declared that the defendant, by the assignment of 1848, became a trustee of the fund for the sole benefit of the plaintiff, and that she might be decreed to transfer it into his name, and be restrained, in the meantime, from transferring it to any other name; and that she should pay the costs of the suit."

.The opinion is short but to the point, and for that reason we will copy it in full.

"The law in these cases is most undoubtedly embarrassing, but I am of opinion, that, consistently with the principles on which I decided the late case of Bridge v. Bridge, 16 Beav. 315, it is impossible that I can come to any other conclusion than that to which I came in that case, after a careful investigation of the authorities. Referring to my decision in that case, for the statement of the principles which govern questions of this description, it only remains for me to consider how they bear upon the facts of the present case, which are very simple. There is a sum of stock which was originally placed, and is still standing, in the names of two trustees, both of whom are dead, and the defendant is the legal personal representative of the survivor, and is, therefore, the person in whom the fund is legally vested. The plaintiff Beech is entitled to a life interest in the fund, and, subject thereto, the defendant is entitled thereto absolutely. In this state of things, the defendant executed a voluntary assignment of her reversionary interest to the plaintiff, which he is now seeking to enforce, and she refuses to complete.

"I cannot do better than read a portion of my judgment in Bridge v. Bridge, to which I still adhere:

Foley v. Harrison.

'" 'The rule is thus stated by Lord ELDON, in El-
lison v. Ellison, 6 Ves. 662: "I take the distinction to
be, that if you want the assistance of the court to con-
stitute you *cestui que trust,* and the instrument is vol-
untary, you shall not have that assistance for the pur-
pose of constituting you *cestui que trust;* as upon a
covenant to transfer stock, etc., if it rests in covenant
and is purely voluntary, this court will not execute
that voluntary covenant; but if the party has com-
pletely transferred stock, etc., though it is voluntary,
yet the legal conveyance being effectually made, the
equitable interest will be  enforced by this court."
This rule has been recognized and acted upon in all
the subsequent cases, but a considerable diversity will
be found amongst them, as to what does or does not
constitute the relation of trustee and *cestui que trust.'*
[I then omitted the case of a covenant in favor of a
volunteer, and proceeded:] 'The question before me
will depend more upon those cases where the donor
professes to assign, for the benefit of the donee, some
previously existing chose in action.  On this subject
some points are, I think, reasonably clear.  If a person
possessed of stock execute a declaration of trust of that
stock in favor of a volunteer, he would, I apprehend,
clearly constitute himself a trustee for the volunteer,
and equity would execute the trust and compel a trans-
fer of the stock to the *cestui que trust.*  But if the same
person executed an assignment of the stock in favor
of the volunteer, and no transfer of the stock took
place, this, I apprehend, would as clearly be considered
to be no more than an imperfect gift, in which the
donor had not done all that it was in his power to do,
and the donee would get no assistance from a court
of equity to compel a transfer of the stock.'

"I pause here to consider how these observations
apply to the present case.

"Supposing this were not the case of a rever-
sionary interest, but that the stock had been the pres-

ent absolute property of the defendant, and standing in her name, and that she had executed this assignment, leaving out the word 'reversionary,' and had afterwards refused to transfer the stock, would this court have compelled her to do so? If I am right in the view I took in the case of, Bridge v. Bridge, this court clearly would not compel her; yet, undoubtedly, if the assignment had been for a valuable consideration, the equitable interest in the stock would have passed, and, in that sense, the defendant would have been a trustee for the purchaser. But the assignee, in this case, being a mere volunteer, and, therefore, the court will not enforce the transfer, or execute it as a trust. Then, is this case varied by the interest being reversionary? I cannot bring my mind to the conclusion (as has been argued), that this is a case in which there is no legal reversion. Here is a case where the whole legal interest is vested in the defendant, subject to the equitable life interest of the plaintiff; and the transaction might have been perfected, by the transfer of the stock on the day following the execution of the deed, or it might have been completed at once by a transfer of the stock, without any deed, and thus the assignee might have become the absolute owner of the fund. I cannot, therefore, make any difference from the circumstance of the defendant's not being absolute owner.

"It is clear from the statements in the bill that some further act was considered by both parties to be necessary to carry into effect the intention of the defendant, and to give the plaintiff the absolute interest in the stock; but a quarrel having ensued between the parties, an application was made to the defendant to execute a power of attorney to transfer the stock to the plaintiff, which she refused to do. It is this which makes a very material distinction between this case and that of Kekewich v. Manning, 1 De G. M. & G. 176. There (as I pointed out distinctly in Bridge

v. Bridge) 'being four trustees of the will in whom the
legal interest was vested, and the beneficial owner hav-
ing assigned over the funds to three persons, in trust
for certain persons as volunteers, no transfer is made
to the new trustees so appointed, nor is there any rea-
son, as there was in Kekewich v. Manning, why the
transfer should not have been made. In Kekewich v.
Manning the original trusts were not exhausted, but
the life estate of the mother continued in the stock,
and until her death no transfer could have been made.
The assignor had done all she could do. That is not
so in this case.' So, in the present instance, it is ob-
vious, there was no outstanding interest except the
plaintiff's, and the transfer of the stock ought to have
been made, if both parties had been willing to com-
plete the transaction, and if the transfer had been
made, the plaintiff's title would have been complete.
The argument employed by the plaintiff, that having
himself the life estate, no transfer could be made with-
out his consent, clearly does not apply, because he
would be the absolute owner if this assignment was
perfect, and it was throughout his expressed desire
to get the transfer completed. The transfer of the
stock is, in fact, what the defendant has refused to
make, and it is that transfer which the plaintiff has
all along been trying to get, and which is now asked
to make the transaction complete.

"I admit that there is a very thin distinction be-
tween an assignment for the benefit of a volunteer and
a declaration of trust in his favor, but it is one which
is to be found to have been taken in all the cases. If
the absolute owner of a fund says, 'I hold this stock
in trust for A. B,' the trust is complete; but if there
be only an assignment, a different relation exists be-
tween the parties, and it would be destroying the dis-
tinction between an assignment and a declaration of
trust to say that an assignment, because it may create
a trust, is to be considered the same as a declaration

of trust. If I were to hold that there was no distinction between an incomplete transfer and an express declaration of trust with respect to personal estate, I do not see why the same doctrine would not apply to land. It would be contrary to all previous decisions to hold, that if a party voluntarily executed a deed, not passing the legal estate, the relation of trustee and *cestui que trust* had been created.''

In Scott v. Lauman, 104 Pa. St. 593, where A executed an assignment of a certificate of deposit to B by indorsement thereon, remarking to his attorney who drew it, that he and B had been engaged in business together and had never had a settlement; that the attorney should take the indorsed certificate with him and keep it in his safe; that it was for B. The attorney retained the certificate until after A's death, when he delivered it to B. The court held that it was invalid as a gift for want of delivery, and as a contract for want of consideration.

In Nutt v. Morse, 142 Mass. 1, the Supreme Court of Massachusetts held the following gift invalid for want of delivery thereof: ''A deposited several sums of money in a savings bank, 'in trust' for certain relatives of his, and told each that he had done so, saying that he could control the money while he lived, but that it was theirs after his death. He gave the deposit-books into the possession of one of these persons, who had charge of A's books and papers; and A drew the interest accruing on the several deposits. About a year before his death, A said that he should not make a will; that he had provided for these relatives by depositing money in the savings bank. The night before he died, A said to these persons, 'When I am gone, you take these books and transfer the money to your own names, and say nothing to nobody about it.' [Syllabus.]

In Baltimore Brick Company v. Mali, 65 Md. 93, a father made an assignment under seal to his daugh-

ter of certain shares of stock in a corporation. The certificates for his stock at the date of said assignment had been made out in due form in the name of the assignor, but remained in the certificate book of the corporation just as they were executed, and uncut therefrom. The assignment appeared on its face to be for value, but was in fact intended as a gift, and not as a sale. The assignment, which contained no power of attorney authorizing the transfer of the stock, was left by the assignor with the attorney of the corporation, with whom also was left the book of certificates, with instructions that upon obtaining the assent of a mortgagee of the corporation, the transfer of the stock should be made to the daughter on the books of the company. No transfer, however, was made in the lifetime of the father. On bill filed by the daughter against the corporation after her father's death, to compel a transfer of the stock, the court held:

1st. That the assignment was imperfect without an actual transfer of the stock on the books of the corporation, and that equity could not make that good and enforcible as a gift *inter vivos* which was incomplete, and, therefore, not enforcible at law.

2d. That there was no element of trust in the case upon which the claim of the assignee could be supported.

3d. That if the father had declared that he held, or would thenceforth hold, the shares of stock in trust for his daughter, then perhaps equity would seize upon and enforce such trust for the benefit of the donee, although voluntarily created.

In Heath v. Portsmouth Saving Bank, 46 N. H. 78: "Where the plaintiff, at the time of making a deposit of money in a savings bank, accepted as the evidence thereof a book stating the deposit and containing this clause: 'Depositors are alone responsible for the safe-keeping of the book, and the proper with-

drawal of their money; no withdrawal will be allowed without the book, and the book is the order for the withdrawal:' *Held,* that the clause must be taken to have been made part of the contract between the plaintiff and the bank.'' [Syllabus.]

In Keepers v. Fidelity Title and Deposit Co., 56 N. J. L. 302, the plaintiff's sister, on her death-bed, delivered to the plaintiff the key of a box, saying, ''I give you the box and all it contains.'' The box was in another room of the house, locked in a closet, the key of which was in possession of the plaintiff's mother, with whom the sister lived. The plaintiff lived elsewhere, and, during her sister's life, made no attempt to take possession of the box. *Held,* that there was no such delivery of securities contained in the box as is essential to a valid *donatio mortis causa.*

In the case of the Second National Bank v. Williams, 13 Mich. 282, where one *in extremis* drew his check upon the bank, with directions to the payee to defray the funeral expenses of the drawer out of it, and to pay the balance to his heirs, and the check was not accepted by the bank at the death of the drawer, it was held that the check did not operate as an assignment of the fund, and that the bank was not liable upon it to the payee; that no mere contract, liability or obligation of the donor can be the subject of a gift *causa mortis;* and, therefore, that an unaccepted bank check, which, if not paid, merely creates a liability on the part of the drawer, is not valid as a gift by him *causa mortis.*

Mr. Schouler in his excellent work on Personal Property, volume 2, section 75, in discussing symbolical delivery of chattels, says: ''Under suitable circumstances, too, the symbolical delivery of an incorporeal chattel or chattels might suffice; as in the case of transferring an attorney's receipt where the instrument is filed in court and out of the owner's custody; or by giving the key of a safe-deposit vault. But,

when some other individual is custodian of the instrument, the owner's order of transfer should be acted upon, in order to complete the gift; for the general rule is to require the utmost delivery of which the thing is actually capable."

Judge Kent, in speaking of the delivery of the subject-matter of gifts, says:

"Gifts *inter vivos* have no reference to the future, and go into immediate and absolute effect. Delivery is essential, both at law and in equity, to the validity of a parol gift of a chattel or chose in action; and it is the same whether it be a gift *inter vivos* or *causa mortis.* Without actual delivery, the title does not pass. A mere intention, or naked promise to give, without some act to pass the property, is not a gift. There exists the *locus poenitentiae,* so long as the gift is incomplete and left imperfect in the mode of making it; and a court of equity will not interfere and give effect to a gift left inchoate and imperfect. The necessity of delivery has been maintained in every period of the English law. *Donatio perficitur possessione accipientis,* was one of its ancient maxims. The subject of the gift must be certain, and there must be the mutual consent and concurrent will of both parties. It is, nevertheless, hinted or assumed, in ancient and modern cases, that a gift of a chattel, by deed or writing, might do without delivery; for an assignment in writing would be tantamount to delivery. But in Cotteen v. Missing, a letter to executors, expressing a consent that a specific sum of money be given to a donee, was not a sufficient act in writing; and it was held not to be a gift of so much money in their hands, because the consent was not executed and carried into effect, and a further act was wanting in that case to pass the money. The vice-chancellor held, that money paid into the hands of B, for the benefit of a third person, was countermandable, so long as it remained in the hands of B. A parol promise to pay money

as a gift is not binding, and the party may revoke his promise; and a parol gift of a note from a father to a son was held not to be recoverable from the executors of the father.

"Delivery, in this, as in every other case, must be according to the nature of a thing. It must be an actual delivery, so far as the subject is capable of delivery. It must be *secundum subjectam materiam,* and be the true and effectual way of obtaining the command and dominion of the subject. If the thing be not capable of actual delivery, there must be some act equivalent to it. The donor must part not only with the possession, but with the dominion of the property. If the thing given be a chose in action, the law requires an assignment, or some equivalent instrument, and the transfer must be actually executed. Therefore, where a donor expressed by letter his intention of relinquishing his share of an estate, and directed the preparation of a release of the personal estate, and he died before it was executed, it was held that his intention, not being perfected, did not amount to a gift." [2 Kent's Com. *438.]

Counsel for respondent have cited many other authorities supporting the propositions under consideration, but it would serve no good purpose to further review them, for the reason that we have selected cases cited in their briefs bearing upon the various phases of the case presented, and a further review of the authorities would only be cumulative. In other words, those selected, we think, support the contention of counsel as to the essentials of a valid delivery of a gift *causa mortis,* and that it is useless to review other authorities along the same line.

In passing, however, we wish to add that the cases cited from this State by counsel for respondent are not in discord with those relied upon by counsel for appellant. But, as before stated, there are two well-defined lines of authorities bearing upon that subject;

and, having reviewed those presented by counsel for respondent, we will now briefly consider those relied upon by counsel for appellant, and them determine which of the two is the wiser, more reasonable and just.

Judge Story, after discussing the theory of the law, as contended for by counsel for respondent, regarding the delivery of the subject-matter of a gift *causa mortis*, says: "But it may admit of doubt whether the doctrine of these last cases can now, upon principle, be supported; for the ground upon which courts of equity now support donations *mortis causa* is not that a complete property in the thing must pass by the delivery, but that it must so far pass by the delivery of the instrument as to give a title to the donee to the assistance of a court of equity to make the donation complete. The doctrine no longer prevails that where a delivery will not execute a complete gift *inter vivos* it cannot create a *donatio mortis causa*, because it would not prevent the property from vesting in the executor; and as a court of equity will not *inter vivos* compel a party to complete his gift, so it will not compel the executor to complete the gift of his testator. On the contrary, the doctrine now established by the highest authority, is, as we have seen, that courts of equity do not consider the interest as completely vested in the donee, but treat the delivery of the instrument as creating a trust for the donee to be enforced in equity." [1 Story's Eq. Jur. (13 Ed.), sec. 607c, p. 614.]

In Wright v. Wright, 1 Cow. 598, the Supreme Court of New York held that a promissory note of the donor himself, executed in his last illness, and delivered by the maker to the donee, the payee, in contemplation of death, was a good *donatio mortis causa*, although no consideration passed.

In Coutant v. Schuyler, 1 Paige, 316, Mr. Chancellor WALWORTH held that a promissory note of a

third person was a proper subject of a *donatio mortis causa,* and might be delivered to a third person for the benefit of the donor. The court said that there was no real difference between the delivery of a bond and the delivery of a note as a *donatio mortis causa.*

In Thomas v. Lewis, 89 Va. 1, William A. Thomas, an old bachelor, under apprehension of death, made a gift of money and securities, valued at $200,000, to Bettie Thomas Lewis, an illegitimate child by a mulatto woman. The principal part of the gift consisted of money on deposit in the bank and bonds and stocks which were in a safety-deposit box in vaults of the Planters' National Bank of Richmond, Virginia. At the time of the gift he explained to the donee the character of the securities, and the importance of the same, and where situated. He gave her his bank book, showing the amount of money on deposit, some negotiable notes, and the keys to his safe in the banking house of Drewey & Company, and also to his safety-deposit box before mentioned. He also told her what was in the box, the contents of the safe, and the amount deposited in the bank, represented by the bank book. The gift disposed of the donor's entire personal property. At the time of making the delivery he said to her all the things before mentioned "were to be hers in case of his death," and told her to put them in her trunk and not to let anybody have them. The donee retained possession of the things given to her until the donor's death, which was only a few hours thereafter. The factum of the gift was proven by only one competent witness. The donor and donee resided together at the time of the gift, and the possession was at their residence. Upon that state of facts, the Supreme Court of Virginia, in a learned and exhaustive opinion, held that the delivery of the keys to the safe and to the safety-deposit box to the donee was a valid constructive delivery of the contents there-

of to her, and that the transaction constituted a valid *donatio mortis causa.*

In Miller v. Jeffress, 4 Gratt. 479, Judge BALDWIN, in delivering the opinion of the court said: "A delivery is indispensable to the validity of a *donatio mortis causa.* It must be an actual delivery of the thing itself, as of a watch or a ring, or of the means of getting the possession and enjoyment of the thing, as of the key of a trunk or a warehouse in which the subject of the gift is deposited; or if the thing be in action, of the instrument by using which the chose is to be reduced into possession, as a bond, or a receipt, or the like."

Mr. Minor in the third volume of his Institutes (Lith. Ed.), pp. 222-224 (following the text of Lomax Ex., 463-464), says: "The general rule requires an actual delivery of the thing to substantiate the gift . . . .; where the nature of the thing is capable of corporeal delivery, such delivery is never dispensed with . . .; where the nature of the thing is incapable of corporeal delivery, the delivery of the means of getting possession or making use of the thing will suffice, as of a writing, of a key of a trunk or warehouse; not that the key or the writing is a symbol of delivery, symbolical delivery" (one thing for another) "being always insufficient."

The delivery must be such as is becoming the nature of the thing given, and not according to the capacity of the donor at the time of the gift to make the delivery. [Turner v. Brown, 6 Hun 331.]

Mr. Pomeroy in the third volume of his Equity Jurisprudence says at section 1149 that the delivery must be such as thereby "the donor parts with all control and power of exercising dominion over the thing given, while the donee obtains the exclusive power of taking physical possession thereof." [See 3 Lawson's

R. & R., sec. 1329; Sterling v. Wilkinson, 83 Va. 791;
Yancey v. Field, 85 Va. 762.]

In Debinson v. Emmons, 158 Mass. 592, the Su-
preme Court of Massachusetts held that, where in a
suit in equity there was evidence tending to show that
the donor upon her death-bed, when almost *in ex-
tremis,* gave to the donee, as a present gift, two trunks
and their contents, which were at the foot of the bed
upon which she lay, at the same time handing to the
donee the keys, and declaring that the trunks and all in
them were the donee's, and that the donor knew that
she had certain bank books in the trunks at the time
of the gift, and referred at the time of the gift to her
money and to the manner in which she had obtained it,
it cannot be said that the presiding justice was not
justified in finding that there was a present transfer
of the actual possession, dominion and property of the
trunks and their contents, including the bank books.

In People ex rel. v. Benson, 99 Ill. App. 325, l. c.
327, the court said: "Appellee did not have manual
possession of the notes until after the death of her
husband. He gave to her the key to the safe in which
the notes were kept, and stated that he gave her the
contents of the safe. After his death, she took manual
possession of the contents. The notes were the only
contents of value in the safe. While delivery of pos-
session of the article is essential to the validity of the
gift, the delivery need not always be a manual de-
livery. The delivery may be symbolic, as the delivery
of a key to a chest or a trunk. The term is not to be
taken in such a narrow sense as to require that the
thing given shall go, literally, into the hands of the
donee and be carried away. An unequivocal declara-
tion of gift accompanied by a delivery of the only
means by which possession of the article given can be
obtained, is sufficient. [Grover v. Grover, 24 Pick.
261; Coleman v. Parker, 114 Mass. 30; Hagemann v.
Hagemann, 90 Ill. App. 251.] Where the donor, at

the time of declaring a gift, divests himself of the means of possession and dominion and invests the donee with such means, he should certainly be considered as surrendering possession.   And so when Benson delivered the key to the safe to his wife and declared that the contents contained therein belonged to her, he parted with possession of the contents and ceased to have dominion over them.   From then on, appellee only had power of manual possession.   We think there was sufficient delivery to make the gift effectual.   Order affirmed."

In Telford v. Patton, 144 Ill. l. c. 619, the Supreme Court of Illinois said: "There are three requisites necessary to constitute a *donatio mortis causa*: (1) The gift must be with a view to the donor's death; (2) it must have been made to take effect only in the event of the donor's death by his existing disorder; (3) there must be an actual delivery of the subject of the donation.  [1 Story's Eq. Jur. 607a; Kenistons v. Sceva, 54 N. H. 24; Roberts v. Draper, 18 Bradw. 167; Barnes v. People, 25 Ill. App. 136; Ridden v. Thrall, 125 N. Y. 572.]  The deposit was made and the certificate was issued on May 1, 1889; and if there was any delivery, either constructive, or in trust for the benefit of the appellee, it must have taken place at that time.   There is, however, no proof tending to show that the deceased was then under the apprehension of death from any existing disease or other impending peril.   He lived for more than eight months thereafter; and the record is barren of any evidence whatever, that the certificate was to be operative only in the event of his death from a disorder existing when the deposit was made.   It follows, that there are lacking the first and second requisites of a gift *causa mortis*.   Was there a gift *inter vivos?*   It is essential to a donation *inter vivos,* that the gift be absolute and irrevocable, that the giver part with all present and

233 Sup.—36

future dominion over the property given, that the gift go into effect at once and not at some future time, that there be a delivery of the thing given to the donee, that there be 'such a change of possession as to put it out of the power of the giver to repossess himself of the thing given.' [1 Parsons on Cont., *234; Dole v. Lincoln, 31 Me. 422; Robinson v. Ring, 72 Me. 140; Northrup v. Hale, 73 Me. 66; Grover v. Grover, 24 Pick. 261.] The delivery must be made with the intent to vest the title in the donee. [Jackson v. Railroad, 88 N. Y. 520.] As a verbal gift is an executed contract, delivery of the subject-matter of the gifts is of the essence of the title. [Grover v. Grover, supra; Wilson v. Keller, 9 Bradw. 347.] The delivery may be constructive, as of a key, or of a part for the whole. [1 Pars. on Cont., supra.] The delivery may be to a third person for the benefit of the donee, instead of being made directly to the donee himself. [Dole v. Lincoln, supra; Barnes v. People, supra.] It has been held in some cases that, where there has been a delivery to a trustee for the benefit of the donee without the knowledge of the latter, acceptance by the donee is presumed, the gift being beneficial to him. [Blasdel v. Locke, 52 N. H. 238; Darland v. Taylor, 52 Ia. 503; Devol v. Dye, 123 Ind. 321.] A gift *inter vivos* is chiefly distinguished from a gift *causa mortis* by the facts, that the former is not made in view of expected or impending death, and that it is not revocable in its nature. [3 Pom. Eq. Jur., 1146 to 1150, and cases cited; 8 Am. and Eng. Ency. Law, 1313 to 1330.]''

In Reynolds v. Reynolds, 20 Misc. Rep. (N. Y.) 254, shortly before her death defendant's intestate gave to plaintiff a bunch of keys, including the key of her trunk and of a tin box therein, and stated that she wanted her and her husband 'to have everything.' Plaintiff thereupon opened the trunk and took therefrom the tin box containing a bank book, and retained it until after decedent's death. The Supreme Court

of New York held this a valid gift *causa mortis* of the deposit represented by the book.

In Goulding v. Horbury, 85 Me. 227, the facts were as follows: An old and illiterate man, with no other family than an illegitimate daughter thirty-six years old at the date of his death, had by his letters to her and in other ways manifested a strong affection for such daughter, and she was the only occupant in his house with him when he died. He had for some years made her his principal confidante in business matters, and had frequently intimated in his letters that she would some day receive his property or the bulk of it. His estate consisted mostly of stock, bonds, and savings bank notes, of the value of some fifteen thousand dollars, which he kept in a small portable cupboard in the room where he lived. During his last sickness, while expecting death, he gave her from his pocket two wallets, containing one hundred dollars in money, and the key of the cupboard, saying that he gave her the money and the cupboard and all that was in it. She thereupon unlocked the cupboard in his presence, he seeing what she did, and after some hasty handling and examination of the papers, she locked them in the cupboard again, ever after during his sickness keeping the key in her own pocket. Soon after this on the same day she placed some valuables of her own in the same cupboard. He had physical strength enough to have got from his bed and taken the articles and passed them to her by his own hand. He died within three days after this act. Upon that state of facts the Supreme Court of Maine held, that the jury were authorized to find a sufficient actual delivery to constitute a valid gift *causa mortis*.

In Stephenson v. King, 81 Ky. 425, the facts were substantially as follows: The donor, in the apprehension of death, delivered the key to her desk, containing some valuables, to her mother, also a letter from one King, her agent, residing in Louisville, contain-

ing a full description of the notes and bonds held by him as such agent. At the time of the delivery of the key and the letter, which was only a few days prior to her death, she told the donee, her mother, that she gave her everything, and that the letter from King would show what property she had, and for her to get the money on the notes and bonds described in the letter. In that case the Supreme Court of Kentucky held that the delivery of the letter by the donor to the donee was a sufficient delivery of the notes and bonds to' constitute a valid gift *causa mortis;* and that the arbitrary rule requiring an assignment and delivery of the identical thing given, in order to make a gift valid, had been abandoned.

In the case of Marsh v. Fuller, 18 N. H. 360, the Supreme Court of New Hampshire, in speaking through Chief Justice Parker, held, that a delivery of the key of a chest, with words of gift of the chest and its contents, was a good delivery to pass the property to the donee.

In Sheegog v. Perkins, 4 Baxter, l. c. 281, the Supreme Court of Tennessee said: "As to the manner of the gift, by delivering the key, it has been several times held that this would be a sufficient delivery, all other elements of a valid gift concurring."

The case of Leyson v. Davis, 17 Mont. 220, 31 L. R. A. l. c. 448, before mentioned, is, in my opinion, the ablest and clearest presentation of the vexed question of *donatio causa mortis* that we have upon the subject on either side of the Atlantic, and has done more to explain the principles upon which that form of conveyance is based and to harmonize the conflicting adjudications thereon than any other opinion to which my attention has been called, or that I have been able to find. That case involved the gift of $1,000,000 in bank stocks. In that great opinion, Judge Hunt, in discussing this question, said:

"This celebrated case of Duffield v. Elwes is regarded as the turning point in the English law of property susceptible of delivery, and Lord HARD-WICKE's distinction between 'the delivery of property and the delivery of its evidence has assuredly lost its point.' [2 Schouler, Pers. Prop., p. 115.] Hewitt v. Kaye (1869), L. R. 6 Eq. 198, recognizes the principle that 'when a man on his death-bed gives to another an instrument, such as a bond, or promissory note, or an I. O. U., he gives a chose in action, and the delivery of the instrument confers upon the donee all the rights to the chose in action arising out of the instrument.' The court approved of the doctrine laid down in Amis v. Witt, 33 Beav. 619.

"The last English case that we have been able to find is Robson v. Hamilton (1891), 2 Ch. 559. Joseph Robson bequeathed and gave to his nephew Joseph Robson his old mahogany desk, 'with the contents thereof,' and made other disposition of his other property. The desk was found to contain notes, bankers' deposit receipts, and unindorsed checks to the order of the testator. The court sustained the gift of the desk with its contents, except the key to a tin box, and adverted upon the disadvantage to men in making bequests of that kind, and then said: 'But in this case, as I have said, I think that the words the testator has used are strong enough, and, properly construed, ought to be held to include all the choses in action. The choses in action, if any distinction is to be taken, are such as could have been given by the testator by mere delivery as a *donatio mortis causa*. In that case the indorsement of the executors would be required, and in this case the indorsement of the executors will also be required.' This last expression from the Court of Appeals of England is evidence of the development of the law in that country upon the subject of gifts *causa mortis*. It is only cited as an instance of the growth of the doctrine permitting gifts of choses in

action. Chancellor Kent, about the same time that Lord ELDON decided Duffield v. Elwes, wrote that the distinction made by Lord HARDWICKE between bonds and bills of exchange, promissory notes, and other choses in action, 'seems now to be exploded in this country, and they are all considered proper subjects of a valid donation *causa mortis* as well as *inter vivos.*' [2 Kent's Com. 448.] One of the earliest explosions was in Wells v. Tucker, 3 Binn. 366, when, in 1811, it was decided that where a bond was delivered by the donor in his last illness to his wife. for the use of a third person, it was a good *donatio causa mortis.* [See, also, 2 Barbour, Rights of Persons and Property, p. 632.] SHAW, C. J., followed the doctrine of Kent in Parish v. Stone, 14 Pick. 198, and Sessions v. Moseley, 4 Cush. 87. The principle has also been recognized by English text-writers. Williams on Executors says bank notes may be the subject of a *donatio mortis causa,* because the property is transferred by the delivery; and, on the same principles, all negotiable instruments which require nothing more than delivery to pass to the donee the money secured by them may be the subjects of donations *mortis causa.* [1 Wms. Exrs. 829; Roper, Legacies, p. 18, and cases cited.] Story, when he wrote in 1835, doubted the soundness of the doctrine of Ward v. Turner, to the effect that a promissory note or bill of exchange not payable to bearer, or indorsed in blank, cannot take effect as a *donatio mortis causa,* inasmuch as no property therein could pass by the delivery of the instrument, and boldly said that the doctrine no longer prevails, that, where a delivery will not execute a complete gift *inter vivos,* it cannot create a *donatio mortis causa,* because it would not prevent the property from vesting in the executor; and as a court of equity will not, *inter vivos,* compel a party to complete his gift, so it will not compel the executor to complete the gift of his testator. On the contrary, the doctrine now estab-

lished by the highest authority is that courts of equity do not consider the interest as completely vested in the donee, but treat the delivery of the instrument as creating a trust for the donee to be enforced in equity. [1 Story, Eq. Jur., 604.]

"It being clear now that, under the progress of administration of principles of equity, gifts *causa mortis* may be made of incorporeal as well as corporeal chattels, and of choses in action generally, we must examine the class of property in this case—namely, national bank shares—and observe whether or not they are to be treated as upon any different plane from that occupied by shares of stock generally. As will be seen by the statement of the facts, the certificates delivered to Andy were issued in the donor's name, and each certificate contained the words 'transferable only by him or his attorney on the books of the bank on the surrender of this certificate.' The by-laws of the bank also required a transfer on the books. The Revised Statutes of the United States (section 5139) provide as follows: 'The capital stock of each association shall be divided into shares of one hundred dollars each, and be deemed personal property, and transferable on the books of the association in such manner as may be prescribed in the by-laws or articles of association. Every person becoming a shareholder by such transfer shall, in proportion to his shares, succeed to all the rights and liabilities of the prior holder of such shares.' No writing having passed at all between the parties, donor and donee, and no transfer on the books having been made, we must look at the principles and authorities bearing upon the direct point involved.

"It was held in Slaymaker v. Bank of Gettysburg, 10 Pa. St. 373, that shares of stock are, in commercial usages, regarded as choses in action, and the certificates are evidence of the title of the holder to them. Now, a chose in action is incorporeal and in-

capable of delivery except by symbol. We grant that it is essential to the validity of a gift that it should be executed, but, where the nature of the property given is incapable of manual delivery, a delivery of the symbol which represents it is the only way to execute the gift. Things incorporeal, says Schouler, in a learned review of gifts *causa mortis,* were not contemplated by the earlier English jurists at all, but when, in the commercial world, bills and notes acquired a standing before the courts, a 'delivery of the writing, with or without indorsement, became the rule of transfer.' Equitable assignments are now thoroughly recognized in the law, and, as a consequence, gifts that would have failed long ago in England because of imperfect delivery may be now upheld by the aid of a court of equity. [2 Schouler, Pers. Prop., sec. 72 et seq.; Thornton, Gifts, sec. 273, et seq.] In Grover v. Grover, 24 Pick. 261, it was decided that a valid gift could be made *inter vivos* of a promissory note payable to the order of the donor, without indorsement by him or other writing. The English cases referred to heretofore are cited in the opinion of the court and Lord HARDWICKE's opinion referred to in the following language: 'The leading case on this point is that of Miller v. Miller, 3 P. Wms. 356, in which it was held that the gift of a note, being a mere chose in action, could not take effect as a donation *mortis causa,* because no property therein could pass by delivery, and an action thereon must be sued in the name of the executor. But in Snellgrove v. Baily, 3 Atk. 214, Lord HARDWICKE decided that the gift and delivery over of a bond were good as a donation *mortis causa,* on the ground that an equitable assignment of the bond was sufficient. It seems to be very difficult to reconcile these two cases. The distinction suggested by Lord HARDWICKE in the case of Ward v. Turner, 2 Ves. Sr. 431, in which he adheres to the decision in Snellgrove v. Baily, is technical, and, to my mind, unsatisfactory,

and certainly has no application to our laws, which
place bonds and other securities on the same footing.
We cannot, therefore, adopt both decisions without
manifest inconsistency; and we think, for the reasons
already stated, that the decision in Snellgrove v. Baily
is supported by the better reasons, and is more con-
formable to general principles and the modern decis-
ions in respect to equitable assignments. We are there-
fore of the opinion that the gift of the note of hand in
question is valid.' In Camp's Appeal, 36 Conn. 88,
it was decided that choses in action, the title to which
passes by delivery, may be the subject of a gift, as
well as any other species of property, and the court
said: 'Whatever may be said or thought of the pro-
priety of the law, it is well settled by the modern au-
thorities that choses in action not negotiable, and ne-
gotiable paper not indorsed, may be the subject of a
gift, and that a delivery which vests in the donee the
equitable title is sufficient without a complete trans-
fer of the legal title. In this respect a title by gift
is not distinguishable from a title by purchase for a
valuable consideration, and, when the claims of cred-
itors do not interfere to affect its validity, such a title
will be recognized and protected in the same manner
and to the same extent as a title by sale.' In Tilling-
hast v. Wheaton, 8 R. I. 536, the delivery of a savings
bank pass book containing entries by the officers of
the bank of the amounts deposited by a deceased's
wife, with a parol gift of the same by her husband
on his death-bed, was a good gift *causa mortis* of the
money deposited in the bank. The court there said
that in the more recent English decisions the strictness
of the ancient rule was relaxed, and the gift was sus-
tained. The courts of Kentucky (Stephenson v. King,
81 Ky. 425) have recently followed the modern doc-
trine. A Mrs. Stephenson selected John King as her
agent, and when she died King had in his possession
a note and some county bonds, the bonds payable to

bearer, and the note indorsed in blank. On the day before Mrs. Stephenson died she told her mother that she gave her property to her, and she delivered a paper to her mother, telling her that this paper was to show the property she had at Louisville, and to get her money on the paper. The paper was the letter from the agent, King, containing a statement of the property in his possession belonging to Mrs. Stephenson. The contention was in part in that case that, in order to make such a gift of a note or bond, it must be delivered by passing manually from the possession of the one to the other; but the court held that the delivery required 'must be according to the nature of the thing, and usually that means according to the physical nature of the thing to be delivered. . . Now, will it be insisted, under the more modern authorities, that an actual delivery of the chose in action to the donee will not constitute a gift? We think not.' The earlier cases are reviewed in this opinion, and the gift of the note and bonds was held to be good. In Hill v. Stevenson, 63 Me. 364, a delivery to a donee of a savings bank book, containing entries of deposits to the credit of the donor, with the intent to give the donee the deposits represented by the book, was held to be a good delivery, as vesting an equitable title in the donee without assignment. [See, also, Druke v. Heiken, 61 Cal. 346; Vesterlo v. DeWitt, 36 N. Y. 340; 3 Redf. Wills, p. 336.]

"Although some writers of recent date disapprove of the doctrine which sustains gifts *causa mortis* of stock in a bank by mere manual delivery of the certificate, yet there is a recognition that such gifts made are upheld where a complete equitable title vests in the donee, and where the evidence shows that it was plainly the intent of the donor to make the gift. This principle is recognized in Grover v. Grover, heretofore cited; also in Bates v. Kempton, 7 Gray, 382, and in the following cases: Allerton v. Long, 10 Bosw.

362; Penfield v. Thayer, 2 E. D. Smith, 305; and, indeed, it was thought it was recognized by Lord HARDWICKE himself in Snellgrove v. Baily, criticised in Grover v. Grover. Pomeroy, after laying down the modern rule that all things in action 'which consist of the promises or undertakings of third persons, not the donor himself, of which the legal or equitable title can pass by delivery, may be the subjects of a valid gift,' says, in a note: 'It is held in England that shares of stock are not capable of being the subject-matter of a valid donation, because no title can be transferred by delivery; no title can pass except by transfer on the company's own books. . . . Under the law of this country, with respect to the title of the assignee before transfer is made on the company's books, there seems to be no reason why a certificate of stock may not be the subject of a valid gift, certainly if it has been indorsed in blank; but in my opinion, such indorsement is not necessary.' [3 Pom. Eq. Jur., sec. 1148; 1 Morawetz, Priv. Corp., sec. 197.] In Grymes v. Hone, 49 N. Y. 17, the court sustained a gift *causa mortis* of bank stock, where there was no delivery of the certificate, and no transfer on the books, but an assignment in writing of the shares. It was held that delivery of the certificates without a transfer on the books of the bank would have made no more than an equitable title against the bank, but would have given a legal title as against the assignor, and that the representatives of the donor became trustees for the donee by operation of law to make the gift effectual. In Wash v. Sexton, 55 Barb. 251, a woman, apprehending death, gave some certificates of stock in a railroad to her husband. The certificates, on their face, were transferable only by her or her attorney on the books of the company on surrender of the certificates. There was no transfer, and no power of attorney was signed. The gift was sustained upon the authority of Westerlo v. DeWitt, 36 N. Y. 345. Westerlo v. DeWitt (1867),

is generally cited, and bears closely upon the case at bar. The donor, apprehending speedy death, told the plaintiff to bring her a roll of paper from the pocket of one of her dresses. She took the roll and gave it to the plaintiff. There was in the roll a certificate of deposit for $1500. After the gift, the ·donee returned the parcel to the pocket of the dress, as directed by the donor before her death. The donor left a last will and testament, in which she bequeathed to the plaintiff the legacy of $1000 and the dress in which the parcel was placed. The plaintiff doubted whether the certificate was intended for her. She was advised that she could not recover it in law. There were other facts and circumstances not necessary to here recapitulate. The Court of Appeals, by HUNT, J., sustained the gift upon the ground that it was quite clear that in apprehension of death, or among the living, the gift of a mortgage or an indorsed note may be effected by a simple delivery of the security, and that Mrs. Clinton did not expect or intend to retain any control over the possession of the money or security after the date of the delivery. The security was placed upon the same footing as the money, and both were held to be susceptible of being presented as a gift by delivery. 'It is impossible,' said the court, 'to apply any rule which would make this a valid gift as to the money and invalid as to the certificate. They must stand or fall together.' In Commonwealth v. Crompton, 137 Pa. St. 138, the donor there delivered a box containing a government bond and certificates of railroad stock, with the intent to give the securities to the defendant. The court passed upon the direct question of whether the failure to make a formal written transfer would defeat the purpose of the donor. It was treated as well settled that a valid gift of non-negotiable securities may be made by delivery of them to the donee, without assignment or indorsement in writing; and, to sustain that proposition, the court

cited Wells v. Tucker, 3 Binn. 366, and Licey v. Licey, 7 Pa. St. 251. 'The shares of stock are choses in action, and the certificates evidence of title to them. Why may not a delivery of certificates, coupled with words of absolute and present gift, invest the donee with an equitable title to the stock, which the donor or a volunteer cannot successfully assail? A stockholder may clothe another with the complete equitable title to his stock, without compliance with the forms printed by the corporation.' In Cook v. Lum, 55 N. J. L. 373, it is recognized that things in action may be given by a surrender to the donee of the donor's voucher of right or title, although the gift was in that case, on the facts, held invalid. So does Tiedeman on Equity Jurisprudence (section 359) uphold gifts of choses in action. [Brantly, Pers. Prop., sec. 208, citing Pomeroy's opinion in his note.] Lowell on Transfers (secs. 43, 109) lays down the rule that 'a certificate is a muniment of title, and a delivery of the certificates, like a delivery of title deeds in England, may be evidence of an intention to transfer the property they represent; and, on the same principle, the delivery of a certificate of stock may be good as a *donatio mortis causa,* although no transfer of stock is executed.' [Reed v. Copeland, 50 Conn. 472.] Promissory notes, with or without indorsements, if delivered, may be good gifts *causa mortis*. [Croswell, Exrs. and Admrs., sec. 621; Vandor v. Roach, 73 Cal. 614.] The delivery of the certificates being intended as a gift of the stock, the donor did all that was required to pass an ownership, especially as there was no blank assignment on the back, and no attorney present to draw one. The authorities above cited permit the circumstances surrounding the actors to be considered. [Thomas v. Lewis, 89 Va. 1, 18 L. R. A. 170.]

"The view that a delivery of the shares to Andy without writing or transfer on the books is good is also in direct harmony with Basket v. Hassell, supra,

where it was regarded as unquestionable that a delivery of the certificate of deposit involved therein to the donee, without an indorsement, would have transferred the whole title and interest of the donor in the fund represented by it, and might have been valid as a *donatio causa mortis*. And we here observe that, as the doctrine of this oft-referred to case seems, upon appellant's theory, to contract the common-law definitions of the character of the conditions attached to a delivery, yet upon this point—that choses in action may be given *causa mortis*—we find the same great tribunal that decided that case expanding the original English definitions so as to include not only choses in action generally, but those which, by delivery, concededly passed but an equitable title against all, except between the parties themselves. Thompson, in his Commentaries on Private Corporations, upholds a gift of stock by a delivery of the certificates, and cites Basket v. Hassell, 107 U. S. 602, to sustain his text, and lays it down that, 'in conformity with this doctrine, it has been often held that a valid gift of nonnegotiable securities may be made by the delivery of them to the donee, without an assignment or indorsement in writing. This principle has been applied to notes, bonds, stocks, certificates of deposit, and life insurance policies. . . So, also, it has been held that a valid gift (in view of death) of corporate stocks, may be made by simple delivery of the certificates, with intent to transfer the stock; even though the certificates on their face are made "transferable only by her or his attorney, on surrender of this certificate;" though, as already seen, a gift of shares may be executed by a transfer on the books without a delivery of the certificate.' [Ed. of 1895, sec. 2390.]

"The argument that national bank shares stand upon a different footing is not tenable, for it was held in Johnston v. Laflin, 103 U. S. 800, that, when a certificate of stock in a national bank was delivered

(with a blank power of attorney indorsed) as between
the parties thereto, the title to the shares then passed;
the right to the shares then vested in the purchaser.
'The entry,' said the court, 'of the transaction on the
books of the bank, where stock is sold, is required, not
for the translation of the title, but for the protection of
the parties and others dealing with the bank, and to
enable it to know who are its stockholders, entitled to
vote at their meetings and receive dividends when de-
clared. . . Purchasers and creditors, in the absence
of other knowledge, are only bound to look to the books
of registry of the bank. But as between the parties
to a sale, it is enough that the certificate is delivered
with authority to the purchaser, or any one he may
name, to transfer it on the books of the company, and
the price is paid.' And, again: 'The transferability
of shares in the national banks is not governed by dif-
ferent rules from those which are ordinarily applied
to the transfer of shares in other corporate bodies.'
In McNeil v. Tenth Nat. Bank, 46 N. Y. 325, the de-
livery of a certificate with the assignment and power
indorsed was held to pass the entire title, legal and
equitable, in the shares of a national bank, notwith-
standing that, by the terms of the charter or by-laws,
the stock was declared transferable only on its books.
'Such by-laws,' said the court, 'do not incapacitate the
shareholder from parting with his interest, and his as-
signment, not on the books, passes the entire legal
title to the stock, subject only to such liens or claims
as the corporation may have upon it, and excepting
the right of voting at elections,' etc. Judge Thomp-
son, in his usual clear and vigorous style, discusses
the doctrine of distinguishing between the legal and
equitable ownership of stock where the delivery of the
certificate is had, and approves that part of the opin-
ion of Judge Rapallo in the case last cited, and con-
cludes with the following observations of his own: 'So,
the legal owner of shares in a corporation is the owner

in whose name the shares stand on the books of the corporation, whereas the equitable owner is the one who, being the beneficiary—that is, the real owner— is not registered as such on the corporate books, and who must, if the corporation refuses so to register him, go into a court of equity to compel them to do so. The real meaning is that his title is complete as against everybody but the corporation itself, and those who have superior right to have the corporation make the transfer to them.' [Thomp. Corp. (1895), sec. 2393.].

"We are, therefore, of the opinion that it was not indispensable to the validity of the transfer of the stock in question, by our statutes or the law generally, that there should have been any writing on the backs of the certificates, and that an equitable title passed to Andy. This equitable title gave Andy full right to the stock, and equity should afford him the means of obtaining the possession of that incorporeal subject of gift—stock itself. The intent having existed in Judge Davis's mind to make the gift, and the stock certificates having been delivered, the legal title was complete as between Andy and his uncle, subject always, of course, to revocation or to the inherent conditions in gifts *causa mortis*. We need not consider the attitude of third parties or creditors, because none have appeared in this case. The donee, therefore, having an equitable title and a legal right, may enforce that right by the aid of equity. Many of the cases heretofore cited are where courts have extended their aid to give effect to gifts *causa mortis*. [1 Story, Eq. Jur., secs. 607 et seq.]"

The case that goes to the furthest extreme in upholding the doctrine of symbolical delivery of a chose in action, is that of Ebel v. Piehl, 143 Mich. 64. There the defendant had received property from his father upon a verbal promise to pay his sister $400 at his father's death; afterwards, in the presence of

his sister, he asked his father, "What do you want me to give Kate [the sister] when you die?" In reply the father said: "I told you you were to give her $400 at my death. I want you to give her writings." In reply, the defendant said that would be all right, and told his sister he would pay it; but the transaction was never reduced to writing. The plaintiff brought suit against the defendant in assumpsit to recover the $400. The defense was that the transaction was a gift *in futuro*, and was therefore void. The court, however, took the view that it was a gift *in praesenti* of a promise to pay in the future, and held the defendant liable. Unquestionably, that case on the principle of symbolical delivery was correctly decided.

Another case along the same line is that of Grangiac v. Arden, 10 Johns. 293. There a father purchased a lottery ticket which he declared he gave to his infant daughter Eliza, and wrote her name upon it, and after the ticket had drawn a prize, he declared he had given the ticket to his daughter Eliza, and that the prize money was hers. In that case the Supreme Court of New York held that the facts were sufficient for a jury to infer all the formality required to a valid gift, and that the title to the money passed *in praesenti*, was complete and vested in the daughter.

The came conclusion was reached by this court in the case of Shackleford v. Brown, 89 Mo. 546. There the controversy was over two notes, and whether they had passed as a gift *causa mortis* to the donees, the Hatchers. The material and important evidence in the case was the testimony of Mrs. Pulliam, as stated by the court, and was as follows:

"She stated that about a week before Mrs. Wetherholt's death, witness visited her at her home in Norborne. Witness further testified: 'She was reading the Bible, but put it up, and went and got her basket;

she came and sat down by me and said: "I have something to tell you; now pay attention to what I am saying." On taking a paper from her basket she said: "This is my will; if anything happens to me I want you to take charge of it;" and she said, "Here are two articles," taking a note book in her hand she said, "This is for Samuel;" she then took up a pocket book and said, "This is for William, and I want you to see that they get them; take them all to Clark Brown, and deposit them with him for safe-keeping; these articles and my will make all my children equal." On Saturday morning, the day of Mrs. Wetherholt's death, I again visited her, and Mrs. Wetherholt said to me: "I sent for you; I am going to die; do you remember what I told you about my papers?" I replied I did. She then said: "Take possession of and leave them with Clark Brown for safe-keeping, and do with them as I have told you." She did not take them in her hand, but pointed to the basket and told me to "take them;" and in her presence I took them and put them in my valise and locked it up and took it to another room.' "

This court in a *Per Curiam* opinion said: "On the authority of the cases of Walter v. Ford, 74 Mo. 198, and McCord v. McCord, 77 Mo. 166, the judgment in this case is hereby affirmed."

While in the case of Walter v. Ford, supra, the gift was held invalid, yet the court there, as stated in the case of Shackleford v. Brown, recognized the doctrine of constructive delivery of choses in action, etc. The same may be said of the case of McCord v. McCord, supra.

In the case of Waite v. Grubbe, 43 Ore. 406, the father, having buried several sums of money in various places about his premises, took his daughter to the whereabouts of the money during his last illness and while quite feeble, and told her definitely the several places where it was hidden, with a positive declaration

that he gave it to her, cautioning her not to let any-one else know where it was,. and advised her to leave it there until the place was rented or she needed it. The Supreme Court of Oregon held, that there was a complete delivery of the money by the father to the daughter, and that the transaction was a valid gift *causa mortis.*

We might go on indefinitely citing and reviewing cases where the courts of last resort of the various states of this country have held that all species of per-sonal property, whether corporeal or incorporeal, are proper subjects of *donatio mortis causa,* and that act-ual physical delivery of the subject of the gift must be made when practicable, or symbolical delivery when the nature or the location of the subject was such that. actual delivery could not be made, or where the existing conditions were such that a physical de-livery would be unreasonable; and in such cases the intention of the donor to part with the control of and dominion over the property given is a prime factor to be considered by the court and jury in passing upon the question of delivery.

From the foregoing review of the authorities, it is observable that there are many respectable authori-ties, both text-writers and adjudications, supporting the positions taken by counsel for both appellant and respondent. But by a close study of those cited by re-spondent, it will be seen that they are based upon some of the early English cases, adopting the civil law as to *donatio mortis causa,* at a time when there seems to have been a diversity of opinion among the jurists of that country as to what was really the civil law upon that subject.

As previously stated, Lord HARDWICKE under-stood it one way, while Lord ELDON expounded it in another. Respondent's cases lean to the views ex-pressed by the former, which in many instances prac-tically required a physical delivery of the subject of

the gift before the law would recognize the validity of a *donatio mortis causa*. It also appears that most of the cases relied upon by counsel for respondent are cases which were determined before choses in action were assignable, even in equity, or were based upon adjudications antedating that period, which, of course, not only refused to recognize a constructive delivery of such assignments, but, in fact, denied the existence of any legal right to assign choses in action as a gift or otherwise, however valuable the consideration paid might have been.

Some of the courts of this country have followed one or the other, and even both, of that class of cases, and, as a result thereof, we have at this day many cases which hold that money or property deposited in a bank, or in the hands of another; valuables stored in safety deposit companies; choses in action, and incorporeal property, etc., are not legitimate subjects of gifts either *inter vivos* or *causa mortis* without the consent of the bank in which the money is deposited, the safety deposit company having the custody of the valuables, or the debtor owing the debt. But notwithstanding that class of cases relied upon by counsel for respondent, the overwhelming weight of authority is in harmony with the position contended for by counsel for appellant—that is: that all species of personal property are proper subjects of gift, either *inter vivos* or *causa mortis;* and that where the intention to give is clear and unmistakable, accompanied by a delivery of possession consistent with and becoming to the nature, character and location of the property donated, the courts will not hestitate in holding such gifts valid. The difficulty the courts meet with in most cases in the administration of the rule contended for by counsel for appellant is one of fact as to what is sufficient delivery in the particular case, and not one of law, as declared by Lord HARDWICKE in Ward v. Turner, supra.

The inextricable conflict existing between the authorities cited by counsel for the respective parties to this suit has been one of the most fruitful sources of litigation mentioned in the books; and prior to the decision of the case of Leyson v. Davis, supra, apparently no attempt had ever been made to reconcile them, or to point out the reason of their divergence. In that case, however, Judge Hunt went a long ways in that direction, and in my feeble way I have, by this opinion, attempted to assist the bench and bar to completing the good work undertaken by him. The only apology I have to offer for the length of this opinion, is the fact that, if observed, it will assist to some extent, I hope, in lessening this class of litigation, and relieve the bench and bar of the arduous labor of wading through these complicated and vexed questions every time a suit of this character is brought.

Returning to the question in hand: was the manner of gift, namely, the delivery of the keys to the safety deposit box, a sufficient delivery of the contents thereof to appellant to constitute a valid *donatio causa mortis?*,

According to the authorities before considered, I have no hesitancy whatever in answering that question in the affirmative; provided, of course, as previously suggested, that all the other elements of a valid gift existed and concurred therewith. In other words, if the evidence in the case showed the *factum* of gift, and that Medley was *in extremis* when the gift was made, then the delivery of the keys to the box was a sufficient delivery of the contents thereof.

But this proposition will receive consideration in the next paragraph of the opinion.

III. We now approach the vital question presented for our determination, and that is, is the evidence preserved in the record sufficient to support a gift of this character?

It is conceded by all the authorities, that a greater weight of evidence is required in this class of cases than is required in ordinary cases, in order to receive the sanction and approval of the courts of the country. This must be true in the very nature of the transaction, and is based upon a wise public policy.

The personal property of every man during his lifetime is either actually or constructively in his possession; and, when death occurs, by operation of that fact the possession of that portion which he had in his actual possession, as a matter of fact, passes into the constructive possession, at least, of those in possession of the premises in which he dies; and as regards the property of which he had only constructive possession, all evidences of that possession which he has about his person and in the premises in which he dies likewise passes to those left in charge thereof, and there remains until it is delivered to or taken possession of by the executor, administrator or other lawful authority.

Under those conditions, if it was not for this wise and wholesome rule regarding the greater weight of the evidence, any unscrupulous and designing person could despoil the dead of his estate by taking actual possession of the personal property about the body and premises, and also possession of the muniments of title to all the personal property of which he had constructive possession, and then set up the claim of *donatio causa mortis*, and produce as evidence thereof his possession of both the property on hand and the muniments of title to that which was deposited elsewhere; and with the testimony of only one witness, and, perhaps, by slight corroborative circumstances, establish his concocted scheme, which had no existence whatever in fact. The temptation to fraud incident to such claims has been recognized and guarded against by the law of all countries where this species of conveyance has been recognized.

Justinian in his Institutes provided that such gifts should be witnessed by at least five persons; and without that important fact, under the civil law, the gift, however just and formal, otherwise had to fail. The lawmakers of the Roman Empire wisely thought it better to let a few meritorious gifts of that character fail than to open wide the door to fraud and perjury, which would be sure to follow without some such restriction or safeguard thrown around them by law. While England, in the adoption of the civil law upon this subject, did not adopt that precaution in all its stringency, she did, nevertheless, reserve to her courts the power and authority to require the strictest proof in all cases of gifts of this character. The proof demanded was of the clearest and most convincing character, leaving no reasonable doubt as to the donor's intention to give, and that his intention was completely executed by an unconditional delivery of the subject-matter of the gift to the donee, during apprehension of approaching death on his part.

The various States of this country, either by statute or by the adoption of rules of evidence similar to those in force in England, have thrown such safeguards around this class of gifts that it has become almost impossible to get through the courts a fraudulent claim of this character.

While this State has enacted no statute upon the subject, nor has she adopted the civil law requiring five witnesses to such a gift, yet she demands evidence of a character as high and more convincing to the judicial mind than is required by the courts of England, and by those of most of the States of this Union.

This idea of strict proof in this class of cases was adopted by the courts of Missouri in conformity to the wise policy requiring strict proof of nuncupative wills, oral agreements to dispose of real esate to another after one's death, in consideration of personal services performed during his life, and in all other

cases where the other party to the transaction is dead, insane, or otherwise incapacitated from testifying in the case. All of those classes of demands have been uniformly looked upon by the courts of all nations with a jealous eye; and the evidence adduced to establish any of them in a court of justice should be weighed in the most scrupulous manner, and pronounced wanting whenever its overwhelming probative force is lacking and fails to convince the judicial mind of its truthfulness beyond a reasonable doubt. It is far better for society that even some meritorious cases of this character should fail for want of this strict proof than to open the doors to the sepulchers of the dead, and expose their estates to the fraudulent claims of designing and dishonest men. And, as was said by this court in the case of Wales v. Holden, 209 Mo. 558, where a similar question was before the court: "If this contract can be specifically enforced upon the proof as made in the trial of this cause, then we confess that it furnishes strong reasons for alarm on the part of every citizen who has accumulated property, when he realizes the slender foundation upon which rest the rights of those who are entitled to it after his death." To the same effect are the following cases: Rosenwald v. Middlebrook, 188 Mo. 101; Asbury v. Hicklin, 181 Mo. 675; Kirk v. Middlebrook, 201 Mo. 254.

We will now return to the evidence in the case at bar, and determine whether or not it measures up to the standard of weight before mentioned.

Edwin Foley, the eighteen-year-old son of appellant, was the only witness who was present at the time the alleged gift was made by Medley to her; and, consequently, this gift must largely stand or fall upon his testimony.

On direct examination he testified:

"Q. At the time he [Medley] gave her [the appellant] the keys what did he say to her, as near as you can give it? A. Well, he called her over to the

bed, and he said, 'Mrs. Foley, here are the keys to my safety deposit box; I will give them to you; what is in there belongs to you; you will find Johnnie's money there also.'

"Q. What did your mother say to that—just a moment, did your mother take the keys? A. Yes, sir. Q. What did she do with them? A. She put them away in the book case."

On cross-examination he testified, that he had talked the transaction over with his mother four times before the suit was brought, and three or four times with appellant's counsel before it was brought, and about the same number of times subsequent to that time, and before the day of the trial; also that he had given his deposition in the case previous to the date of the trial, and had never told the appellant or her counsel the same story twice regarding what he had heard Medley say to her about the alleged gift.

He was then asked if he could give the language of Mr. Medley, and he answered: 'I don't know as I can give the same language.' Q. Well, give it just the best you can. What did he say? A. Well, he said, 'Mrs. Foley, here are the keys to my safety deposit box; I give them to you; what is in there belongs to you; you will find Johnnie's money there also.' "

In this connection his deposition was shown him, where he testified that Mr. Medley said to appellant, "Mrs. Foley, here are the keys to my safety deposit boxes," and when asked why he said safety deposit box at the trial and boxes in the deposition, he said, "I don't remember of saying boxes," but would not say that he did not so state.

"Q. 'They are yours; what is in them I will give it to you.' Now you say, 'what is in there belongs to you.' That is the way you say it to-day. 'They are yours; what is in them I will give it to you.' 'You will find Johnnie's money there also.' Now, which is cor-

rect, that you said then or that you said to-day? A. What I say now is correct, I know.

"Well, then, you say then that if you said that there, that is not correct? A. No, sir; I don't say it ain't correct.

"Q. How do you account for making two different statements, if you made them? (Witness makes no response.)

"The Court: "Do you understand the question, Edwin?

"(Question read by the reporter.)

"(Witness makes no response.)

"Q. Well, let's drop that. We will pass on. Now, you say you had this deposition in your hands for several days. Since when did you say—Thursday? A. Yes, sir.

"Q. Well, now, don't you remember anything it contains? What did you get it for? What was it given to you for? A. Well, I read it over is all.

"Q. You read it over to see what you said on that occasion, didn't you? A. Yes, sir.

"Q. Now, do you recollect that you stated that conversation that you say took place between your mother and Mr. Medley at the time she got those keys,—do you recollect that you stated it twice differently in this deposition? A. That in there I stated it twice different?

"Q. Yes. A. No, sir.

"Q. You remember stating it twice, this conversation, in this deposition, don't you? A. Yes, sir.

"Q. Do you think it is just the same? A. I don't know as it is just the same.

"Q. Now, here is what you say the second time here. Here is the deposition, Mr. Foley, the one I showed you and the one you signed. Just read that. You can read, can't you? A. Yes, sir.

"Q. Yes, I want you to read the answer to that question. A. 'Mrs. Foley, here is the keys to the safe-

ty deposit box; I give them to you and all the money there is in there I give to you, and Johnnie's money is there, too.'

"Q. Well, now, was that the conversation that you heard there? A. I don't know whether it is exactly or not.

"Q. Oh, I know, but in the first question you answered there, the first time you detailed this conversation you say that everything that was in that box was hers, now in this one you say that the money that was in there was hers, that the old man said so, don't you? A. I don't remember of ever saying anything about money; I know Johnnie's money was mentioned.

"Q. Do you tell the jury that you didn't swear on the taking of this deposition this: 'Mrs. Foley, here is the keys to the safety deposit box; I give them to you and all the money there is there I give to you, and Johnnie's money is in there, too?' Now, didn't you use that language? A. I don't recall ever saying that.

"Q. Do you swear that you didn't do it? A. No, I don't swear.

"Q. Why did you state here 'Mrs. Foley, here is the keys to the safety deposit box; I give them to you and all the money there is in there?' Why did you make that statement? Was that what the old man said? A. I know he spoke in connection with Johnnie's money.

"Q. Well, this is not in connection with Johnnie's money. A. I don't remember saying anything about the money in there.

"Q. Would your memory be better now to-day here than it was in December? A. No, sir. .

"Q. It ought to have been better then, oughtn't it, than now? It was nearer to the time. It ought to have been just as good? A. Yes, sir.

"Q. Then, if you said that, why did you say it, if it wasn't true?

(Witness hesitates.)

"Q. Can you answer? (Witness makes no response.)

"Q. If you decline to say so, just say so, and that ends the business. Do you want to answer it or not? A. Well, I know it was in connection with Johnnie's money.

"Q. Oh, of course, it was in connection with Johnnie's money, because he mentions Johnnie's money right there next? A. Yes, sir.

"Q. But the answer is this: 'I give them to you' (that is, the keys) and all the money there is in there I give to you, and Johnnie's is in there, too.' Of course, he speaks about Johnnie's money. You are right on that. I am not understanding you to say that is wrong or the other is wrong, but I am just saying—asking you now why you stated that the old man said that all the money that was in there belonged to your mother and he gave it to her, if it wasn't true? Why did you make that statement? (Witness hesitates.)

"Q. Can you answer it? (Witness makes no response.)

"Q. Oh, if you can't answer it, just say so, and we will go on.

"The Court: Do you understand the question, Edwin? A. Yes, sir.

"The Court: Well, can you answer it? (Question read by the reporter.)

"Q. Well, he can say he can't answer it.

"The Court: Answer the question, Edwin.

"(Question again read by the reporter.)

"The Court: Do you know what statement he is talking about? A. Yes, sir.

"The Court: Well, then, answer the question; why did you make that statement? A. I don't know.

"The Court: He says he don't know."

This testimony is by no means satisfactory and convincing.

It is not a plain straightforward statement of a transaction witnessed by a frank person, stating the truth in such a manner as to carry weight and conviction with it. It is contradictory upon material points, uncertain in character, hesitating in delivery, and shows a want of clear conception of what took place upon the occasion of the alleged gift. It falls far short of the weight required by the rules of evidence before mentioned, and its probative force and convincing power is lacking in that same proportion. Instead of satisfying the judicial mind beyond a reasonable doubt, as it should, it excites suspicion therein, and impresses one with the wisdom of the saying, that courts of justice view such claims with a jealous eye, and demand strict proof thereof. While there is some corroborating testimony, such as the history of the parties thereto, their friendship toward each other, the strained relations that existed between Medley and his brother, his only heir-at-law, and the testimony of his sister to the effect that Medley told her that he had so arranged his affairs as to protect them from want. This evidence, however, does not go to the heart and soul of the transaction itself; in only tends to bolster up and strengthen a weak, uncertain, vacillating and contradictory narration of the alleged gift. It adds form, but not life to Edwin Foley's testimony; and no court, in our judgment, would be justified in diverting the estate of John Medley from its legitimate channels into the possession and ownership of strangers thereto. If such a disposition of property could be upheld upon that character of testimony, then there would indeed be but little, if any, protection to the heirs and devisees of the estates of deceased persons. The pedestal upon which their rights are bottomed would be undermined, upon a honey-combed sub-structure, liable to be completely undermined at any moment with but little effort, and fail for want of that

proper legal support which is the boast of our civilization.

If this transaction should be tolerated, then it would practically erase from our Constitution the italicized portion of that provision which guarantees to all the right of life, liberty *and property*.

From the views thus expressed, it must follow that the order and judgment of the trial court granting a new trial must be affirmed; and it is so ordered, with directions to the trial court to try the case anew in harmony with the views herein expressed.

All concur, except *Valliant, J.,* absent.